IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NUMBERS: |
| | : | |
| KELLY MEGGS, and | : | 22-cr-15-APM-2 |
| CONNIE MEGGS, | : | 21-cr-28-APM-9 |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE MARITAL COMMUNICATIONS**

The messages that Defendant Kelly Meggs sent to his adult family members (including his wife and co-conspirator Connie Meggs) on the night of November 3, 2020, about Speaker of the House Nancy Pelosi should not be excluded. The motion in limine filed by Kelly Meggs (*Rhodes* ECF No. 221) and Connie Meggs (*Crowl* ECF No. 719) should be denied.

**FACTUAL BACKGROUND**

Pursuant to a search warrant, the FBI recovered and searched Defendant Kelly Meggs' iPhone. The extraction from the iPhone shows that, on the night of Tuesday, November 3, 2020 (election night), at 7:54 PM EST,[1] Kelly Meggs wrote two messages to a group text chain called "Family chat" containing his wife (and co-conspirator) Connie Meggs and his then-21-year-old son Zack Meggs, stating, "I'm gonna go on a killing spree," and then 10 seconds later, "Pelosi first." Connie Meggs replied one minute later, "Shut the fuck Up[.] Your getting me stressed."

---

[1] The time on the messages is "UTC +0," which at this time of the year is five hours ahead of Eastern Standard Time. Thus a timestamp of 11/4/20 at 12:54 AM UTC corresponds to a true time of 11/3/20 at 7:54 PM EST.

1

Immediately preceding Kelly Meggs' messages, Connie Meggs had written, "Trump wins Kentucky I'm so nervous."

According to the extraction from Kelly Meggs' iPhone, he and Connie Meggs had a message thread with just the two of them that contained over 5,000 messages. The messages in question were *not* sent to the private thread. Rather, they were sent to the group thread "Family Chat."

Kelly and Connie Meggs' adult daughter Danielle started the thread in question on October 3, 2020. At the time, the thread was unnamed. The members of the thread were Kelly Meggs, Connie Meggs, Danielle Meggs, and Zack Meggs. Danielle removed herself from the thread on the morning of October 30, leaving her parents and brother as the remaining members. On the afternoon of October 30, however, Kelly Meggs added Danielle back to the thread and provided the previously unnamed thread with the name of "Family chat." At the same time, Kelly Meggs wrote to the thread: "I added Danielle back in and renamed the chat."

On November 1—two days later—Danielle again removed herself from the thread, leaving her parents and brother as the remaining members. Each of these three individuals sent at least one message to this thread over the next three days.

On the night of November 3, Kelly Meggs sent the messages in question to the "Family chat" thread. The text chain contains messages from Zack Meggs just before and after the messages in question. At 6:54 PM EST (approximately one hour prior to the messages in question), Zack Meggs sent a message about USF banning a club; one minute later Kelly Meggs sent a message with a laughing/crying face emoji; and finally, sixteen minutes later Connie Meggs wrote, "Haha."

Then, at 8:01 PM EST (approximately 7 minutes after the messages in question), Connie Meggs wrote to the thread, "But still to many people voted for Biden wtf is wrong with people I hate them."  Five minutes later, Kelly Meggs wrote, "Trump now has the lead in Florida.  The red counties just poured in and that includes Tallahassee. So we are good."  Finally, six minutes after that, Zack Meggs wrote, "You guys are so behind wtf."

## ARGUMENT

The messages from Kelly Meggs to Connie Meggs and Zack Meggs should not be excluded, for three reasons.  First, the messages were not privileged, because they were not made in the confidence of a marriage.  Second, even if any privilege did exist, it is voided by the crime-fraud exception.  Finally, the messages should not be excluded under Federal Rule of Evidence 403.

### I.      LEGAL STANDARD

There are two types of marital privileges.  First, the "confidential marital communications privilege" "protects from disclosure private communications between the spouses in the confidence of the marital relationship."  *S.E.C. v. Lavin*, 111 F.3d 921, 925 (D.C. Cir. 1997) Second, the "adverse spousal testimony privilege" provides that one spouse can neither be compelled nor foreclosed from testifying against the other.  *Id*.  Here, only the confidential communications privilege is implicated.

The confidential marital communications privilege has four prerequisites: "(1) there must have been a communication, (2) there must have been a valid marriage at the time of the communication, (3) the communication must have been made in confidence, and (4) the privilege must not have been waived."  *Id.*  The privilege is "narrowly construed."  *See id.* at 929

("Generally, the considerations that support a strict approach to waiver in the attorney-client context would appear to apply as well in the marital context: while both privileges serve to promote important public interests by encouraging full and frank communications within special relationships, they must be narrowly construed because of their adverse effect on the full disclosure of truth.") (internal quotation marks and citations omitted).

