IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal No. 1:22-cr-00015-APM** |
| **KENNETH HARRELSON** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANT KENNETH HARRELSON'S AMENDED MEMORANDUM OF LAW IN
SUPPORT OF HIS OPPOSITION TO THE GOVERNMENT'S MOTIONS IN LIMINE
(ECF 213, 214, and 215) REGARDING ANTICIPATED TRIAL EVIDENCE**

Defendant, Kenneth Harrelson, by and through undersigned counsel, and pursuant to this

court's Pretrial Order, dated May 12, 2022, (ECF 133), hereby file this Opposition Memorandum

of Points and Authorities to the Government's three (3) Motions in Limine (MILs) (each

compound on several topics), docketed at ECF 213, 214, and 215.

ECF 214 seeks to bar the Defendants from submitting evidence during trial to include: (1)

the actions or inaction of law enforcement officers at the Capitol on January 6, 2021; (2) the

actions of rioters at other, unrelated events, and the status, disposition, and pendency of cases or

charges involving those other rioters; and (3) purported diminished mental or physical capacity

of any defendants.  (ECF 214).

In ECF 213, the government seeks to prohibit not only the public authority defense, but

also to preclude the defendants from raising an e*ntrapment-by-estoppel defense* at trial narrowly

focused on the premise of total inaction of law enforcement officers being unable to change the

law (but ignoring changes to the factual scenario).  The motion argues that inactivity by officers

cannot make lawful conduct that would otherwise be lawful.  (ECF 213).

In ECF 215, the Government seeks to prohibit cross-examination of one or more Secret Service agents whom apparently the prosecution intends to call to testify.  However, as with all of the MILs, the first ground or issue stated is unremarkable, followed by far more serious, more objectionable, and more unworkable later issues sort of slid in near the end.

Kenneth Harrelson submits that these motions are too broad and premature.

As the government submitted, Seditious Conspiracy under 18 § U.S.C. 2384 is a specific intent crime, as is obstruction under 18 § U.S.C. 1512(c).  *United States v. Rahman*, 189 F.3d 88, 130 (2nd Cir. 1999); *United States v. North*, 910 F.2d 843, 881 (D.C. Cir. 1990).  Knowingly entering a restricted area is a specific intent crime under 18 U.S.C. 1752(a)(1) requiring knowing that an area is restricted (which requires knowing the boundaries of the area) and knowingly entering a restricted area without authorization.  Destruction of government property under  18 U.S.C. 1361 is a specific intent crime ("Whoever willfully…")

At the outset, we should remember that the Honorable Judge Amit Mehta in a motion hearing on April 8, 2022, repeatedly and strenuously emphasized that everything in this case is about the Defendant's intent.  Judge Mehta then ruled on that basis upon several motions as to a continuance and accelerated discovery procedures.  That is, the idea that this case is about intent was not a random or idle thought but a necessary part of important rulings.  Judge Mehta sought to narrow the scope of the trial.  The intent specified in each statute is required because it is an explicit element of the crimes that must be proven beyond a reasonable doubt.  The Defendants are not guilty if the necessary intent is not proven beyond a reasonable doubt, including the possibility of alternate explanations for each action.  Furthermore, conspiracy specially requires a showing of the relevant intent specified in each charge.

The Government's proposed limitations fail because they do not address tangential issues, but they gut the very core of what appears to be the prosecution's case. The prosecution cannot present only some of the topic of the charges while arbitrarily excluding other aspects of the same criminal charge. Again, the Government errs because these are not tangential matters.

A motion in limine was denied in a court where,

> "[t]he defendants' willingness to discuss their activities with a DEA agent may suggest a lack of knowledge because they did not flee or hide their activities from law enforcement. See Id. at 2304 n.1 (stating knowledge can be shown through direct and circumstantial evidence, including evidence of "a defendant's concealment of his activities" and "evasive behavior with respect to law enforcement"); *United States v. Makkar*, 810 F.3d 1139, 1147-48 (10th Cir. 2015) (stating the court had a "hard time imagining more powerful proof" of lack of knowledge than that the defendant "turned to law enforcement for information about the drug's composition and offered to suspend sales until tests could be performed")

*United States v. Ritchie*, 2018 U.S. Dist. LEXIS 210267, *11-12, 2018 WL 6580570.

This is relevant by way of analogy, because there is video and evidence of these Defendants inside the Capitol coming to the rescue of Officer Dunn, Meggs assisting police and exchanging pleasantries while he directs foot traffic upon his exit, and, after Meggs and Harrelson exited, why they would stand by police in a comfortable and easy communion where it was even requested of them that they guard a broken window that Hunter Ehmke had broken. They can be seen chatting amicably with police officers, and they "did not flee or hide from law enforcement." This similarly relates to intent.

One police officer went looking for Oath Keepers, and explicitly asked these Oath Keepers to go into the U.S. Capitol, to help extract his fellow officers from the building.[1] They did and exited in a line with this officer and other U.S. Capitol Police. We have the explicit

---

[1] https://www.newsy.com/stories/video-capitol-officer-works-with-rioters-to-help-others/

request by the U.S. Capitol Police for members of the Oath Keepers to come into the U.S.

