**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES | * | |
| vs. | * | Case No.: 22-15 APM |
| THOMAS E. CALDWELL | * | |
| (U.S. v. Elmer Stewart Rhodes) | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## CALDWELL'S REPLY AS TO SENTENCING

**A.  The government's recommended sentence ignores the jury's verdict.**

In light of the jury's verdict, the government's recommended 14-year sentence for

Caldwell is draconian.  The government possessed every possible advantage over Caldwell.

Prior to trial, D.C. juries had not acquitted *a single J6 defendant* of a *single count*—65 counts

"guilty," 0 counts "not guilty."[1]  The *Rhodes* defendants were the subject of scores of negative

news articles and one-sided J6 Committee hearings.  Media covering the trial were, largely,

overtly hostile towards the defendants, providing a daily one-sided infomercial on the

government's behalf.[2]  The government had unlimited resources to prosecute the defendants.

And the government hand-crafted the Indictment and conspiracy allegations in a way that

ensured the introduction of prejudicial evidence into trial, e.g., guns and polemical statements.

Despite these unprecedented advantages, the jury rejected the gravamen of the government's

---

[1] R. Parloff, *Lawfare.com*, "Five Stray Thoughts on the Oath Keepers Verdict," (Dec. 1, 2022).
[2] A "regular" in the Court's media room advised the undersigned that during trial, all but a couple of reporters would assiduously type away when the government presented its case but, upon defense cross-examination, would take their coffee breaks.

case:  "[That] the defendants' conduct led directly to the breach of the Capitol and Congress's evacuation[.]"  (ECF 565 at 59) (Gov. Sent. Memo).

**B. Caldwell's "relevant" conduct did not include causing "the breach of the Capitol and Congress's evacuation."**

The jury acquitted Caldwell of *five* conspiracy allegations, i.e., two seditious conspiracies, a conspiracy to obstruct the certification, and two 18 U.S.C. § 372 conspiracy allegations. (ECF 411).  In fact, the five *Rhodes* defendants collectively were cleared of 18 of 25 conspiracy allegations *and* all 9 allegations related to the destruction of Capitol property.[3]  *Id.*  In other words, of 34 allegations made potentially tying the *Rhodes* defendants to relevant "conduct [that] led directly to the breach of the Capitol and Congress's evacuation," the jury convicted on only 7 allegations.  In context, however, these 7 convictions demonstrate that the jury *absolved* the *Rhodes* defendants of responsibility for the Capitol riot and Congress's evacuation.

As to 2 of the 7 convictions, the seditious conspiracy convictions of Rhodes and Meggs clearly did not involve "conduct [that] led directly to the breach of the Capitol and Congress's evacuation," as Rhodes was contemporaneously acquitted of 4 conspiracy allegations *tied specifically to such conduct*.  As to the other 5 convictions, while Meggs and Watkins were each convicted on Count 2, conspiracy to obstruct the certification, and Count 4, they were acquitted, along with all defendants, of Count 4's *second prong*, which alleged a conspiracy "[t]o induce a Member of Congress to leave the place where the Member of Congress's duties are required to be performed," (ECF 411), which evidences the jury's belief that the wildcat Oath Keepers's conspiracy to obstruct Congress was entered into *after* Congress was evacuated from Capitol

---

[3] Meggs, Watkins, and Harrelson were each charged with Destruction of Government Property pursuant to 18 U.S.C. § 1361, and the separate allegations of "attempt" and "aiding and abetting" related to the destruction of Capitol property. (ECF 400) (jury instructions).

2

Hill.  In short, the jury resoundingly cleared Rhodes, his organization, and Caldwell of involvement in *any* conspiracy that was entered into *on or before J6*, and absolved Meggs, Watkins, and Harrelson of any conspiratorial responsibility for actions that "led directly to the breach of the Capitol and Congress's evacuation."

### C.  The Jury accepted the government's argument regarding lack of planning.

The government's claim that "we never have [alleged a specific plan to storm the U.S. Capitol]" was "pants on fire" false.[4]  Nevertheless, the jury apparently accepted the government's downscaled argument in closing that "we do not allege a specific plan to storm the United States Capitol.  We never have *and we are not now*." (Tr., 10,296) (emphasis added). Accordingly, Caldwell is not on the "relevant conduct" hook for a *spontaneous* conspiracy by incommunicado, wildcat Oath Keepers, which formed *after* Congress was ordered to evacuate. Respectfully, the Court should accept the jury's finding and sentence Caldwell based upon his *de minimis* conduct, which did not delay the certification vote by one second.