"The burden is on the proponent of [a] privilege to demonstrate that it applies." *Federal Trade Commission v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018); *United States v. Acker*, 52 F.3d 509, 514-15 (4th Cir. 1995) ("The party asserting an evidentiary privilege, such as the marital communications privilege, bears the burden of establishing all of the essential elements involved.") (quoting *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991)).

## II.    THE MESSAGES WERE NOT PRIVILEGED

The messages from Kelly Meggs were not privileged, because the presence of his son on the text message thread indicated that he did not have an expectation of privacy to make a protected spousal communication to his wife. "The presence of a third party negatives the presumption of privacy." *Perreira v. United States*, 347 U.S. 1, 6 (1954). Almost 100 years ago, the Supreme Court succinctly explained that communications between spouses in the presence of others are not protected by the common-law marital privilege:

> Communications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged; but wherever a communication, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential it is not a privileged communication. And, when made in the presence of a third party, such communications are usually regarded as not privileged because not made in confidence.

4

*Wolfle v. United States*, 291 U.S. 7, 14 (1934) (citations omitted). "Although 'communications' between spouses are presumed to be confidential, this presumption is rebutted when the communicant knew that the information was or would be disclosed to third parties or to the public." *In re Witness Before the Grand Jury*, 791 F.2d 234, 239 (2d Cir. 1986) citation omitted).

Simply, the fact that a spouse believed his communication would be read by persons other than his wife means that the communication was not a privileged marital communication. *See United States v. Etkin*, No. 07-CR-913, 2008 WL 482281 (S.D.N.Y. Feb. 20, 2008) (defendant not permitted to claim marital communications privilege for emails sent on employer's computer where flash screen warning notified users that they had no expectation of privacy when using computers).

Here, Kelly Meggs knew or should have known that his adult son would have access to the text messages in question. Indeed, his adult son had been texting with both of his parents *on the same thread* just before and after Kelly Meggs sent the messages. And the use of the plural *guys* in Zack Meggs's 8:12 PM EST message ("You guys are so behind") indicates that he was addressing both of his parents when he sent his message, which is further evidence that all three were on the same text thread.

Kelly Meggs' messages about wanting to kill Speaker Pelosi were not sent "in confidence" of his marriage, and thus they are not privileged.

### III.   ANY PRIVILEGE IS VOIDED BY THE CRIME-FRAUD EXCEPTION

Even if the messages were initially privileged, they fall within an exception to the privilege, namely the crime-fraud exception. *See United States v. Ammar,* 714 F.2d 238, 257 (3d Cir. 1983) (relying on the principles of the crime-fraud exception to the attorney-client privilege, holding that

communications between spouses pertaining to ongoing or future criminal activity not protected by marital communications privilege); *see also United States v. Estes*, 793 F.2d 465, 466 (2d Cir. 1986) ("[C]onfidential marital communications concerning ongoing criminal activity are not protected by the privilege.").[2]

Kelly and Connie Meggs were co-conspirators in conspiracies to obstruct Congress's official proceeding and to prevent officers of the United States (i.e., members of Congress) from discharging their duties. At the time, Nancy Pelosi was the Speaker of the House of Representatives and one of the most prominent Democratic members of Congress. From this message thread—and other evidence the government intends to introduce at trial—it is apparent that Kelly Meggs wanted the Republican nominee for president, President Trump, to prevail in the election over the Democratic nominee and for President Trump to remain in office.

The focus of the "joint criminal participation" exception to the marital communications privilege is actual participation in the criminal activity; it does not matter if only one spouse, in fact, was prosecuted for the criminal activity. *United States v. Hill*, 967 F.2d 902, 912 (3d Cir. 1992); *see also United States v. Parker*, 834 F.2d 408, 413 (4th Cir. 1987) ("[J]oint participation exception to the confidential marital communication privilege extends to statements made in the course of successfully formulating and commencing joint criminal activity."); *United States v. Neal*, 743 F.2d 1141, 1446 (10th Cir. 1984) ("[M]arital communications having to do with the

---

[2] The defendants note that there is a circuit split on whether to recognize a joint-participation exception to the adverse spousal testimonial privilege. Mot. at 7. But that has no impact on the apparently universal recognition of a joint-participation exception to the marital communications privilege. Indeed, in *United States v. Tejeda*, No. 15-CR-215-01/02-JL, 2017 WL 3396527, at *3 (D.N.H. Aug. 8, 2017), on which the defendants rely in the motion, the court specifically noted the distinction in the exception between the two types of privileges.