Capitol with him and to provide assistance to the U.S. Capitol Police.  And they did so.



A video without the journalist's commentary can be accessed at: January 6: US Capitol

Police ask Oath Keepers for Help (rumble.com). As reported by the Epoch Times,[2] "[i]n the

video, Lt. Tarik Khalid Johnson asks a group of men to help him get more than a dozen trapped

Capitol Police officers out of the Capitol and through a tightly packed crowd of protesters on the

building's east steps. It was widely reported in January 2021 that Johnson wore a red Make

America Great Again cap on Jan. 6 as a ruse to "trick" supporters of President Donald J. Trump

into helping him rescue fellow officers from the Capitol. He was later suspended for wearing the

MAGA cap. Johnson is a registered Democrat, according to online records."  And "In the middle

of the afternoon on Jan. 6, Lt. Johnson appeared on a terrace area near the bottom of the east

stairs at the U.S. Capitol. He approached a group of Oath Keepers for help.  If you guys can help

---

[2]      https://www.theepochtimes.com/video-of-oath-keepers-rescuing-16-police-officers-deflates-jan-6-sedition-narrative-attorneys-say_4456393.html

me save some of the guys," Johnson said to two Oath Keepers. "If you can help me get aside these people, I'd appreciate it. I just need to get these other officers out. They're scared.  See also https://www.theepochtimes.com/jan-6-oath-keeper-charged-with-seditious-conspiracy-says-he-was-helping-get-law-enforcement-out-of-the-building_4331369.html.

The Oath Keepers chief medic for the mission of that day – the mission being to provide security to lawful First Amendment demonstrations – who is a doctor, was effectively "detailed" from the Oath Keepers to assist the U.S. Capitol Police and Washington, D.C., Metropolitan Police Department to provide first aid to police officers and others at the U.S. Capitol.  African American Michael (Simmons) Greene who was in charge of all Oath Keeper operations in D.C. on January 6 volunteered the Oath Keepers' help.  Whereupon, the Oath Keepers' volunteer doctor spent hours working under the authority of the U.S. Capitol Police at the Capitol.

We intend to show up to one dozen instances when the Oath Keepers came to the assistance of police or rally attendees.

Video shows that Oath Keepers James, Minuta and Walden all seem to receive different forms of permission that seem to have more compelling expressions of assent by police officers than Defendant Matthew Martin received from these officers in his trial that resulted in his acquittal by Judge McFadden.[3]

As proven in the subsequent surveillance videos, James strolls in right behind the cops and is let in and momentarily being paused and he gestures back to Minuta.  Minuta follows, but a police officer momentarily stops him.  Minuta steps back and shows him the seal on his Oath Keepers shirt. They have an exchange and the police officer tugs his arm in a bit as Minuta walks

---

[3] https://www.npr.org/2022/04/07/1091392445/jan-6-riot-acquittal

by. James is in front of him here and Walden has the goggles on above and left. He looks very patient.





Thus, Minuta is stopped momentarily – and he complies – until the U.S. Capitol Police recognizes Minuta as an Oath Keeper, whereupon the U.S.C.P. officer then allows Minuta into the Capitol with a friendly gesture.

After Minuta walks in with a friendly tug by the officer, Walden and his dog are stopped. We don't know why Walden was initially stopped, whether it was a concern about granting his dog access or whether he did not realize he was an Oath Keeper that has this special relationship with police, but you can see this police officer's right hand on Walden's shoulder as the police officer pulls him in with significant force.



These events occurred after Defendant Harrelson entered the Capitol but it provides

multiple contextual examples where Oath Keepers were invited or permitted into the Capitol under a variety of circumstances.  The fact that police searched out different Oath Keepers for escorts shows the longstanding relationship between Oath Keepers and law enforcement that the Government has all but erased when evaluating any of the circumstances around Defendant Harrelson's entrance into the Capitol.  With good reason, he believed his efforts would be welcomed and he rescued a police officer in the exchange that landed him in solitary confinement without any criminal record.

Next, the Government also seeks to exclude entrapment-by-estoppel based on inaction. The Government misunderstands.  First, views of the officers caught on video show conduct of affirmative agreement for the entry of demonstrators into the Capitol, not inaction.  The evidence shows affirmative welcoming of demonstrators.   The Defendants are not necessarily arguing inaction. Second, inaction is not limited to just one category, depending on the context.  Third, this destroys the prosecution's necessary task of showing intent.  Even if the officers did display merely inaction which might not constitute entrapment, it would nevertheless destroy any charge of intent by the Oath Keepers to knowingly enter a restricted area or to seek to disrupt anything. The question is not whether the demonstrators were correct or incorrect about having a legal right to be in the Capitol, but whether they reasonably believed they were allowed to enter based on the officer's expressions of agreement with them walking in.   None of the Government's cited precedents are remotely relevant to this.  The charges are not, in fact, trespassing, but close. The statute at issue concerns _knowingly entering_ a restricted area _without authorization_.   Thus, a mistaken belief that people were allowed to enter would defeat the intent of "knowingly" even if the entrants, in fact, had no lawful status to be present.  That intent – and an apparent invitation to enter – is from the stand point of the beholder, the entrant, not from the perspective of the law

enforcement officer.  If an officer were to gesture in way that a reasonable, objective person might view it as a gesture of agreement that people enter – particularly where the public, open status of the building is the norm.  The U.S. Capitol Police are normally engaged in welcoming visitors.  And the building is host to tours even of schoolchildren.