### D.  The Court must use a higher burden of proof for U.S.S.G. enhancements that dramatically increase Caldwell's Guidelines range.

Trial courts typically assess relevant conduct using a preponderance of the evidence standard; however, this is not a typical case.  Before enhancements, Caldwell's Base Offense Level is 14, or 15-21 months of incarceration. (PSR, ¶126).  The PSR recommends upward enhancements that result in a Total Offense Level of 32, or 121-151 months of incarceration. (PSR, ¶¶126-36).  If the Court applies these enhancements, Caldwell faces a Guidelines incarceration range roughly 8 times higher than that called for by his Base Offense Level.  Such

---

[4]  Caldwell requests that the Court thoroughly review ECF 299, (Attachment A), which outlines in detail the government's numerous unsubstantiated allegations against Caldwell, including his alleged "plan" to, *inter alia*, "storm the Capitol."

a radical upward adjustment, if adjudged on a preponderance of the evidence standard, would violate Caldwell's rights under the Due Process Clause.

1. *In "extreme cases," trial courts must use a clear-and-convincing standard*.

The D.C. Circuit implicitly held that a "clear and convincing" standard must apply in "extraordinary circumstances" where "relevant conduct" would dramatically increase a sentence. *See United States v. Long*, 328 F.3d 655, 672 (D.C. Cir. 2003) ("We accordingly hold that the district court did not err by failing to treat Long's case as presenting 'extraordinary circumstances[]' . . . that require a heightened standard of proof."). While finding that an 8-level increase in the defendant's base offense level was not "an extreme case," the *Long* Court suggested that a double-digit increase in levels could require a clear-and-convincing standard. *Id*. at 671. *See also United States v. Valensia,* 222 F.3d 1173, 1182 (9th Cir. 2000) (adopting a "six-factor" test to determine whether sentencing enhancements had a "disproportionate impact" and therefore had to be proven by clear and convincing evidence). Appellate courts are split as to whether the advisory post-*Booker* Guidelines render nugatory the need to use a heightened burden of proof in cases like Caldwell's.[5] The D.C. Circuit has not addressed this issue.

The government's case was insufficient to prove that Caldwell "conspired" with anyone under any standard, especially when Paul Stamey's exculpatory FBI interview is considered. If the Court disagrees, however, it can still "dip below the guidelines range if . . . reluctant to

---

[5] *Compare United States v. Staten*, 466 F.3d 708, 720 (9th Cir. 2006) (holding that clear and convincing standard applies to enhancements that disproportionately impact a sentence post-*Booker*) *with United States v. Chandia*, 675 F.3d 329, 338-39 (4th Cir. 2012) (concluding post-*Booker* that "the due process clause does not require . . . a heightened standard of proof before using it as a basis for determining a defendant's sentence."); *United States v. Fisher*, 592 F.3d 293, 308 (3d Cir. 2007) ("[B]ecause the Guidelines are now advisory . . . it is a logical impossibility for the "tail to wag the dog," as could occur when the Guidelines were mandatory.").

impose a sentence most of which rests entirely on a finding of fact supported by a mere preponderance of the evidence." *United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006) (noting that under § 3553(a), "[a] judge might reasonably conclude that a sentence based almost entirely on evidence that satisfied only the normal civil standard of proof would be unlikely to promote respect for the law or provide just punishment for the offense of conviction.").

   2. ***Caldwell did not cause or threaten injury or damage via a QRF.***

The government seeks an 8-level enhancement under U.S.S.G. §2J1.2(b)(1)(B) on the grounds that Caldwell "managed" a QRF which, it alleges, was *ipso facto* a "threat" to Congress. (ECF 565 at 35-36). The government's conflicting arguments are puzzling. The government was adamant that there was no "plan" by the *Rhodes* defendants to "storm the Capitol"; by contrast, the government now suggests the existence of a plan by Caldwell to "manage" the QRF "to support the other conspirators on the ground at the Capitol." *Id*. Either the QRF was intended to target the Capitol as part of a "plan" or it was not.