commission of crime and not with the privacy of the marriage itself, do not fall within the privilege's protection."). As the Second Circuit explained after the Supreme Court's decision in *Trammel*, "[a] person desiring to enlist the aid of his spouse as an accomplice cannot now be sure that he is not creating another potential witness; he takes the risk that the spouse may choose to testify." *In re Grand Jury Subpoena*, 755 F.2d 1022, 1026 (2d Cir. 1985), *vacated and remanded as moot*, 475 U.S. 133 (1986); *see also United States v. Van Drunen*, 501 F.2d 1393, 1397 (7th Cir. 1974) (noting that the public interest in preserving the family "does not justify assuring a criminal that he can enlist the aid of his spouse in a criminal enterprise").

The government intends to present evidence at trial that as early as election night 2020, Kelly Meggs formed the intent to do whatever was necessary to prevent Joe Biden from assuming the presidency. Kelly Meggs intended to stop Congress's certification of the Electoral College vote, and that as part of that scheme, he specifically targeted Speaker Pelosi. Connie Meggs shared his intent. They traveled together from Florida to DC, stopping to deposit firearms at the Quick Reaction Force hotel in Arlington. They entered the Capitol together. And they spent most of their time inside the Capitol with each other, in the area just outside of Speaker Pelosi's office. Finally, on the evening of January 6, Kelly Meggs had the following text message exchange with another man affiliated with the Oath Keepers:

- Meggs:   We busted in.
- Other man: Was hoping to see Nancy's head rolling down the front steps.
- Meggs:   We looked forward[3] her.

---

[3] This was likely a typographical error with Meggs meaning to write, "We looked *for* her."

7

Therefore, even if the messages were privileged, the privilege is voided by the crime-fraud exception.

### IV. THE MESSAGES SHOULD NOT BE EXCLUDED UNDER RULE 403

The defendants argue that Kelly Meggs' messages should be excluded because they are "more prejudicial than probative," citing to Federal Rule of Evidence 403. Mot. at 10. But that is *not* the standard under Rule 403. Rather, under Rule 401, relevant evidence is presumptive admissible, and it is excluded under Rule 403 only "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. All evidence tending to show a defendant's guilt is "prejudicial." *See Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977) ("'[U]nfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'"). Unfair prejudice means "an undue tendency to suggest decision on an improper basis." Fed. R. Evid. 403, Advisory Committee's Note. The evidence should be excluded only if it is *unfairly* prejudicial, and only then if its probative value is *substantially* outweighed by that prejudice.

Here, there is no danger of unfair prejudice. On election night 2020, when he thought that President Trump was going to lose the election, Kelly Meggs clearly expressed his intent to his wife and child that he was so displeased that he wanted to kill Speaker Pelosi. Just two months later, with an arsenal across the river and 13 co-conspirators at his side, he breached the Capitol building and made his way to the area outside of Speaker Pelosi's office. His statements are probative of his intent. And they are not unfairly prejudicial.

For similar reasons, the exchange between Kelly and Connie Meggs is probative of Connie Meggs' intent. These messages reflect her intense dismay at the prospect of President Trump losing the election. Just a week after election day, Connie Meggs submitted her application to join the Oath Keepers, and on January 6, 2021, she followed Kelly Meggs into the Capitol, through the Rotunda, and towards the House side of the building. Late on the night of January 6, 2021, Connie Meggs sent a text message to her friend describing the events of the day: "Antifa went up there dressed as trumpers but trumpets heard about mike pence being a faggot and everyone went to the capital to stop the vote and police." These messages from election night provide important context to the message from the night of January 6 and her conduct earlier that day. For these reasons, these messages are also probative to the question of Connie Meggs' intent and are not unfairly prejudicial.

## CONCLUSION

The government respectfully submits that the messages should not be excluded.

        Respectfully submitted,

        MATTHEW M. GRAVES
        UNITED STATES ATTORNEY
        D.C. Bar Number 481052

By:    /s/
        Jeffrey S. Nestler
        Assistant United States Attorney
        D.C. Bar No. 978296
        Ahmed M. Baset
        Troy A. Edwards, Jr.
        Louis Manzo
        Kathryn Rakoczy
        Assistant United States Attorneys
        U.S. Attorney's Office for the District of Columbia
        601 D Street NW
        Washington, D.C. 20530

                /s/
Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division,
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20004