Furthermore, the MIL focuses on the idea of police officers being able to change the law. But that's not what is at issue.   Defendants are not arguing that the officers changed the law, but rather the operative facts.  The MIL is misplaced because implied or apparent authorization to enter can and does render entry into the building lawful.  The law does not change.  But the operative facts can change the legal result.  The argument cited from *United States v. Gutierrez-Gonzalez* is that an officer cannot sanction unlawful conduct.  But the conduct is not unlawful if it is agreed to.  Accepting entry into the building makes the conduct (of entering) lawful.  It is not a change of law but of fact.  A person may not enter my home without permission.  But if I say "Sure come on and, what do you want to talk about late at night?" the law has not changed. But the operative facts and result has changed what is illegal to legal.

To start with, it should be remembered that parties can object to questioning when the question is asked at trial, which will then occur in the context of a foundation being laid and an entire thread of issues.  The MILs seek to short-circuit the normal procedures for objections.

In the Government's MIL at Dkt. # 214, the Government wishes to "preclude the following evidence during trial: (1) the actions or inaction of law enforcement officers at the Capitol on January 6, 2021;"  Yet the Government also seeks to prosecute the Defendants for their supposed interactions with those same law enforcement officers.  The Court cannot hear only one side of the same story. Furthermore, the prosecution seeks to smear the Defendants in guilt by association.  The prosecution contends that "a mob needs a leader" which is patently

false, and almost the opposite of the definition of a "mob." The prosecution essentially argues that because the Oath Keepers were in Washington, D.C., and some persons brawled, therefore the Oath Keepers must have caused it. The Congress' failure to marshal a significant number of its officers for a very important day may not suggest any fault by officers or excuse for the brawlers. But the actions or omissions of the officers might very well refute the suggestion that the Oath Keepers caused any of it merely by responding to assist or standing idly by.

Furthermore, in the MIL at Dkt. # 214, the Government wishes to "preclude the following evidence during trial: … (2) the actions of rioters at other, unrelated events," However, the prosecution's entire case is of a vast, though nebulous and vague, conspiracy in which nearly 500,000 demonstrators all had the same motivations, the same intent, and the same plan. Thus, the prosecution cannot present its case without the imprecise and unfounded assumption that all of the demonstrators everywhere in D.C. were all part of one big unity.

For example, the fact that Ray Epps ran all over the area urging people, using common rhetoric, to go into the Capitol, but the Oath Keepers did not, proves that the Oath Keepers lacked the necessary intent or agreement on a common plan to be guilty of the charges against them. The fact that explosive devices were found so close in time to the Epps breach and that he reported suspicions about bombs to the FBI, might make a reasonable jury wonder if Epps had the explosive devices planted as a diversion and perhaps it was he, who remains unarrested, who was involved in a seditionist plan instead of the Oath Keepers.

There are many examples of the actions of others that go to the circumstances of the entry, as to what did these defendants' heard or knew immediately before going on to the Capitol grounds, which includes the circumstances around them, and specifically relates to their intent and knowledge.

For example, the Defendants will show that barricades were moved before these Defendants entered the grounds.  This evidence relates to both knowledge and intent. The evidence will show that to have a "Restricted Area" there must be an "area" to which the restriction applies.  An unidentified, indeterminate area cannot be a restricted area.  For a person to knowingly enter a restricted area without authorization, there must be both an identifiable area that is restricted and knowledge by the person of a restriction.  Defendants intend to show that the only small, flimsy signs (some seen in photographs torn in two as being merely paper) got affixed to light-weight, movable bike racks, appearing at a very low height at about waist-high-level in most places. We anticipate we will have substantial evidence in this regard testified to by eyewitnesses and experts.

The Defendants will further show that there was an announcement made by the lead police officer in the East, whom we are still attempting to identify, who bellowed to the crowd "we understand this is your house" and "we'll push it up to our leadership and see about getting you upstairs."[4] Obtaining information about this event, and the Suspicious Actors that bullhorned this false information throughout the crowd has proved very difficult notwithstanding the fact that under *ex rel Brady*,  this should have prompted an immediate letter to all counsel of record. Undersigned counsels have been trying in vain to get the necessary Brady information around this event since April 7, 2022 when, in a status conference hearing, undersigned counsel explained this event with as much detail as possible at the time—based only on public information--(Page 31, Line 24 to Page 34, Line 19).[5]  Subsequent to that April hearing, the

---

[4] https://www.dropbox.com/s/un9rpzuspmxfp9u/Public%20Authority.mp4?dl=0  We have been repeatedly asking for any and all information about the many people surrounding this exchange and we laid it out in 225-2 and 225-3 but we still have very little information that the defense team can locate.