   3. ***Overwhelming evidence demonstrated that the QRF had nothing to do with J6.***

The government's *speculation* that the QRFs had a nefarious purpose was debunked at trial. First, testimony and Signal messages proved that the Oath Keepers routinely used QRFs at prior events. Second, QRFs were employed at pre-J6 events in D.C. in November and December on dates *when Congress was not in session*. Third, S/A Palian acknowledged that of hundreds of witnesses interviewed, not one person told the FBI that the QRF was meant to attack the Capitol. Fourth, all defendants in this case have denied knowledge of any illegal purpose for a QRF. Fifth, numerous witnesses testified that a "QRF" is an evacuation team. Sixth, the group that Caldwell was aligned with, North Carolina, had no arsenal to "manage." Seventh, despite the Capitol riot occurring, the QRF was never called into D.C. Eighth, if the QRF was really

intended for evil purposes in D.C., it would have been stationed in D.C.  Finally, even Rhodes's obsession with the Insurrection Act called for a QRF to protect *the White House* if it was attacked by *Antifa*, not to attack the Capitol.

### 4.  *S/A Hilgeman's testimony debunked the QRF-Capitol connection*.

The government's QRF argument regarding Caldwell self-immolated during S/A Hilgeman's testimony.  Hilgeman, the government's QRF expert, was *obviously* unfamiliar with the geography and traffic patterns of D.C.  She pointed to DuPont Circle on a map when asked by the government to point to the Capitol, (Tr., 3454), and misidentified the location of the Ellipse. (Tr., 3679).  Hilgeman was incognizant as to whether numbered or lettered streets in D.C. run north-south or east-west, (Tr., 3681), and was unaware that traffic coming into D.C. from Arlington was blocked from driving directly to the Capitol on J6. (Tr., 3681-82).  When the undersigned walked her through Caldwell's QRF directions on a map, which took a circuitous route north towards Maryland, through Georgetown and ended northwest of DuPont Circle, Hilgeman seemed dumbfounded. (Tr., 3693).  It was at this point, realizing that the government's "QRF was intended to attack the Capitol" hypothesis was crumbling, that Hilgeman opined, bizarrely:  "I think the QRF was meant to occupy D.C." (Tr., 3689).  The jury collectively rolled its eyes and audibly gasped.

While the concept of a QRF is disconcerting to many in D.C., intellectual honesty must prevail over an emotion-based hypothesis.  The QRF, especially the North Carolina QRF associated with Caldwell, had nothing to do with the Capitol riot or any conspiracy.  Caldwell, therefore, should receive no aggravating enhancements for the QRF.

### E. Caldwell is not dangerous.

According to the government, "Caldwell is dangerous, not because of his words, but because of his plans and actions of violence and stated intent to continue violence after January 6." (ECF 565 at 163). The government's claim overlooks their lead FBI case agent's determination that Caldwell's messages can't be trusted. (Tr., 1657). The government's reliance on Caldwell's rhetorical flourishes and political hyperbole for its sentencing recommendation is tone deaf. The notion that a severely disabled veteran who requires special chairs, bedding, and furniture--and who wears Depends™--was actually planning to start a civil war from the sparsely populated Shenandoah Valley is ludicrous. Caldwell's more than two violence-free years on pretrial release belies any claim that he poses a danger to the public. *See also* Attachment D (character letters).

### F. Caldwell never planned or encouraged violence against political opponents.

The government continues to misinform the public about a purported "death list." The "list" was actually a scratch pad, which had unrelated writings on it. Moreover, the words "death list" and those referencing temporary election workers were *obviously* written *in different inks*, a fact the government previously acknowledged, (ECF 251), but which is not perceptible in the publicly-released version. Logically, unless Caldwell's pen ran out of ink at the precise moment he finished writing the word "list"—a one-in-a-million chance—the words "death list" and the names of election workers were doubtless written at separate times with different pens and, accordingly, were unrelated.

Caldwell is a creative person and an amateur movie script writer. While in the Navy, he attended screenplay writing classes at UCLA. His home is filled with thousands of random notes, writings, incomplete and completed screenplays, and reams of "jot-downs." The FBI

performed a thorough review of Caldwell's home, computers, documents, and writings and interviewed dozens of people connected to him.  There is not one shred of corroborative evidence that Caldwell intended to harm Georgia election workers.