[5] https://www.dropbox.com/s/k9ymne8tpop5n3f/20220407%2022cr15%20Document%2076%20transcript.pdf?dl=0

Government also promised investigative files on 600 individuals' for which the defense still seems to still be waiting.  ECF 225-2 was originally filed in July in a vain attempt to politely scope the government around core Brady disclosures that the Siege Unit was obligated to make to all assigned government prosecutors precisely so that disclosures could be made to all defense counsels.  To date, although these comments could have been interpreted by the crowd as having given official permission and that could have been distorted by Suspicious Actors that we can see on video bullhorning this throughout the crowd, there is substantial evidence submitted in 225-2 and 225-3 of a coordinated and planned attempt to warp attendees view of the events as they transpired, and this provides the most reasonable explanation not only for why over 1,000 people would walk to the East steps after a coordinated breach by Suspicious Actors that had a plan, but also why the Oath Keepers might respond to protectees being drawn in by this nefarious effort. Again this goes to both what these Defendant knew, what they believed, why they acted the way they did and for what purpose they acted the way they did and all this speaks to intent.

The evidence will further show, through video produced by the government, that the Columbus doors were opened from the inside, (for the second time) at 2:38 PM, after which an unidentified man, referenced in 225-2 as #JamesDeanWannabe who helped attack James Dolan on the stairs and who was the only man to hold a Confederate Flag in the East for the cameras, and that led the attack on police with chemicals while the Oath Keepers were standing on the steps singing the National Anthem and who, to the inside of the door, begins to (frantically) physically pull people inside at a rapid pace, until these Defendants enter nearly four minutes later, almost stumbling as they enter following a line of entry.  One person takes a header (fall) and is injured.  The evidence will show what that looked like from their vantage point, which

again goes to knowledge and intent.  The actions of others relate to both what notice they had and their intent.

The Government couldn't even sustain "a more likely than not" burden of proof on facts that are less compelling for Harrelson than for Martin.   https://www.washingtonpost.com/dc-md-va/2022/04/06/jan6-acquittal-martin-first/

To demonstrate the issue for the Honorable Court (and the Government), in *United States v. Martin*, Judge McFadden acquitted the defendant, presumably because of video presented that constituted permission by police.

Police, some of whom were present during the Oath Keepers entry at approximately 2:38 p.m., seem to let in about 20 people prior to the Defendant Martin's entry on the clip and let in another 60 individuals prior to police directing traffic so that a group of Oath Keepers can peacefully exit.  Isaacs and other Oath Keepers patiently wait until police let in as many as 60 people until the police are ready for them to exit. They then peacefully exit.





7029 USCS 02 Rotunda Door Interior - 2021-01-06_19h53m

Therefore, it is impossible to present a fair trail consistent with due process without showing the interaction between these Defendants specifically and law enforcement officers. What the law enforcement officers did or did not do directly proves what Judge Mehta directed is the only real issue in the case:  *The Defendant's intent (on many, various points).*

And if the Defendants wished to argue that *something* they did was authorized by a public authority, then *what?*   Under what scenarios would a defense of public authority exist?

This lack of clarity is caused by the Government.  And until the Government is more precise, we cannot evaluate or analyze the Government's MIL.

Beyond question, the U.S. Capitol Police provided authorization for demonstrations on the U.S. Capitol Grounds by six (6) different permits.  Permits give permission.  That is, authorization.  The Defendants were authorized to be on the Capitol Grounds, including to travel to and from or among the six authorized demonstration sites.

Specifically, the Defendants did not require any authorization to act as volunteer security for the permitted demonstrations on the Capitol grounds.

Now, the Government's proposed limitations are far too vague and unclear to be granted. They are unworkable.  For example, there is no clear objective standard for identifying what activities at different locations are "unrelated."   How is the Court to decide – especially in advance of the evidence – what is related and what is unrelated?  The proposed Orders in Limine are too vague and unworkable to be capable of being granted by the Court, much less followed and applied at trial.  Contrast that with the Court ruling on relevance when a question is asked.

One can't establish a category of related or unrelated without knowing the full context in

detail.  The Defendants don't have the facts and the context yet because their pleas for required discovery have gone ignored for many months.

For example, a radio call about shots fired might seem unrelated until knowing the context making it related to an officer's decision to shoot Ashli Babbitt.  Again, a woman shot in one place in the 751 foot long Capitol building might seem unrelated, until we consider the state of mind of both demonstrators and police officers.  A gunshot and rumors, even inaccurate rumors, may speak to the intent of military veterans and law enforcement officers (known as the Oath Keepers) trained in first aid upon hearing that in another part of the building one or more people had been shot, the initial rumor including a 12 year old girl.  This is not about whether those rumors are true but what the demonstrators believed in their intent and state of mind.  The shooting might not be related.  But the motivation of both officers and demonstrators could be.

Is a conversation between George Tenney looking backwards into the center of the building up to the balcony above the East Rotunda entrance "related" to him apparently opening the East Rotunda doors from the inside a few seconds later?   Tenney tries to open the East Rotunda doors through which the Defendants are accused of entering the Capitol, cannot, and then turns around and looks up and has a conversation with someone up on the balcony, then turns to the doors again.  This time he is successful in opening the East Rotunda doors.  Is the conversation "related?"  Maybe not.  But did the conversation with someone shown on the video relate to how to open the doors, or that the doors were being unlocked from a control room?