The government also claims that Caldwell was attempting to push his 17 year-old nephew "to join him in violence." (ECF 565 at 161).  Not so.  Notably, Caldwell's nephew, who was actually 19 years old when he messaged with Caldwell, was never contacted by the FBI to give context to the messages.  Caldwell's nephew, *who begins law school next semester*, vehemently denies the government's slander that his uncle was grooming him for violence. *See* Attachment B.[6]

### G.  Caldwell has taken responsibility for his actual conduct on J6.

The government complains about Caldwell publicly criticizing certain aspects of his prosecution.  Caldwell has every right to complain.  Caldwell has been financially crushed as a result of unsubstantiated conspiracy charges.  His wife, a stroke survivor, had laser sites trained on her forehead during a raid that lacked predication.  Caldwell was falsely accused of leading a "stack" into the Capitol on J6, and a magistrate judge was incorrectly told--at his *detention hearing*--that Caldwell was a fugitive. (Caldwell Ex. 125).  The government claimed in court filings, *inter alia*, that Caldwell was "the coach" of the Oath Keepers "team" with a "plan" to "arrest Members of Congress."  Caldwell has taken responsibility for his *actual* conduct, not the government's mischaracterization of his conduct.

---

[6] Undersigned counsel verbally instructed Caldwell's nephew, for privacy reasons, to not use his name in his letter to the Court.  The undersigned personally confirmed the letter's authenticity.

**H.  Caldwell did not "repeatedly lie."**

The government's kill-shot as to Caldwell's credibility is that he testified about being on classified "missions" but denied ever being in a classified "location." (ECF 565 at 157). However, Cubi Point Naval Air Station and the Philippine jungle, where Caldwell was, respectively, stationed and wounded, are not classified "locations," e.g., black sites or secret command bunkers.  The government damaged its own credibility, not Caldwell's, with its uninformed accusation.  Next, Caldwell did not "devise[] cover stories for his plans to engage in violence with people he claimed were Antifa." (ECF 565 at 160).  In early filings, the government hysterically screamed to the public that Caldwell had an "op plan" to attack Capitol Hill.  When the FBI actually examined the "op plan," which it later extracted from Caldwell's computer, the government was proven wrong again:  "The mission [of this op plan] is to confront Antifa[.]"  *See* Caldwell Ex. 14.  The "op plan," which reads like an outline for a Tom Clancy novel, never mentions *the election, politicians, Congress, the Capitol, or J6*. (Tr., 1691) (S/A Palian cross).

Ironically, *the FBI found Caldwell highly credible*.  In fact, in the latter part of his 3-hour interrogation, the FBI located a real, albeit inert, grenade in Caldwell's garage. *See* Attachment C.  When asked about it, Caldwell advised S/A Palian that the grenade was inert.  Based upon Caldwell's *word*, an FBI agent handled the grenade sans a bomb-squad.  *Res ipsa loquitur*.

**I.  Avoiding unwarranted sentencing disparities.**

Respectfully, Caldwell's request for a non-incarceration sentence is consistent with the Court's sentence in *U.S. v. Matthew Wood*:  3 years' probation, 12 months of home detention,

and 100 hours of community service. (21-APM-223).  Caldwell's conduct was far less egregious than Wood's conduct, which included entering the Capitol through a broken window *before* Congress's evacuation, entering Speaker Pelosi's conference room, encouraging others to confront law enforcement, and remaining inside the Capitol for 77 minutes. *See Wood* (ECF 1-1) (statement of facts).  Whereas Wood's conduct helped prompt Congress's evacuation, Caldwell's conduct did not result in the certification being delayed for one second.

Respectfully submitted:

_____/s/_____

David W. Fischer, Esq.
Federal Bar No. 023787
Law Offices of Fischer & Putzi, P.A.
7310 Ritchie Highway, Suite #300
Glen Burnie, MD 21061
(410) 787-0826
Attorney for Defendant


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of May, 2023, a copy of the foregoing Caldwell's Reply as to Sentencing was electronically filed with the Clerk of the United States District Court using CM/ECF, with a notice of said filing to the following:

Counsel for the Government:          Office of the United States Attorney
                                     Kathryn Rakoczy, AUSA
                                     Jeffrey Nestler, AUSA
                                     Troy Edwards, AUSA
                                     Alexandra Hughes, AUSA
                                     Louis Manzo, AUSA
                                     555 4th Street, NW
                                     Washington, DC 20001


_____/s/_____
David W. Fischer, Esq.