But how would the Court craft an Order in Limine of what is "related" or "unrelated?"  In context, it may emerge that a witness has no knowledge, ending the topic right there.  It may quickly emerge during normal questioning whether two things are related or unrelated.

Both MILs ECF 213 and 214 seek to bar the introduction of large categories of evidence,

that the government has produced including regarding officers who were investigated, by way of

an example,

> 'That on Wednesday, January 6, 2021, an Unknown Officer  violated
> USCP Directive 2053.013, Rules of Conduct, when they allegedly waived
> unauthorized persons2, into a restricted area secured by bike racks3, toward the
> US Capitol during an insurrection' or
> "While working with MPD at the lower west terrace door, to hold back the
> mob of rioters, I looked to my right and saw Lt. --- leaning against the wall taking
> no action… In this video,---you can see Lt. --- in the background doing nothing to
> address the rioters in the building or stop the officer taking what appears to be a
> selfie; or
> "According to the officers, a few officers were told to go home early on
> the date of the incident at the U.S. Capitol. The officers did not say, however, who
> instructed the officers to go home. *Officers were also told to open the U.S.
> Capitol doors as well…*"

(These reports are not cited, nor are any names produced, to maintain the government's
protective order, but the examples cited are copied from productions made by the government).[6]

Additionally, based on additional evidence that is still under investigation because of

discovery that is outstanding (see Defendant Harrelson's Motion for Discovery filed

contemporaneously), the evidence already available is anticipated to be genuinely probative

because it will also go to Defendants' intent and their knowledge before entering the space

alleged to be restricted, and at the Capitol.

The Government also seeks to exclude a defense of public authority, in this context an

argument that the Defendants were acting on the orders or authorization of an appropriate public

authority.  However, this also suffers from the lack of precision and ambiguity common to the

case.  It is difficult to grasp what exactly the Government believes happened on January 6, 2021,

and what role various people played.

---

[6] See CAPD reports

All of the Government's Motions in Limine share several serious, major, and insurmountable problems, as well as each having their own individual difficulties.

The Defendants are charged with conspiracies premised on events starting from November 4, 2020, and supposedly spread all over the country.

Furthermore, the proposed limitations are simply incompatible with the prosecution case.

Moreover, the motions are premature because the Government has steadfastly refused to specify its prosecution theory or its position on multiple points.  Until those points emerge in context on the evidence the Court would be unable to make a reasoned decision and should not do so in violation of Due Process.

Concerning ECF 213, without erroneously claiming that the Oath Keepers' discussion of President Trump invoking the Insurrection Act, the prosecution has nothing at all on which to hang its mistaken charge of a seditious conspiracy.

The prosecution both relies upon the Oath Keepers Defendants discussing and asking for authorization from a public authority (POTUS) but then wants to exclude that same evidence from the trial.

The Oath Keepers were engaged in an act of ***lobbying*** – asking the President to invoke an actual law, the [Anti] Insurrection Act – not sedition.   The Government is trying to prevent the Defendants from presenting the truth, that Stewart Rhodes for the Oath Keepers was publicly asking for the President to empower them to repel ANTIFA rioters from attacking the White House and unarmed demonstrators in the D.C. gun free zone and keep order in other ways.

Kelly Meggs, by prior counsel, notified the USA that the Defendants would assert a

defense of public authority, but alerted all AUSA's and Defense counsel that the confusing nature of the prosecution's made the question problematic.  The defense of public authority is conditional upon things that did not happen.

The Government has no evidence of a seditious conspiracy except (a) words of lobbying and why the President should invoke the [Anti] Insurrection Act, (b) the Oath Keepers public appeals to be _empowered_ by a public authority (the President of the United States) which did not actually happen, (c) egregiously misrepresenting the statements of the Defendants by ripping phrases out of their context and hiding the entire conversations, and (d) trying to hide the condition precedent undergirding all of their purported evidence.  The Government asserts that the lobbying campaign to the POTUS constituted a seditious conspiracy.

Misrepresenting what the Oath Keepers were asking for, the Government has made calls for President Trump to invoke the Insurrection Act the only bases for its mistaken charge: However, President Trump in fact never did invoke the [Anti] Insurrection Act of 1807.

### 13 U.S.C. §252. Use of militia and armed forces to enforce Federal authority

> Whenever the President considers that unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings, he may call into Federal service such of the militia of any State, and use such of the armed forces, as he considers necessary to enforce those laws or to suppress the rebellion.

**See also,** Madeleine Carlisle **"**What Is the Insurrection Act And Does it Give Trump the Authority to Send Military Troops Into States? Here's What To Know, Time Magazine, June 2, 2020, accessible at:  https://time.com/5846649/insurrection-act-1807-donald-trump/  .

Everything that the Government seeks to depend upon for its case requires a condition precedent that the President as a public authority deputize them to stop ANTIFA rioters.

The Insurrection Act exists.  The Insurrection Act is real.  Using the Insurrection Act is

lawful.  The topic sounds strange to those who have never heard about it.  But it is legal.

All throughout 2020, and indeed stretching back to 2014 and earlier, anarchists burned down neighborhoods and minority-owned businesses and assaulted federal officials and other law enforcement.  The Oath Keepers went to Ferguson and Portland to defend minority-owned businesses and minority neighborhoods that were burning, and saw this up front and personal, not just in the newspaper.  They lawfully assisted demonstrations in November and December 2020 as security and again saw the violence from left-wing anarchists up front and personal.  It was universally expected that ANTIFA violence against a huge crowd of demonstrators on January 6, 2021, would be a bloodbath, far worse.  Petitioning the President to redress this mass violence is a right protected by the U.S. Constitution's First Amendment.

But all of this was a matter of direct concern to the Oath Keepers from their direct experiences, not mere observation by people at a distance.  This was personal to them.

But the Oath Keepers have always been explicit that their plans were conditional on beingofficially granted authority by President Trump as a public authority.  Trump did not invoke the Insurrection Act.  And the Oath Keepers did nothing blameworthy.  The condition precedent was not met.

Discussion of what Trump should do and why – but did not do – cannot sustain the prosecution's case.

The public authority defense is necessary to rebut the false claims by the prosecution.  But the Oath Keepers never, in fact, did any of the things that the prosecution imagines.  Therefore, the public authority defense applies to the counter-factual scenario pushed by the prosecution, but does not relate to what the Defendants never did.

Next, surprisingly, the U.S. Attorney's Office for the District of Columbia now argues

that President Donald Trump and his leadership team played no role in the demonstrations and disturbances on January 5-6, 2021.

The Motion in Limine is seriously flawed, but the USAO does not seem to notice that Due Process would prohibit them from arguing or introducing evidence that there was any involvement at all by President Trump encouraging any events at the U.S. Capitol on January 6, 2021.  Constitutional Due Process would not permit the Government from arguing one side of the same coin while prohibiting the other.  If the Defendants may not argue that their actions were inspired or authorized by a public authority (President Trump), the Government may not argue that President Trump played any role in causing, conspiring, or inspiring any events at the U.S. Capitol on January 6, 2021.  Combined with the Constitutional force of Due Process, the Government's MIL, if granted, must completely foreclose all evidence, argument, or discussion of any role whatsoever by President Trump or Trump's leadership team.

But then the resulting case will fail at trial, because the prosecution's theory depends upon smudging unrelated events and rushing past the absence of any evidence that any of the Oath Keepers Defendants committed any crime.  Boiled down to the evidence against these Defendants, the prosecution has nothing but trash talk exchanged only internally among the Defendants themselves.

Next, the Government seems to overlook how the MILs must go both ways.  If the MILs were granted, the prosecution's case at trial would be gutted.  And that would be fine for the Defendants, but the prosecution does not seem to understand that.  At trial, the Court and the U.S. Attorney's Office may be surprised and fight against the consequences of its own MILs. Counsel can foresee the mistake of limiting one side but not the other on the same points.

Therefore short of violating Due Process under the Constitution, the Court cannot exclude only a part of the same topic while allowing the rest of the same topic to be argued as a crime against the Defendants.

To the extent that the Defendants can discern with difficulty what exactly the Government is charging the Defendants with and what its theory of the case might be and what evidentiary themes the USAO will pursue and present, it seems clear that the USAO would be completely disabled from presenting any of the case it intends to press against these Defendants if these MILs were granted and not reversed in the middle of trial. If the MILs were granted, and strictly observed, applying equally to both sides, the trial could be very short indeed.

And again that mistake by the prosecution would be good for the Defendants except that when that comes as a surprise to the prosecution and the Court unexpectedly in the midst of trial, the risk is very high that the contradiction will be ignored in the press and rush of trial. It will be very difficult to bring the momentum to an abrupt stop and confront the contradiction.

Therefore, the Court must now grant the MILs in both directions or not at all.

In the same vein, the prosecution has vigorously fought against being specific in what the Government is alleging against these Defendants and played every card in the deck to try to prosecute the Defendants by ambush and surprise. Resisting every form of motion, the prosecution has argued that it does not have to tell the Defendants exactly what its case is against the Defendants, such as whom they supposedly aided and abetted, what property they allegedly damaged, maybe they broke windows, how they "breached" (that is, broke into) the 10 ton, 17 feet high Columbus Doors, or else why the doors were left open, how they disrupted an official proceeding before they arrived, who if any police officers they encountered, how they "led" anyone or anything especially before they arrived, whom they talked to other than themselves,

etc.

In other words, having resisted precision all along, the prosecution now wishes to impose precision like hammering a nail into a wall of jello.

The Government argues its MIL as if the matters sought to be precluded could be separated from the larger topic and group of facts and allegations charged against the Defendants.  But in these cases they cannot be separated.


The Defendants did not require the authorization of any public authority to do what they never did.  It would appear that the prosecution is unable to contemplate the reality that the Oath Keepers are in fact innocent, which is why they will not plead guilty.

However, the prosecution wants to include as proof Stewart Rhodes petitioning the government for the redress of grievances as a protected right under the First Amendment by urging through public letters then President Donald Trump to invoke the [Anti] Insurrection Act of 1807.  By definition, a President invoking the Insurrection Act would be giving public authorization – and a chain of command with responsibility and allegiance to a public authority.

This garbled account is the crown jewel of the prosecution's attempt to patch together a seditious conspiracy out of chewing gum and straw.  Without the prosecution putting into evidence Rhodes' calls protected under the First Amendment urging the President of the United States (a public authority) to deputize the Oath Keepers to keep order under the [Anti] Insurrection Act of 1807, the prosecution must drop their highly-political charge[7] of seditious

---

[7]      The charge was added by a Seventh Superseding Indictment on January 12, 2022.  The new indictment did not contain any new factual information that would support the addition of the seditious conspiracy charge.  The only thing that changed was harsh criticism from the U.S. Congress explicitly and publicly demanding that the DoJ charge someone for sedition.  The AUSA responded to those public criticisms, not to finding new evidence relevant to that charge.

conspiracy.

Thus the prosecution wants to both argue that the Oath Keepers were ready and willing to respond to an official, formal, governmental call deputizing them to assist in fighting an insurrection but also argue that the Defendants cannot respond to their accusation. The prosecution cannot have it both ways. Not just that they should not have it both ways. They literally cannot have it both ways. If they pursue their inaccurate theory that Stewart Rhodes asking for authorization under the [Anti] Insurrection Act amounts to a seditious conspiracy, rather than a protected First Amendment right to petition the government for redress of grievances, they are literally arguing that the Oath Keepers sought to receive authorization and empowerment to maintain order in the face of an insurrection from a public authority.

Thus, the prosecution can only ask to avoid discussion of a public authority defense by dropping their claim that there was a seditious conspiracy because Stewart Rhodes asked a public authority to invoke the existing law to authorize the Oath Keepers to keep the peace.

This is inextricably linked with the weapons that the Oath Keepers allegedly kept in Virginia in strict compliance with the law. The Oath Keepers' careful compliance with the law and not using any weapons defeats the prosecution's charge. Not only should not the prosecution present evidence of law-abiding, lawful possession of lawful weapons strictly in compliance with the law, but they cannot do so. The Oath Keepers were prepared to respond to a public authority, the President of the United States. Yet the prosecution wants to depend centrally upon the Oath Keepers' appeal to public authority.

This is the objection that Kelly Meggs' prior attorney placed the prosecution on notice of in responding to an inquiry. This was timely objected to.

Additionally, it may show entrapment-by-estoppel defense, a separate defense from the

public authority defense, which would be on the defendants' show that,

> 'Entrampment by estoppel is the unintentional entrapment by an official who mistakenly misleads a person into a violation of the law." *Ramirez-Valencia*, 202 F.3d at 1109. It derives from the Due Process Clause of the Constitution, which prohibits convictions based on misleading actions by government officials. *Tallmadge*, 829 F.2d at 773 (*citing and discussing Cox v. Louisiana*, 379 U.S. 559, 13 L. Ed. 2d 487, 85 S. Ct. 476 (1965), and *Raley v. Ohio,* 360 U.S. 423, 3 L. Ed. 2d 1344, 79 S. Ct. 1257 (1959)).

> In order to establish entrapment by estoppel, a defendant must show that (1) "an authorized government official," "empowered to render the claimed erroneous advice," *Brebner*, 951 F.2d at 1024, 1027, (2) "who has been made aware of all the relevant historical facts," *Tallmadge*, 829 F.2d at 774, (3) "affirmatively told him the proscribed conduct was permissible," *Ramirez-Valencia*, 202 F.3d at 1109, (4) that "he relied on the false information," Tallmadge, 829 F.2d at 774, and (5) "that his reliance was reasonable." *Id.* As to this last element, we have stated that "[a] defendant's reliance is reasonable if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" Ramirez-Valencia, 202 F.3d at 1109 (*quoting United States v. Lansing*, 424 F.2d 225, 227 (9th Cir. 1970)).

*United States v. Batterjee*, 361 F.3d 1210, 1216-1217, (9th Cir. 2004).

Moreover, the government has admitted to continuing to supplement discovery at the last conference, and these Defendants are still working to analyze discovery, therefore, these 2 motions that are overly broad and seek to bar significant evidence are prejudicial to Defendants being able to rebut specific intent charges.

Defendant Harrelson, however, has no intention of raising a defense of "diminished physical capacity."

Finally, the Government appears to oppose cross-examination of Secret Service agent(s) concerning only the presence of the Vice President *somewhere* in the vicinity of the U.S. capitol. But whether Mike Pence was *somewhere* in or near the Capitol is a far cry from proving all the elements of a violation of 18 U.S.C. 1752.  But, strangely, the MIL at ECF 215 is explicitly limited to 18 U.S.C. 231.

The Government argues that some questioning – with no reason for the Government or the Court to suspect that any such questioning will ever happen – that might reveal sensitive secrets (obviously sensitive non-secrets could not be protected) about something unidentified.

The Government offers a broad-brush cliché that "the very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive branch and, by extension, national security."  However, this broad statement does not provide either any reason to limit cross-examination in this case nor does it provide any standard for the Court to enter an order or apply it at trial.

And here we return again to the problem:  The prosecution's theory remains vague, foggy, and ambiguous.  Yet it appears that the Government wants to call a witness purely for the purpose of establishing that the Vice President was _somewhere_ in the vicinity of the U.S. Capitol.

If that were the only point at issue, there would be no point in disputing that fact alone, and very limited need for cross-examination.  However, it would still be necessary for reasons arising from Defense counsel's analysis of the case to cross-examine those witness(es) as to (a) whether the witnesses have any first-hand knowledge for their testimony, which counsel suspects they might not, (b) why the U.S. Capitol is not routinely restricted every time the Vice President drives over to break a tie vote in the U.S. Senate, (c) is the declaration to a "restricted area" merely a mis-use of the law and pretext, given that the Capitol apparently is not restricted when the Vice President is on site breaking a tie, and (d) therefore how can there be a "restricted area" if no area affected by the Vice President's presence is defined?  How do events nowhere near the Vice President's location affect the Secret Service protectee?  And also (e) why did the Secret Service _not_ declare a restricted area, while the U.S. Capitol Police did the day before January 6,

2021?  In other words, what threat assessment existed as of January 5, 2021?

Note that the Defendants will call U.S. Capitol Police and Secret Service to show that the Joint Session of Congress recessed at 2:18 PM EST on January 6, 2021, because of the discovery of pipe bombs – having no relationship to the Oath Keepers -- and not because of anything done by Kenneth Harrelson or his co- Defendants.  The Defendants are likely to name the same Secret Service witnesses as their own witnesses not limited to cross-examination.

In the Government's preamble, the MIL at 215 appears to present only a modest proposal.  But under Argument Section II – as is typical of the MILs – the Government then vastly expands its request quietly and beneath the radar.

Now, suddenly, we find that the Government also wants the same witnesses – who might not have first-hand knowledge (given the size of the 751 foot long building and the grounds of over 58 acres) -- to testify to the *effect* of various unspecified events upon the Secret Service's detail of VIP protectees on January 6, 2021, by people who are not among any of these Defendants.

"A Secret Service official is further expected to explain how the events at the Capitol on that date affected the Secret Service's ability to protect Vice President Pence and his family."

Notice that this is an entirely different topic.  It is not consistent with Due Process, nor is it functionally workable, to try to make a broad, unfocused case about the *effect* of unspecified actions by unknown people – certainly not the Oath Keepers – and then say you can't cross-examine the witness about this.  Most importantly, Defendants are entitled to cross-examine any such witness that none of his or her testimony has anything to do with Kenneth Harrelson or his co-Defendants.   The prosecution is constitutionally prohibited by Due Process from arguing that *someone* – not any of these Defendants – had an effect upon involving the Secret Service but

then avoid scrutiny of such claims.

Certainly, the fact that the Secret Service made a security decision to refuse to allow then President Donald Trump to travel to the Capitol and for the Vice President to relocate as the better part of valor is not a disruptive "effect" on the Secret Service. That's just what they do, normally. Moving a protectee to minimize risks is the Secret Service's regular job.

The only thing that affected the Secret Service's ability to relocate Mike Pence, was Pence's refusal to get in the car out of a sense of honor or bravery. The Defendants are entitled to cross-examine any such witness to reveal to the jury that nothing affected their ability to protect the Vice President except the Vice President's decision that he did not need protecting. Indeed, where Pence chose to remain at the Capitol, his testimony that he did not perceive any unusual threat may be required. Also it is an open question whether the suspicious actors breachers that came through the Senate gates at 1:58 pm (exactly one hour after Ray Epps breachers attacked) and the gates in front of the east steps at 1:59 pm came before or after the exit of the Secret Service motorcade. Did the attack cause the motorcade's exit, coincide with the motorcade's exit, or was the attack plan timed to the motorcade's exit?

However, the Government wishes to put on a criminal case and expresses concern about the revelation of sensitive security information. Harrelson, by counsel, just doesn't see it. But if there is some non-obvious secrets at issue, the remedy for the Government is to drop the case. The Government is not entitled to a work-around of Harrelson's Due Process rights, confrontation right, and other rights of the U.S. Constitution. The Government does not have a right to deprive people of their Constitutional rights because it does not wish to fairly present all of the evidence involved.

THEREFORE, Defendant Kenneth Harrelson respectfully requests that the Court deny

these two Motions in Limine to bar this evidence at trial where it is highly prejudicial because

the evidence relates to Defendant's specific intent under Federal Rules of Civil Procedure 403

and Rule 404(b), other than allowing Defendant to stipulate with the government that they are

not seeking to show "diminished physical capacity."

Dated:  August 15, 2022          RESPECTFULLY SUBMITTED
                                 KENNETH HARRELSON, *By Counsel*
                                 /s/ Brad Geyer

                                 Bradford L. Geyer, PHV
                                 PA 62998
                                 NJ 022751991
                                 Suite 141 Route 130 S., Suite 303
                                 Cinnaminson, NJ 08077
                                 Brad@FormerFedsGroup.Com
                                 (856) 607-5708


## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2022, a true and accurate copy of the forgoing was
electronically filed and served through the ECF system of the U.S. District Court for the District
of Columbia.

                                 /s/ Brad Geyer
                                 Bradford L. Geyer, PHV
                                 PA 62998
                                 NJ 022751991
                                 Suite 141 Route 130 S., Suite 303
                                 Cinnaminson, NJ 08077
                                 Brad@FormerFedsGroup.Com
                                 (856) 607-5708