```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2
     * * * * * * * * * * * * * * *   )
3    UNITED STATES OF AMERICA,       )     Criminal Action
                                     )       No. 22-00015
4                    Plaintiff,      )
                                     )     CORRECTED TRANSCRIPT
5      vs.                           )     AFTERNOON SESSION
                                     )
6    ELMER STEWART RHODES, III,      )     Washington, D.C.
     et al.,                         )     November 8, 2022
7                                    )
                     Defendants.     )     1:00 p.m.
8                                    )
     * * * * * * * * * * * * * * *   )
9

10
                 TRANSCRIPT OF JURY TRIAL - DAY 26
11             BEFORE THE HONORABLE AMIT P. MEHTA,
                  UNITED STATES DISTRICT JUDGE
12

13
     APPEARANCES:
14
     FOR THE GOVERNMENT:      KATHRYN L. RAKOCZY, ESQ.
15                            TROY A. EDWARDS, JR., ESQ.
                              JEFFREY S. NESTLER, ESQ.
16                            LOUIS MANZO, ESQ.
                              UNITED STATES ATTORNEY'S OFFICE
17                              FOR THE DISTRICT OF COLUMBIA
                              601 D Street, Northwest
18                            Washington, D.C. 20579

19                            ALEXANDRA S. HUGHES, ESQ.
                              JUSTIN T. SHER, ESQ.
20                            U.S. DEPARTMENT OF JUSTICE
                              950 Pennsylvania Avenue, Northwest
21                            Washington, D.C. 20530

22
     FOR THE DEFENDANT        PHILLIP A. LINDER, ESQ.
23          RHODES:           JAMES L. BRIGHT, ESQ.
                              EDWARD L. TARPLEY, JR., ESQ.
24                            BARRETT BRIGHT LASSITER LINDER
                              3300 Oak Lawn Avenue
25                            Suite 700
                              Dallas, Texas 75219
```

1      APPEARANCES, CONT'D:

2      FOR THE DEFENDANT          STANLEY E. WOODWARD, JR., ESQ.
              MEGGS:              BRAND WOODWARD LAW
3                                 1808 Park Road, Northwest
                                  Washington, D.C. 20010
4
       FOR THE DEFENDANT          BRADFORD L. GEYER, ESQ.
5          HARRELSON:             FORMERFEDSGROUP.COM, LLC
                                  141 I Route 130 South
6                                 Suite 303
                                  Cinnaminson, New Jersey 08077
7
       FOR THE DEFENDANT          JONATHAN W. CRISP, ESQ.
8          WATKINS:               CRISP AND ASSOCIATES, LLC
                                  4031 North Front Street
9                                 Harrisburg, Pennsylvania 17110

10     FOR THE DEFENDANT          DAVID W. FISCHER, SR., ESQ.
           CALDWELL:              FISCHER & PUTZI, P.A.
11                                7310 Governor Ritchie Highway
                                  Glen Burnie, Maryland 21061
12
13     REPORTED BY:              MARIA V. WEINBECK, RMR, FCRR
                                  Official Court Reporter
14                                United States District Court for the
                                   District of Minnesota
15                                300 South Fourth Street
                                  Box 1005
16                                Minneapolis, MN  55415
                                  (612) 664-5109
17

18

19

20

21

22

23

24

25

1                        <u>**I N D E X**</u>

2       <u>**Witnesses**</u>:

3

4            **RICKY JOHNSON** ................................... 7743
             Direct - Mr. Tarpley ........................... 7743
5            Cross - Ms. Hughes ............................. 7760
             Redirect - Mr. Tarpley ......................... 7793
6            **DONALD SIEKERMAN** ............................... 7797
             Direct - Mr. Woodward.......................... 7797
7            Cross - Mr. Manzo.............................. 7825
             Redirect - Mr. Woodward........................ 7862
8

9

        <u>**Exhibits Admitted**</u>:
10
             Government Exhibit 9300......................... 7762
11           Government's Exhibit 1088.1 .................... 7778
             Government Exhibit 9301 ........................ 7786
12           Government's Exhibit 4757 ...................... 7788
             Government's Exhibit 9303 ...................... 7791
13           Defendant Meggs Exhibit KM-63 .................. 7807
             Government's Exhibit 9091 ...................... 7832
14           Government's Exhibit 9097 ...................... 7837
             Government's Exhibit 9093 ...................... 7852
15           Government's Exhibit 9092 ...................... 7854
             Defendant Meggs Exhibit KM-64 .................. 7864
16

17

18

19

20

21

22

23

24

25

```
 1              (Whereupon, the following proceedings were had in open

 2      court:)

 3              MR. WOODWARD:  We have two witnesses who are

 4      ready, and I believe Mr. Rhodes is going to call one, and

 5      then we'll call one.  We want to flag for the Court and for

 6      the government that our investigator did interview

 7      Mr. Aquino, and so she has, obviously, knowledge of what he

 8      would have testified to.

 9              And under the availability exception of the

10      hearsay rule, we're going to ask to have her testify, and so

11      there's going to be some issues, so flagging you now.  We'll

12      get you some case law, get the Court and the government some

13      case law on this overnight.  It's not going to be today.  I

14      don't have any time today, but in the interest of

15      transparency and the 24-hour rules and such, that's what our

16      thought process is over lunch is can the Court overrule a

17      hearsay objection for availability purposes when someone has

18      taken the Fifth Amendment in the fashion that occurred

19      earlier today?  Okay.

20              THE COURT:  So Mr. Jackson is prepared to proceed;

21      is that --

22              MR. BRIGHT:  Yes, Your Honor.

23              MR. WOODWARD:  We would also request a jury

24      instruction on the invocation of the Fifth.

25              THE COURT:  So that was the second issue, which
```

```
1    was what, if anything, the parties thought I would say to
2    the jury because, frankly, I'm not sure any of them heard
3    it.
4              MR. WOODWARD:  Mr. Bright didn't know what he
5    said, but give us two seconds, and maybe nothing is the way
6    to --
7              THE COURT:  And I'm throwing it out there.  I'm
8    happy to give a limiting instruction, now, later.
9              MR. WOODWARD:  I think the concern is he did take
10   the stand, not on the stand, so not wanting our clients to
11   be prejudiced by whatever they may think happened in the
12   period while we were away.
13             THE COURT:  Well, let me just put this out there:
14   I think I will do whatever you all want me to, but if what
15   you're proposing is I say to them, You're not going to hear
16   from Mr. Aquino because he's invoked his Fifth Amendment
17   right not to testify, that seems like nothing that you all
18   would not want.
19             MR. WOODWARD:  I think just, Disregard anything
20   you heard Mr. Aquino say.
21             THE COURT:  Okay.  You should not speculate as to
22   why he will not be testifying.
23             MR. BRIGHT:  Things happen in trial all the time,
24   just something in general.
25             THE COURT:  Okay.
```

1              MR. NESTLER:  We know there is a Red Book

2      instruction on this exact topic.

3              THE COURT:  Yeah, I was just looking for it.

4              MR. NESTLER:  It is 2.212, and it says:  You have

5      heard, name of witness, assert his Fifth Amendment privilege

6      against self-incrimination.  The fact that the witness has

7      asserted the privilege does not mean that he has done

8      anything wrong.  I instruct you that you must not guess at

9      what he would have said if he had not invoked the privilege.

10     You may not in any way hold Mr. Aquino's assertion of the

11     privilege against him.  In addition, you may not hold

12     Mr. Aquino's assertion of the privilege against either the

13     defendant or the government.

14             THE COURT:  Right.  So thank you for pointing it

15     out, Mr. Nestler.

16             So, I mean, that's the Red Book instruction.

17     Would you all prefer that I give that or go the route that

18     we just discussed, which is to just tell the jury we would

19     normally be --

20             MR. BRIGHT:  I actually don't --

21             THE COURT REPORTER:  I am sorry.  I can't hear

22     you.

23             MR. LINDER:  I apologize.  Phillip Linder.

24             Since some of the jurors may not have heard it in

25     the first place, I would prefer the general, Hey, just

1    disregard what you saw; things happen in criminal trials all

2    the time.  So just some generic dismissal.

3              THE COURT:  This is meant to protect the

4    defendant's interests.  If that's what you would have me do,

5    I'm happy to go that route.

6              MR. NESTLER:  I think it's actually worded

7    neutrally to protect both parties.  The final sentence:  You

8    may not hold the implication of the ability of the defense

9    contrary to the defendant --

10             THE COURT:  That's true.  So the government is

11   asking for that instruction?

12             MR. NESTLER:  I think if we provide the

13   instruction, we ought to provide the Red Book instruction.

14             THE COURT:  That's right.  Well, if -- you're

15   saying if we provide any instruction, it should be the Red

16   Book instruction as opposed to what Mr. Linder has proposed?

17             MR. NESTLER:  Correct.  I hear what Your Honor

18   said.  I am not sure --

19             THE COURT:  Let me poll the room.  Did anybody

20   hear him invoke other than me?

21             MR. NESTLER:  I heard him invoke, but I was also,

22   I was also keyed into what might be happening, given though

23   we had heard his counsel earlier.  I think we're probably

24   more attuned to it than a juror is, but I certainly heard

25   it.

```
 1                    THE COURT:  Okay.  I was under the impression that
 2      I was the only one that heard it.
 3                    MR. BRIGHT:  Your Honor, when I was up there, I
 4      heard him kind of mumble, but I --
 5                    THE COURT REPORTER:  I am sorry.  Can you give me
 6      your name, please?
 7                    MR. CRISP:  For the record, Jonathan Crisp, and I
 8      representing Jessica Watkins.
 9                    MR. WOODWARD:  Good afternoon, Your Honor.
10      Stanley Woodward, and I represent Kelly Meggs.
11                    MR. LINDER:  Phillip Linder, James Lee Bright
12      representing Stewart Rhodes and --
13                    MR. TARPLEY:  Ed Tarpley representing Stewart
14      Rhodes.
15                    MR. FISCHER:  David Fischer, F-i-s-c-h-e-r, on
16      behalf of Mr. Caldwell.
17                    MR. GEYER:  Bradford Geyer on behalf of Ken
18      Harrelson.
19                    THE COURT:  Thank you, Counsel.
20                    And government counsel do the same because I don't
21      think --
22                    MR. NESTLER:  Sure.  Good afternoon, ma'am.  Jeff
23      Nestler.
24                    MR. MANZO:  Good afternoon.  Lou Manzo.
25                    MS. RAKOCZY:  Good afternoon.  Kate Rakoczy.
```

```
 1            MR. NESTLER:  And Alexandria Hughes is here as
 2     well.  She's sitting to my left.
 3            THE COURT:  So where are we then?  Who is asking
 4     for what, and do I need to make a decision on what I say to
 5     the jury or not?
 6            Defense is not asking for the Red Book
 7     instruction, notwithstanding it's likely they heard it or
 8     some of them may have heard it?
 9            MR. FISCHER:  Your Honor, I'm asking the Court to
10     do nothing myself because, quite frankly, it was barely
11     understandable, and it was right before lunch, and I
12     seriously doubt that they will remember it.
13            MR. LINDER:  In an abundance of caution, I think
14     some may have heard it, but I don't want to draw a big
15     amount to it by giving a formal Red Book instruction.  I
16     would rather just, Hey, disregard what you saw; sometimes
17     things happen in trials and, you know, move on.
18            THE COURT:  Okay.
19            MR. LINDER:  Something rather innocuous.
20            THE COURT:  Okay.  Mr. Nestler, are you okay with
21     that?
22            MR. NESTLER:  We believe the Court should provide
23     the Red Book instruction.
24            THE COURT:  So I'm not going to -- if the defense
25     doesn't want it -- I don't know the Red Book speaks in terms
```

1    of the government and the defendant, but I think it's mainly

2    intended to protect, certainly in a case like this, where it

3    is a defense witness that has invoked on the stand.  So

4    given that the defendants are not asking for it, I'm not

5    going to give it.

6            I'll just ask that -- instruct the jury to

7    disregard what we may have heard from Mr. Aquino and that he

8    will not be testifying, and they should not speculate as to

9    the reasons for his nontestimony.

10           I'm going to introduce something that -- that I

11   looked a little bit at over lunch, and I wanted to just

12   point out to the parties.  The defense has said on more than

13   one occasion its inability to call witnesses, then the issue

14   was because they have been indicted or, in this case -- with

15   Fifth Amendment issues whether they've been indicted or in

16   this case the individual is not granted immunity.

17           There is no settled precedent in this circuit as

18   to what a trial judge is supposed to do in that instance.

19   There is some precedent in other circuits, specifically in

20   Seven and the Ninth and even in the Second Circuits, in

21   which the Courts have said that there are potential

22   sanctions against the government if, in extraordinary

23   circumstances, the government does not grant immunity to a

24   defense witness.

25           I'll just cite to you the DC Circuit cases that

1    discuss this issue, none of which actually adopt a

2    particular principle or a particular process.  They are

3    *United States versus Maynard*, 615 F.3d 544, and that's at

4    554 to 55.

5           *Maynard* cites a Second Circuit decision called

6    *United States versus Pinto*, 850 F.2d 927, in which the

7    Second Circuit addresses when a defendant's due process

8    right may be violated if the government refuses to grant use

9    immunity to a defense witness.

10          And *Pinto* sort of provides a three-part inquiry in

11   which the Court is supposed to -- in order to make a

12   determination of whether there's a Fifth Amendment

13   violation, three elements are:  One -- and *Pinto* is 850 F.2d

14   957, Second Circuit, 1988.

15          The three elements are:  Prosecutorial

16   overreaching must force the witness to invoke the privilege;

17   two, the witness's testimony must be material, exculpatory

18   and not cumulative; and, three, the defendant must have no

19   other way to obtain the evidence.  The defendant bears the

20   burden of convincing the Court that each of these elements

21   is present.

22          There's another circuit decision called -- DC

23   Circuit decision called *United States versus Lugg* -- this is

24   quite old -- 892 F.2d 101 at 104 in which the circuit notes

25   that there are other circuits that have recognized that in,

1    quote, unquote, "extraordinary circumstances" the government

2    may be compelled to grant the defense witness immunity.

3          I think that compulsion is in reference to and not

4    allowing afoul of the Fifth Amendment because the cases are

5    clear the federal trial court has no authority to do so.

6          Quotes from the Seventh Circuit decision -- sorry.

7    Hang on a minute.  I want to make sure I have the citations.

8    I just cut and copy and pasted them, so --

9          So there's two other cases from the DC Circuit.

10   There's *United States versus Lugg*, L-u-g-g, 892 F.2d 101.

11   It notes that the Seventh and Ninth Circuits have indicated

12   the courts may intervene in the prosecutorial immunity

13   decision "where the prosecutor's decision not to grant a

14   witness use immunity has distorted the judicial fact-finding

15   process."  That's quoting a dissent from the Ninth Circuit

16   that quotes a Seventh Circuit decision.

17         The Circuit says -- you know, we're not knowing,

18   but the circuit in that case in that instance did not

19   present extraordinary facts that would be required for the

20   Fifth Amendment to be implicated.

21         There is also a case called *United States versus

22   Moore*, 651 F.3d at 30.  It's a long case, so the relevant

23   provision is from 81 to 83.  It actually references a DC

24   Court of Appeals case.  The Court of Appeals actually has a

25   process in place for when this matter occurs, that is, when

1    a defense witness is called and he invokes the Fifth and the

2    question of immunity comes up.

3            And there's a process that the DC Court of Appeals

4    follows.  The DC Circuit has not adopted that process, and,

5    in fact, has, at least in *Maynard,* suggested that the trial

6    court had not abused its discretion in not following that

7    process in a case called *United States versus Carter.*

8    That's a DC Court of Appeals case, 684 A.2d 331, 1996

9    decision from the DC Court of Appeals.

10           MR. CRISP:  I am sorry.  The preceding cite was

11   651 F.3d at 30, the second one that you cited?

12           THE COURT:  Correct.  651 F.3d 30.  And it's a

13   long decision.  The relevant portions are pages 80 to 83.

14           MR. CRISP:  Thank you.

15           THE COURT:  So I'll give everybody that to have

16   that food for thought, consider it, and let me know what you

17   want to do.

18           At a minimum -- well, I shouldn't say a minimum.

19   I may ask the government to put on the record its reasons

20   for declining to grant use immunity, but -- it's not

21   something that is required by any precedent but may be

22   something that's useful out of an abundance of caution.  But

23   I'll let you all chew on it overnight since I sprung this on

24   you.

25           Okay.  All right.  Are we ready to proceed then?

1          Okay.  Let's bring the jurors in.

2          (Whereupon, the jury entered the courtroom at 1:51 p.m.

3     and the following proceedings were had:)

4          THE COURT:  Please be seated everyone.

5          Ladies and gentlemen of the jury, welcome back.

6     I'll apologize for the extended lunch hour.  There were some

7     legal issues that required my extended attention, so that's

8     the reason for the delay.

9          So we will not be hearing from Mr. Aquino, who was

10    the witness called immediately before lunch.  I'm going to

11    instruct you to disregard anything you may have heard

12    Mr. Aquino say, and I'm also going to instruct you not to

13    speculate as to the reasons why you will not hear from

14    Mr. Aquino -- or you will not be hearing from Mr. Aquino.

15         All right.  With that, we'll have the next

16    witness.

17         MR. TARPLEY:  Yes, Your Honor.  We would like to

18    call Ricky Jackson.

19       (Whereupon, Ricky Jackson, entered the courtroom and the

20    following proceedings were had:)

21         THE COURT:  Okay.  Mr. Jackson, come up here and

22    have a seat, sir.

23         THE CLERK:  Would you please raise your right

24    hand.

25         (Witness sworn.)

1        THE COURT:  Mr. Jackson have a seat, and welcome.

2        Mr. Tarpley, ready when you are.

3   **RICKY JOHNSON, DEFENDANT RHODES WITNESS, DIRECT EXAMINATION**

4                      **DIRECT EXAMINATION**

5   BY MR. TARPLEY:

6   Q.  Good afternoon, Mr. Jackson.  My name is Ed Tarpley.

7   I'm one of the attorneys for Stewart Rhodes.

8        I'd like you, first of all, to start by asking you

9   to tell us your name and where you live.

10  A.  My name is Ricky Allan Jackson.  I live at 161 Fairway

11  Oaks Drive, Perry, Georgia.

12  Q.  How old are you, Mr. Jackson?

13  A.  67.

14  Q.  Could you tell us where you grew up?

15  A.  I grew up in the state of Iowa, a small town of Moville,

16  about 300 people, about 35 miles north of Omaha-Council

17  Bluffs.

18  Q.  Okay.  And what is your educational background?

19  A.  After graduating from high school, I entered into the

20  U. S. Military, the Army, served seven and a half years

21  active duty.  After honorably discharged out of active duty,

22  I joined the Reserve system.

23        I went to night school and got my bachelor's

24  degree.  I continued to get a master's degree.

25  Q.  What are your degrees in?

1    A.  My bachelor's was a double major in management and

2    accounting.  My master's degree was a Master of Business

3    Administration, with a concentration in government

4    contracting.

5    Q.  How long did you serve in the military?

6    A.  Seven and a half -- roughly seven and a half years

7    active duty, and the remainder of my time, about just a

8    little over a combined 20 years, I spent in the Reserves,

9    United States Army Reserves.

10   Q.  After you finished your active duty military career, did

11   you continue to -- where did you continue to work?

12   A.  I secured a position with the United States Army at Fort

13   Devens, Massachusetts, as a civilian.  I worked there for

14   approximately about five years and was able to get a job at

15   Hanscom Air Force Base where I worked for the United States

16   Air Force up until my retirement.

17   Q.  And how long have you been retired?

18   A.  Just a little, about a year and a half.

19   Q.  How many total years did you work for the U. S.

20   Government?

21   A.  Approximately 47 years.

22   Q.  I would like to ask you how you found out about the Oath

23   Keepers.

24   A.  I first became aware of the Oath Keepers when I was up

25   in Massachusetts.  I looked into the organization.  I was

```
 1    thinking about joining them, but for some reason I just
 2    didn't join.  I -- when we moved to Georgia, I became aware
 3    of the Oath Keepers again and decided to join.
 4    Q.  And when did you join?
 5    A.  Roughly about the fall of 2020.
 6    Q.  Why did you join the Oath Keepers?
 7    A.  I -- the people I had talked to in Georgia -- it was the
 8    Georgia Oath Keepers -- they told me what they did, and they
 9    said they provided family and community.  They wanted to
10    help out family and community events and just be there at
11    time of emergencies and just for things of that nature.
12              And that is something that I have always wanted to
13    do, to be part of an organization to serve.
14    Q.  Have you ever been involved in any volunteer activities,
15    like a volunteer fire department of anything like that?
16    A.  I volunteer currently as security for church.
17    Q.  For your church?
18    A.  Yes, sir.
19    Q.  Did you ever attend any Oath Keeper events?
20    A.  Other than Washington, no.
21    Q.  So the first Oath Keeper event that you attended was
22    January 6th; is that right?
23    A.  Yes, sir.
24    Q.  During the year of 2020, what were your thoughts about
25    what was happening?
```

```
1    A.  In regards to what, sir?

2    Q.  The political situation, what was going on across the

3    country.

4    A.  It was a lot of upheaval, a lot of uncertainty.

5    Q.  Were you concerned about the civil unrest?

6    A.  Somewhat, because I live in a 55-plus community, so I

7    was more worried about how that would affect our community.

8    Q.  You said you attended the rally on January 6th.

9             How did you find out about Oath Keepers being

10   involved?  Were you invited to attend by someone?  How did

11   that all take place?

12   A.  I just -- somehow I just --

13            THE COURT:  Mr. Jackson, I'm sorry to interrupt

14   you.  Could I ask you to keep your voice up and speak into

15   the microphone so we don't have any difficulty hearing.

16            THE WITNESS:  Can you hear me good?

17            THE COURT:  Much better.

18            THE WITNESS:  I heard -- I just -- I forget who I

19   heard it from, but I was able to contact the Georgia people,

20   and then they told me that there was going to be an event

21   that was going to be in DC and they were going to be

22   participating.  And I said, Well, I would possibly like to

23   attend if I can, and that was it.

24   BY MR. TARPLEY:

25   Q.  Did you attend the million MAGA march?
```

7747

1    A.   No.

2    Q.   Did you attend the Atlanta rally?

3    A.   No, sir.

4    Q.   Did you attend the Jericho march?

5    A.   No, sir.

6    Q.   How did you get to Washington for the January 6th event?

7    A.   I drove.

8    Q.   Did you drive by yourself?

9    A.   No.  I picked up an individual that said he needed a

10   ride to the event, so I told him that I would provide him a

11   ride.

12   Q.   And who was that?

13   A.   His first name is Brian.

14   Q.   Okay.  Did you drive only with Brian, or did you all

15   meet anyone else on the way to DC?

16   A.   When I had to meet Brian a little bit -- northeast

17   Georgia to pick him up, once I picked him up, we met up with

18   the other three individuals in -- outside of Atlanta.  Once

19   we met up with them, then we gassed up and we headed to

20   Washington, D.C.

21   Q.   Do you remember who they were?

22   A.   One individual I remember was Joshua James.

23   Q.   Do you remember the other two individuals?

24   A.   I don't remember their names at this time, no.

25   Q.   Okay.  So you were riding with an individual named

```
1    Brian?

2    A.  Yes, sir.

3    Q.  Would his name have been Brian Ulrich?

4    A.  Yes, sir.

5    Q.  Now, after you got to Washington, D.C. -- oh, by the

6    way, what day did you all arrive in Washington, D.C.?

7    A.  We arrived the evening of the 4th.

8    Q.  Okay.  And where did you all stay when you were in

9    Washington, D.C.?

10   A.  I believe it was the Mayflower.

11   Q.  Okay.  On the next day, January 5th, what did you all

12   do?  What were your activities on that day?

13   A.  January 5th, we got dressed.  We headed down to the

14   Willard Hotel where we stood outside waiting to hear what

15   our objective was for that day, and Roger Stone was the

16   individual that we were to provide security detail for.

17   Q.  Before you arrived in Washington, were you advised by

18   anyone what you would be doing once you got to Washington,

19   D.C.?

20   A.  Basically I was -- not the specifics who we were going

21   to provide for at that time but basically general crowd

22   safety and security.

23   Q.  Did you bring a firearm with you?

24   A.  No, I did not, sir.  I'm not authorized to carry one in

25   Washington, D.C.
```

1    Q.  Did you bring one with you to Virginia?

2    A.  No, I did not, sir.

3    Q.  So you didn't bring a firearm at all?

4    A.  No, sir.

5    Q.  Okay.  So you said on January 5th you all provided

6    security for Mr. Stone?

7    A.  Yes, sir.

8    Q.  What did that consist of?

9    A.  Basically there was -- what? -- five of us.  We provided

10   security by providing transportation.  We had one speaking

11   engagement at the Supreme Court.  That was in the morning.

12   Then we sat around all afternoon waiting for anything else

13   that he may have plans to do.

14           But he had an evening event on the Freedom Plaza,

15   I believe, which we provided security to him to and from

16   that area.

17   Q.  Did you all do anything else on January 5th other than

18   provide security for Roger Stone?

19   A.  No, that was it.

20   Q.  The next day on January 6th, what did you do?

21   A.  We got dressed.  We headed back to the Willard where we

22   waited to hear about what events Roger Stone would be doing

23   that day.  There was still some confusion about what that

24   would be.  So the team -- we walked over to the Washington

25   Monument area to look over the crowd and observe the crowd

1    and observe all the things that were going there.

2             About maybe after an hour -- it was right before

3    Trump started his speech -- we went back to the hotel, and

4    at that time we were told by Joshua James it was too

5    difficult with the crowd and security to get Roger Stone to

6    and from the area so we would not be doing that event.  So

7    we returned back to our hotel.

8    Q.  And that was the Mayflower?

9    A.  Yes, sir.

10   Q.  How long did you all stay at the Mayflower at that

11   point?

12   A.  We were probably -- once we got back to the hotel, we

13   were there for about an hour, hour and a half.

14   Q.  What happened next?

15   A.  Joshua James came in and told us that President Trump's

16   speech had ended; all the people that were there at the

17   Washington Monument area for his speech were now at the

18   Capitol; and he was going to go there and ask if anybody

19   would want to come to help protect and do our crowd security

20   and safety; and if anyone didn't want to go, they didn't

21   have to.

22   Q.  Okay.  Did you decide to go with them?

23   A.  I did.

24   Q.  How were you all transported to the Capitol?

25   A.  We went back to the Willard to pick up the two carts

1    that we had for our use during those two days, and that's

2    how we made it to the area.

3    Q.  Tell me what happened once you got to the Capitol.

4    A.  By the time we got there, the place was completely

5    packed with people.  We were able to secure a parking place

6    for our golf carts.  We got all of the golf carts.  Then we

7    started -- there was too many people, so we walked in a

8    single file going up to the -- we were on the west side,

9    going around the northwest side.

10   Q.  That's the left-hand side?

11   A.  Yes, sir.  Because there's too many people on that side,

12   and so we went back to the northwest around the Supreme

13   Court side to the northeast.  And there we took a location

14   right there on the Senate side of the building, on the back

15   side.

16   Q.  Once the group made it to that location, what took place

17   next?

18   A.  When we got there, the crowd was a little -- there was a

19   little less people back there, but I wanted to get more of a

20   look, so I went up to a couple of steps.  I was about one

21   step away from a line of police officers that were there

22   watching, and I stood in front of them and just observed the

23   crowd.

24   Q.  Okay.  Did anyone tell you to move from that location?

25   A.  No, sir.  I looked at every police officer and

1    acknowledged where they were and said, you know, basically,

2    How you doing?  But no one ever responded.  No one ever

3    responded with anything.

4    Q.  Did you see anyone fighting the police at that point?

5    A.  No, never saw -- all during the presence around the

6    Capitol building, I never once saw any violence or any

7    agitation towards the police officers, local law enforcement

8    officers.

9    Q.  After you were at that location for a few moments, did

10   Mr. James give any further direction for your group?

11   A.  He basically said we were going to walk down to the

12   center part of the Capitol, so we ended up walking down in

13   that area.

14   Q.  Toward where the central steps were located?

15   A.  Yes.  I believe that's the visitation door there.

16   Q.  Okay.  What happened after you got to that location?

17   A.  We sort of stood around for a little bit, and then he

18   sort of mentioned they were going to go up the stairs, and

19   they started going up the stairs.  Everyone on the team went

20   up.  I stood back for a little bit and then I said, Well,

21   I'll go up.  But there was just too many people on the

22   stairs, but we did go up.

23   Q.  Okay.  Once the team got to the top of the stairs, what

24   happened at that point?

25   A.  At that point I did not see or hear Joshua James said he

1    was going in.  At that point I sort of lost communications

2    with the team.  And I did yell out to the team that I was

3    going to not enter the Capitol but I was going up the

4    stairs, so I would be moving to the south of the door.

5              I took a position up next to a column where there

6    was a rail there.  And I stood right next to a police

7    officer or a law enforcement officer, and we started

8    engaging in a general conversation with him.

9    Q.  What kind of conversation did you have with the police

10   officer?

11   A.  It was pretty much general with what -- the event that

12   was going -- what things were going.  One of the specific

13   things I asked was with regard to the woman that was shot.

14   I just wanted to know what information he had pertaining to

15   that, what happened or is she still alive or okay.  And he

16   didn't have any information, so we just continued general

17   conversation.

18   Q.  So how long did that conversation last?

19   A.  About five, ten, minutes.

20   Q.  Okay.  So at the conclusion of that conversation, what

21   did you do?

22   A.  At that time I observed that there was a bunch of people

23   being pushed, pushed in and pushed out against the door.  I

24   believe the police at that time started using Mace or some

25   tear gas.  And I looked at the police officer and said, Well

1    it's getting too crowded for me.  I'm fearing for my safety,

2    so I said I was going to go back downstairs, at which time I

3    proceeded to go back downstairs and stood next to -- I

4    believe it was two or three vehicles at the bottom, since I

5    was -- I lost the team.  They were separated, so I --

6    Q.  You didn't know where they were at that point?

7    A.  Well, I knew they had gone in.  I just didn't know where

8    they were.  My phone had died.  The radio I had didn't work

9    that well, and I didn't how in the "F" I was going to get

10   back with them.  But I stood looking to see if I could find

11   anyone to reconnect with my team.

12   Q.  So eventually did the team reappear?

13   A.  Yes, sir.

14   Q.  How did they come out?

15   A.  Basically one by one.

16   Q.  And did you all meet at the bottom of the stairs?

17   A.  Pretty much, yes, sir.

18   Q.  And what happened next?

19   A.  Well, before the team met up, there was a point in time

20   where some of the Capitol Police were exiting the building,

21   and they were coming down the stairs.  And I was at the

22   bottom, and no one was really opening up an area for them to

23   walk.  So I started to move people away so that the police

24   would have a free exit to go where they wanted to go.

25              At that time, Brian had come down the stairs.  He

1    took the lead as he walked them through the crowd.  And I

2    watched everyone go by and told them that we had their back,

3    that we were going to help them to go to a safe place, and

4    that once when the last police officer came by, I said, I

5    got your back, and I walked with him until we got around to

6    the Supreme Court steps sort of where there was an open area

7    there, and then said, Okay.  Have a good day, a safe day.

8    Q.  Okay.  After you had left the area immediately in front

9    of the Capitol, did you reassemble with a larger group?

10   A.  Yes.  After -- after we had escorted the police around

11   the corner, we were able to connect back up with the other

12   team members.  We sat and talked a little bit, and then we

13   noticed that there was a larger group of Oath Keepers at the

14   northeast corner, so that's where we went over to join them.

15   Q.  Okay.  Was -- did -- during this day, on January 6th,

16   did you ever see Mr. Stewart Rhodes?

17   A.  At that point I did.  I was able to see Stewart Rhodes.

18   Q.  Had you ever met Mr. Rhodes before?

19   A.  Just a brief time on the 5th that there was a meeting

20   that Joshua James had with them at their hotel.  We just

21   met -- it was a very short introduction to him.

22   Q.  Did you ever talk with Mr. Rhodes?

23   A.  Not in an in-depth conversation, no, sir.

24   Q.  At any time during January the 5th or January 6th, did

25   Mr. Rhodes ever tell you to go into the Capitol?

1    A.  No, sir.

2    Q.  Did anyone ever discuss with you during the January 5th

3    or January 6th that there was a plan to enter the Capitol?

4    A.  No, sir.

5    Q.  If you had heard of a plan to enter the Capitol, what

6    would you have done?

7    A.  First, I would not have entertained that, and I probably

8    would have got in my truck and went home.

9    Q.  What happened after the meeting at the northeast corner

10   of the Capitol grounds where all the Oath Keepers met up?

11   A.  It was just a gathering.  Everybody was just talking.

12   And probably about after 30 minutes or so, the police or --

13   the Capitol Police or law enforcement that was there at the

14   Supreme Court end of the building, they started throwing

15   flash grenades, tear gas and stuff at the crowd without any

16   warning.  They just started throwing these things at people.

17          We were sort of far enough away to stay safe where

18   the projectiles would not hit us, but at that time I told

19   the team leader -- I said it's time to get out of here

20   because they're getting a little -- they're getting a little

21   dangerous.

22   Q.  And did -- did you leave the grounds at that moment?

23   A.  Yes, sir.  We backed off towards the Supreme Court

24   building.  Then we made our way around the grass area and

25   came down the curve to the little path area back down to the

```
1    golf carts.

2    Q.  Once you got to the golf carts, what did you do?

3    A.  We got on the golf carts and we came back over to the

4    hotel.

5    Q.  Where did you all leave the golf carts?

6    A.  We left the carts at the Willard.

7    Q.  And you went back to the Mayflower?

8    A.  Yes, sir.

9    Q.  Did you spend the night at the Mayflower on January 6th?

10   A.  Yes, sir.

11   Q.  When did you leave Washington, D.C.?

12   A.  We left bright and early probably around -- I'll give

13   you a window -- between 6:00 and 7:00 a.m.

14   Q.  And where did you go?

15   A.  We went home.

16   Q.  And who was with you when you went home?

17   A.  There was Brian, and there was two other individuals

18   that was with the team that we drove.

19   Q.  Since the time period of January 6th, have you had any

20   further activities with the Oath Keepers?

21   A.  No, I have not.

22   Q.  Subsequently, in April of 2021, were you contacted by

23   the FBI?

24   A.  Yes, I was.

25   Q.  And did you speak with the FBI?
```

 1    A.  Yes, I did.

 2                MR. TARPLEY:  That's all the questions I have.

 3                THE COURT:  Thank you, Mr. Tarpley.

 4                Mr. Geyer, could you get on the phone please.

 5          (Whereupon, the following proceedings were held at

 6    sidebar outside the presence of the jury:)

 7                THE COURT:  Mr. Geyer, what's the basis of the

 8    proposed cross-examination?

 9                MR. GEYER:  I have two videos of the event which

10    I'd like to see if he can identify maybe even himself or

11    certainly the scene as a fair and accurate description of

12    what he described when evacuating the police.

13                THE COURT:  Okay.  Any objection to him asking

14    those questions and introducing those videos?

15                MS. HUGHES:  I have not seen the videos, so we

16    would ask to identify their admissibility before he does

17    that.

18                THE COURT:  Mr. Geyer, can you show him the

19    videos?

20          (Whereupon, counsel conferred out of the hearing of the

21    jury.)

22                THE COURT:  Counsel, where are we?

23                MS. RAKOCZY:  Your Honor, we would object to any

24    cross.  We do not believe that Mr. Harrelson was in any way

25    in this testimony and I would object to this.

1          And we have additional issues with the

2    admissibility at large, but sort of the first issue, we

3    would object to cross-examination.

4          THE COURT:  Mr. Geyer?

5          MR. GEYER:  There is an understanding in many

6    corners of the law enforcement community and the Oath

7    Keepers that if they have an issue, they find an Oath

8    Keeper.  A picture of this video depicts two Oath Keepers,

9    one of them I anticipate would be testifying, who is sought

10   out by the police officer for assistance in extracting his

11   police line.

12         THE COURT:  Mr. Geyer, when you say you're

13   anticipating another Oath Keeper will be testifying, is that

14   somebody you intend to call?

15         MR. GEYER:  Yes, it is.

16         THE COURT:  So I'll -- in light of that

17   representation, I will sustain the objection to

18   cross-examination.  Mr. Harrelson was not implicated in the

19   witness's testimony, and, therefore, the confrontation right

20   does not arise.  And given that Mr. Geyer is representing

21   that he expects somebody to testify who will authenticate

22   the video, we'll save that for his case.

23         MR. GEYER:  Thank you.

24         THE COURT:  All right.  Thank you.

25         (Whereupon, the following proceedings were had in open

1    court:)

2              THE COURT:  All right.  So, Ms. Hughes, come to

3    the podium.

4                        **CROSS-EXAMINATION**

5    BY MS. HUGHES:

6    Q.  My name is Alexandra Hughes.  I represent the United

7    States.

8              How are you?

9    A.  Fine.

10   Q.  Sir, you became a member of the Oath Keepers in

11   November 2020, correct?

12   A.  In the fall of 2020, yes.

13   Q.  And you purchased a membership on November 17th, 2020?

14   A.  If that's what the date was, yes.

15   Q.  And then December 2020, you were added to a Signal group

16   that was called the Georgia OK general chat; is that

17   correct, sir?

18   A.  I believe so.

19   Q.  And Signal is an encrypted application you can text

20   people and message in different groups, right?

21   A.  Yes, ma'am.

22   Q.  And this Georgia group, that was a group that was

23   specific to the Oath Keepers in Georgia?

24   A.  Yes, ma'am.

25              MS. HUGHES:  If we could please bring up just for

7761

1     the witness Government Exhibit 9300.

2              THE COURT:  It should come up on your screen

3     shortly.

4     BY MS. HUGHES:

5     Q.  Now, sir, on the screen in front of you there is a

6     single message, and if you look on the top right hand of

7     this image, it says "Georgia OK general chat."

8              That is the name of the chat, right?

9     A.  Yes, ma'am.

10    Q.  And if you see, this message says, "Welcome Rick Jackson

11    to the group."

12             Rick Jackson is you, correct?

13    A.  Yes, ma'am.

14             MS. HUGHES:  And if you could flip through,

15    Ms. Rhode, if you keep going and keep on the right-hand

16    side -- upper right.

17    BY MS. HUGHES:

18    Q.  These remain messages that were sent in the Georgia OK

19    general chat by you, Rick, and others in that group,

20    correct?

21    A.  I believe so, yes.

22             MS. HUGHES:  The government seeks to admit and

23    publish Government's Exhibit 9300.

24             THE COURT:  Any objection?

25             MR. TARPLEY:  No objection.

```
 1                    MR. FISCHER:  Can we see all the slides first?

 2                    MS. HUGHES:  That's it.

 3                    MR. FISCHER:  No objection.

 4                    THE COURT:  Government 9300 will be admitted.

 5          (Government Exhibit 9300 admitted.)

 6                    MS. HUGHES:  Ms. Rohde, if we could begin on

 7     slide 1.

 8     BY MS. HUGHES:

 9     Q.  Starting here on December 11th, John P writes to the

10     group, "Welcome Rick Jackson to the group.  Glad to have you

11     Rick."

12                    That's you, sir?

13     A.  Yes, ma'am.

14     Q.  Now you joined this group on December 11th?

15     A.  I was added to the group.

16     Q.  Added to the group on December 11th.

17                    MS. HUGHES:  If we could please go to slide 2.

18     BY MS. HUGHES:

19     Q.  Bilbo, now this is Brian Ulrich.  Bilbo here on the

20     left, that is Brian Ulrich, and Mr. Ulrich is the individual

21     you rode with to Washington, D.C., correct?

22     A.  Yes, ma'am.

23     Q.  And on December 15th, Mr. Ulrich writes the same group,

24     "I need some OK patches," OK meaning Oath Keepers, correct?

25     A.  Yes, ma'am.
```

1          MS. HUGHES:  If we could go to slide 3, please.

2

3     BY MS. HUGHES:

4     Q.  And you respond.  You were Rick, right, and this is your

5     number?

6     A.  Yes, ma'am.

7     Q.  You respond on the same day, "I would like to get some.

8     I would also like to get some," right?

9     A.  Yes, ma'am.

10    Q.  So on December 15th -- this is roughly three weeks

11    before January 6th -- you don't even have Oath Keepers gear

12    at this point, right?

13    A.  They didn't have any specific gear, no, ma'am.

14    Q.  You didn't have the Oath Keepers patches or any of the

15    Oath Keepers -- or insignia gear that you would wear?

16    A.  No, ma'am.

17    Q.  Because you're new?

18    A.  Yes, ma'am.

19          MS. HUGHES:  If we could go to the next slide,

20    please.

21    BY MS. HUGHES:

22    Q.  On page 4, December the 19th, one week after you joined

23    this chat, Mr. Ulrich, Bilbo, writes, "I know folks on the

24    Donald Win site are saying they are coming armed, but I

25    think it's the bodies that matter"; is that correct?

1    A.  If that's what he wrote, yes, ma'am.

2    Q.  And December 19th, this the same date that President

3    Trump had announced a rally in Washington, D.C., correct?

4    A.  If that's what was stated, yes, ma'am.

5            MS. HUGHES:  If we could go to the next slide

6    please.

7    BY MS. HUGHES:

8    Q.  And you respond on December 19th, this same date, "We

9    can have nonlethal items, batons and so forth"; is that

10   right?

11           Is that right, sir?

12   A.  Yes, ma'am.

13           MS. HUGHES:  If we could please go to the next

14   slide.

15   BY MS. HUGHES:

16   Q.  "Just getting back on the tread" -- thread -- "I am in

17   if you guys are planning a trip.  I can drive and take three

18   or four others"; is that correct?

19   A.  Yes, ma'am.

20           MS. HUGHES:  Can we move to the next slide.

21   BY MS HUGHES:

22   Q.  The next day, on December 20th, you write, "January 6th,

23   the great reset, America or not"; is that correct?

24   A.  I don't remember sending that one, no.

25   Q.  Is this your number, sir, on the top left?

1    A.  It is my number.

2            MS. HUGHES:  If we could please go to the next

3    chat.

4    BY MS. HUGHES:

5    Q.  You write again on December 22nd, two days later,

6    "Remember John Paul Jones.  Surrender?  I have yet to begin

7    to fight.  Patriots must have the will, desire, and resolve

8    to see this through.  Cannot just let things happen and be

9    on the sidelines."

10           Sir, John Paul Jones is a commander in the

11   Revolutionary War, correct?

12   A.  Yes, ma'am.

13           MS. HUGHES:  Now the next page, please, Ms. Rohde.

14   BY MS. HUGHES:

15   Q.  Another individual, Truth Seeker 69, writes the next

16   day, on December 23rd, "A link to an open letter to

17   President Trump."

18           Do you remember reading this letter, sir?

19   A.  I don't remember, no, ma'am.

20           MS. HUGHES:  Ms. Rohde, if we can please bring up

21   what's already in evidence Government Exhibit 1008.  If we

22   could go to page 6.  Zoom in just a little bit.

23           Perfect.  Thank you, Ms. Rohde.

24   BY MS. HUGHES:

25   Q.  And the part I want to focus your attention on, sir, is

1    this letter, which is from Mr. Rhodes, correct?

2            If you could focus your attention here.  This

3    letter is from Mr. Rhodes in which he wrote, "If we fail to

4    root out the deep state, root out the branch now, this

5    republic is dead.  We, the people, will not let that happen,

6    but we need you, President Trump, to stand up and honor your

7    oath and do your duty as commander in chief."

8            And he goes on to say, "If you fail to do your

9    duty, you will leave we, the people, no choice but to walk

10   in the founders' footsteps by declaring the regime

11   illegitimate and incapable of representing us, destructive

12   of the just ends of government.  And like the founding

13   generation, we will take up arms in defense of our God-given

14   liberty."

15           Do you see that on the screen?

16   A.  I see that on the screen, yes, ma'am.

17           MS. HUGHES:  And if we can go back, please, to

18   Government's Exhibit 9300, page 10.

19           If we go back one slide.

20   BY MS. HUGHES:

21   Q.  So after Truth Seeker 69 links to this article, this

22   letter from Mr. Rhodes, you respond.  And this message was

23   sent at 12-23 and the time is 8:41 p.m.

24           MS. HUGHES:  Go to the next slide.

25   BY MS. HUGHES:

7767

1    Q.  12-23 8:42 p.m. you write, "The red line in the sand";

2    is that correct, sir?

3    A.  I don't remember sending that, no, ma'am.

4              MS. HUGHES:  If we could go to the next slide,

5    please.

6    BY MS. HUGHES:

7    Q.  On the same date, December 23rd, you write further, "We

8    are patriots.  We are strong together and shall overcome the

9    evilness that's before us.  Stand strong and do not waiver.

10   Our family and our country depend on us."

11             Did you write this, sir?

12   A.  I don't remember, ma'am.

13   Q.  And is that your number?

14   A.  That's my number.

15             MS. HUGHES:  We can bring that down, Ms. Rohde.

16   BY MS. HUGHES:

17   Q.  Now, in fact, Mr. Jackson, you travelled to DC for

18   January 6th, correct?

19   A.  Yes, ma'am.

20   Q.  And on January 4th, you testified on direct that you

21   traveled from Georgia with another individual?

22   A.  Yes, ma'am.

23   Q.  And that individual is Brian Ulrich, correct?

24   A.  Yes, ma'am.

25   Q.  And you travelled to DC and you stayed at the Mayflower

1    hotel?

2    A.  Yes, ma'am.

3    Q.  But you did not make your reservation at the Mayflower

4    Hotel, correct?

5    A.  No.

6    Q.  That reservation was made by Roberto Minuta?

7    A.  I did not know who the reservations were made by.  I

8    thought they were made by Joshua James.

9    Q.  You were -- and speaking of Mr. James, Mr. James was the

10   head of your contingent, right?  He was the head of the

11   southeast group that you were traveling with, correct?

12   A.  The what group?

13   Q.  The southeast, the Georgia group, the Alabama group; he

14   was the head of your group?

15   A.  Yes, ma'am.

16   Q.  Now you said that you were accompanying Roger Stone this

17   weekend, but Roger Stone did not stay at the Mayflower,

18   correct?

19   A.  No, ma'am.

20   Q.  He was at the Willard?

21   A.  Yes, ma'am.

22   Q.  That's a different hotel in DC, right?

23   A.  Yes, ma'am.

24   Q.  Let's move to January 6th.

25          Now, on January 6th, you testified that you were

1   with Roger Stone for part of the day; is that correct?

2   A.  I was outside the hotel.  He did come out and speak for

3   a bit, yes, ma'am.

4   Q.  And the other Oath Keepers you were with were Mark

5   Grods, correct?

6   A.  I don't remember.

7   Q.  Brian Ulrich?

8          MR. TARPLEY:  Objection.  He didn't actually

9   identify everybody who was there.  He said there were a

10  couple that he didn't know.

11         THE COURT:  He can answer if he knows.

12  BY MS. HUGHES:

13  Q.  You've already identified Brian Ulrich?

14  A.  Yes, ma'am.

15  Q.  Roberto Minuta?

16  A.  Yes, ma'am.

17  Q.  And Joshua James?

18  A.  Yes, ma'am.

19  Q.  And you said there were five of you, so that's the five

20  who was in your group that day, correct?

21         We can go through them again.

22         Mark Grods, Brian Ulrich, Roberto Minuta, Josh

23  James and yourself; that was your contingent that day,

24  correct?

25  A.  I believe so.  There might have been two others, but...

1   Q.  So on January 6th, you mentioned that you had been at

2   the Willard with Mr. Stone, but at a certain point you

3   returned to the Mayflower, correct?

4   A.  Yes, ma'am.

5   Q.  And you on direct you testified that you were at the

6   Mayflower for about an hour or so before you left the hotel?

7   A.  I wasn't wearing a watch, so -- I'm not a good

8   timekeeper, so about an hour.

9   Q.  And you, Mr. Josh James, Mr. Roberto Minuta, Mr. Mark

10  Grods, you went back to the Capitol, didn't you?

11  A.  Yes, ma'am.

12  Q.  And to get there, you had to go to the Willard first?

13  A.  Yes, ma'am.

14  Q.  And you obtained golf carts?

15  A.  The golf carts that he had in his possession to allow us

16  to provide security for Roger Stone.

17  Q.  And you used those golf carts to drive to the United

18  States Capitol?

19  A.  Yes, ma'am.

20          MS. HUGHES:  If we could bring up what's already

21  in evidence as Government's Exhibit 1500.

22          And, Ms. Rodhe, if we could start the video at

23  14 minutes 34 seconds.

24          Pause there, please.

25  BY MS. HUGHES:

```
1    Q.  This is Roberto Minuta, correct?

2    A.  I believe so, yes.

3             MS. HUGHES:  If we can please keep playing,

4    Ms. Rohde.

5         (Whereupon, Government's Exhibit 1500 played.)

6             MS. HUGHES:  You can pause there.

7    BY MS. HUGHES:

8    Q.  So Robert Minuta, who is narrating this video, he's in

9    the first golf cart, right?

10   A.  You said he's in the first golf cart?

11   Q.  Well, yeah.  So let me back up.

12            There's two golf carts, right?  You all didn't go

13   in one golf cart.

14            So in this golf cart there's Roberto Minuta that's

15   narrating this video, correct?

16   A.  It appears so, yes.

17   Q.  And Roberto Minuta is in this golf cart that's being

18   driven by Joshua James, the leader of your contingent,

19   right?

20   A.  Yes.

21   Q.  And in the back is Brian Ulrich?

22   A.  If you say so, yes, ma'am.

23   Q.  And you're in the second golf cart that's following this

24   golf cart, correct?

25   A.  Yes, ma'am.
```

1    Q.  And in your golf cart is Mark Grods and Jonathan Walden,

2    correct?

3    A.  Yes, ma'am.

4    Q.  And Jonathan Walden actually has a dog, right, named

5    Warrior?

6    A.  Yes, ma'am.

7    Q.  And you are following this golf cart to the United

8    States Capitol?

9    A.  Yes, ma'am.

10   Q.  And Mr. Minuta on this video says, "Headed to the

11   Capitol.  Patriots storm the Capitol.  There's violence

12   against patriots."

13            So you're aware at this point that this is not a

14   peaceful protest, correct?

15   A.  He may have said that, but I might not have heard that.

16   There was too much noise and traffic going on.

17   Q.  But you were aware when you left the hotel what the

18   situation was at the United States Capitol?

19   A.  I was aware there were a lot of people there, yes.

20            MS. HUGHES:  We can keep playing this, Ms. Rohde.

21            We can pause there, Ms. Rohde.

22   BY MS. HUGHES:

23   Q.  Do you see there's a police car trying to block the road

24   here?

25   A.  I see the police cars, yes, ma'am.

1          MS. HUGHES:  And we can keep playing.

2          We can pause right there, Ms. Rohde.

3     BY MS. HUGHES:

4     Q.  Again, Mr. Jackson, do you hear on the video what

5     appears to be directions from a Google Maps or from some

6     sort of navigation system, the voice that said in a robotic

7     tone, "At the light turn left on Constitution Avenue"?

8     A.  That's what it appears, yes.

9     Q.  Do you know what address was entered into the phone to

10    navigate here?

11    A.  No, I don't.

12    Q.  Do you know if there was a specific location relayed to

13    your group about where you should go in your golf carts?

14    A.  I was not aware.

15          MR. TARPLEY:  Objection, Your Honor.  May it

16    please the Court, the witness has already testified he was

17    in the second golf cart.  This is Mr. Minuta's phone.  He's

18    in the first golf cart.  There's no way that the witness

19    could have heard what was going on in the second golf cart.

20          MS. HUGHES:  I can make it more general.

21    BY MS. HUGHES:

22    Q.  Were you told before you got in the golf carts, "Here's

23    the location where we're going"?

24    A.  No, ma'am.

25    Q.  And you weren't in touch with Mr. Rhodes that day, were

7774

1    you, sir?

2    A.  No, ma'am.

3    Q.  You didn't have any calls with Mr. Rhodes?

4    A.  No, ma'am.

5    Q.  You didn't have any texts with Mr. Rhodes?

6    A.  No, ma'am.

7    Q.  But Joshua James was in touch with Mr. Rhodes, wasn't

8    he?

9    A.  He was the team lead.

10            MS. HUGHES:  We can keep playing this.

11            You can pause right there.

12   BY MS. HUGHES:

13   Q.  Is that Mr. Minuta reporting, "Word is they got in the

14   building"?

15   A.  That's what you have there; that's what he said.

16   Q.  That's at 2:35, correct?  That's the ticker at the

17   bottom?

18   A.  2:35 p.m., yes, ma'am.

19            MS. HUGHES:  We can keep playing.  Thank you,

20   Ms. Rohde.

21            And we'll pause there for a second again.

22            Sorry.  If we could just go back two seconds,

23   Ms. Rohde.  My apologies.

24            Pause there.

25   BY MS. HUGHES:

```
1    Q.  The individual who is ahead of you is Mr. Josh James,

2    correct?

3    A.  Yes, ma'am.

4    Q.  So he's the one who's leading the way?

5    A.  Appears that way, yes, ma'am.

6    Q.  Just to be clear, where you parked your golf carts --

7    you testified to this on direct -- this was on the west side

8    of the Capitol, right?

9    A.  I believe it was on the west side, yes, ma'am.

10            MS. HUGHES:  Okay.  If we could please keep

11   playing, Ms. Rohde.

12   BY MS. HUGHES:

13   Q.  And, again, that was Joshua James, correct?

14   A.  Yes, ma'am.

15   Q.  So you moved from the west side, but you don't stay on

16   the west side, right?

17   A.  No, ma'am.

18   Q.  And here we see you.  You've referred to yourselves as

19   walking in a stack formation, in a single line formation,

20   correct?

21            MR. TARPLEY:  Objection, Your Honor.  The witness

22   never testified that they were walking in stack formation.

23   He never used those words.

24   BY MS. HUGHES:

25   Q.  In a single line?  You testified that you have walked in
```

```
 1    a single line, correct?

 2    A.  In a single line, yes, ma'am.

 3    Q.  And this is your group walking in a single line.  You

 4    also notice the dog?

 5    A.  Yes, ma'am.

 6    Q.  And this is at 2:45 p.m.?

 7    A.  Yes, ma'am.

 8    Q.  At this point you are walking from the west to the east,

 9    correct?

10    A.  Yes, ma'am.

11              MS. HUGHES:  Please keep playing, Ms. Rohde.

12              And we can pause at 1701, 17 minutes and 1 second.

13    BY MS. HUGHES:

14    Q.  Now, when you get to the east side --

15              MS. HUGHES:  We can bring that down for a moment,

16    Ms. Rohde.

17    BY MS. HUGHES:

18    Q.  When you get to the east side, you observed Roberto

19    Minuta berating and screaming at law enforcement, don't you?

20    A.  Yes, ma'am.

21              MS. HUGHES:  If we could please bring up just for

22    the witness Government Exhibit 1088, page 1.

23         (Government's Exhibit 1088 played.)

24    BY MS. HUGHES:

25    Q.  Do you see Mr. Minuta in this video?
```

7777

1    A.  I see him there, yes, ma'am.

2    Q.  And do you see Joshua James?

3    A.  Yes, ma'am.

4         MS. HUGHES:  Government seeks to admit and publish

5    Government's Exhibit 1088.1.

6         THE COURT:  Any objection?

7         MR. WOODWARD:  I'll object -- objection to

8    transcripts, and I'm not sure a proper foundation has been

9    laid for the entire video, given we have not seen all that's

10   in it.

11        MS. HUGHES:  We can play it in full.  And the same

12   stipulation applies regarding this transcript as to the

13   others.

14        THE COURT:  Okay.  Has he verified the accuracy of

15   the video?

16        MS. HUGHES:  It is a very short video, so we can

17   play a few more seconds.  It is just this scene.

18        THE COURT:  Play the video and have him verify.

19        MS. HUGHES:  Ms. Rohde, if you can please keep

20   playing.

21   BY MS. HUGHES:

22   Q.  Is that the scene you observed, Mr. Jackson?

23   A.  Can you repeat that?

24   Q.  Is that the scene you observed, Mr. Minuta berating law

25   enforcement?

```
 1    A.  I was observing a lot of things.

 2    Q.  Do you see yourself in that video?

 3    A.  I see myself in that video, yes, ma'am.  But I may not

 4    have observed him personally.  There was too much of chaos

 5    going on.

 6              THE COURT:  Okay.  I'll admit it over objection.

 7              MS. HUGHES:  If we could please publish and start

 8    from the beginning Government Exhibit 1088.1.

 9        (Government's Exhibit 1088.1 admitted.)

10        (Government's Exhibit 1088.1 played.)

11              MS. HUGHES:  Now pause there.

12    BY MS. HUGHES:

13    Q.  So in this video you see Roberto Minuta, correct?

14    A.  Yes, ma.

15    Q.  Brian Ulrich, correct?

16    A.  Yes, ma'am.

17    Q.  And Joshua James, correct?

18    A.  Yes, ma'am.

19    Q.  And now you see Mark Grods, Jonathan Walden and

20    yourself, correct?

21    A.  Yes, ma'am.

22        (Government's Exhibit 1088.1 played.)

23    BY MS. HUGHES:

24    Q.  Now, sir, that's not the only time Roberto Minuta

25    berated and aggressively screamed at law enforcement, was
```

 1    it, that day?

 2    A.  I don't believe so.  Yes, ma'am.

 3             MS. HUGHES:  If we could please bring up

 4    Government's Exhibit 2004.2, just for the witness.

 5        (Government's Exhibit 2004.2 played.)

 6             THE COURT:  Keep the volume down while the witness

 7    is viewing the video, please.  Just have him take a look at

 8    the video without the sound.

 9        (Government's Exhibit 2004.2 played.)

10    BY MS. HUGHES:

11    Q.  The individual we saw at the beginning of the video,

12    that was Mr. Brian Ulrich, correct?

13    A.  Yes, ma'am.

14             MS. HUGHES:  The problem, Your Honor, is that he

15    needs to recognize Mr. Minuta's voice.

16    BY MS. HUGHES:

17    Q.  Is this at the Capitol?  Is this consistent with the

18    steps you were located at at the Capitol, Mr. Jackson?

19    A.  It's -- I can't tell specifically as to a close-up view.

20             MS. HUGHES:  Without Mr. Minuta's voice, it's

21    difficult to ask further questions about this.

22             THE COURT:  Any objection to its admission,

23    Counsel?

24             MR. WOODWARD:  I'm sorry.  Yes, Your Honor.  He

25    doesn't -- if he doesn't recognize what's happening here, he

 1    can't authenticate the video.

 2              MS. HUGHES:  If we can ask him to identify

 3    Mr. Minuta's voice.  He's recognized Brian Ulrich.  Taken in

 4    totality -- the group was together -- I think there's

 5    sufficient foundation for me to play his voice.

 6              THE COURT:  Okay.  If he can recognize the voice.

 7              MS. HUGHES:  If you can please play the sound,

 8    Ms. Rohde.

 9    BY MS. HUGHES:

10    Q.  First of all, is that the dog Warrior, to begin with?

11    Is that Mr. Walden's dog?

12    A.  It appears that he is, yes, ma'am.

13              MS. HUGHES:  If we can please keep playing.

14    BY MS. HUGHES:

15    Q.  Is that Brian Ulrich?

16    A.  It appears to be, yes, ma'am.

17              MS. HUGHES:  Please keep playing.

18    BY MS. HUGHES:

19    Q.  Is that Mr. Minuta's voice, Mr. Jackson?

20    A.  I don't recognize it.

21    Q.  Are these the steps of the Capitol where you were with

22    that group?

23    A.  It doesn't appear to be the same place I was standing

24    on.

25    Q.  At any point that day were you separated from

```
 1    Mr. Walden, Mr. Minuta, and Mr. Brian Ulrich prior to them

 2    entering the Capitol?

 3    A.  Yes, ma'am.

 4    Q.  When were you separated from them?

 5    A.  When we were walking up towards the -- we were in that

 6    area, and so we got separated.  And separated could be from

 7    here to the door.  I was not in constant grouping with them.

 8                THE COURT:  He can't meet the video requirement.

 9                MS. HUGHES:  It's fine.  We can move on.

10                THE COURT:  The objection will be sustained.

11    BY MS. HUGHES:

12    Q.  Mr. Jackson, Mr. Minuta was saying more than howdy,

13    wasn't he?

14    A.  Yes, ma'am.

15    Q.  You testified on direct that you were saying hello to

16    officers cordially, but that's not what Mr. Minuta was doing

17    in that video, was he?

18                We can move on.

19                MS. HUGHES:  If we can please move back to

20    Government Exhibit 1500, and we can start at 1701.  Thank

21    you, Ms. Rohde.

22    BY MS. HUGHES:

23    Q.  Now, when you moved to the east side from the west side,

24    which is where you parked --

25                MS. HUGHES:  You can pause right there.
```

```
 1      BY MS. HUGHES:
 2      Q.  -- you move up the center steps of the east side of the
 3      Capitol; isn't that right?
 4      A.  Yes, ma'am.
 5      Q.  Now, there are more than one set of steps on the east
 6      side, correct?
 7      A.  I believe there's three sets.
 8      Q.  And you move up the center steps?
 9      A.  Yes, ma'am.
10      Q.  And when you move up these steps, Joshua James enters
11      the Capitol?
12      A.  I believe so, yes, ma'am.
13      Q.  Roberto Minuta enters the Capitol?
14      A.  I believe so, yes, ma'am.
15      Q.  Jonathan Walden enters the Capitol?
16      A.  I believe so, yes, ma'am.
17      Q.  Mark Grods enters the Capitol?
18      A.  I believe so, yes, ma'am.
19      Q.  And Brian Ulrich enters the Capitol?
20      A.  I believe so.  Yes, ma'am.
21              MS. HUGHES:  If we can please keep playing,
22      Ms. Rohde.
23      BY MS. HUGHES:
24      Q.  And at this point, as you can see in this video, it is a
25      crowded scene in these doors at 3:14 p.m., correct?
```

1          MR. TARPLEY:  Objection, Your Honor.  The witness

2    never entered the Capitol.  He can't testify about what

3    happened in the Rotunda.  He was outside the door.

4          THE COURT:  All right.  I understand.

5          The video is in, but I'll ask you not to ask him.

6    Surely he can see on the video.  He wasn't inside so --

7          MS. HUGHES:  And the government is not going to

8    ask what happened inside.

9          THE COURT:  Okay.

10          MS. HUGHES:  You can please keep playing,

11    Ms. Rohde.

12    BY MS. HUGHES:

13    Q.  And then at 3:21 p.m., this is when Brian Ulrich and

14    Mark Grods entered the Capitol, correct?

15          MR. TARPLEY:  Objection, Your Honor.  Same -- same

16    objection.

17          THE COURT:  He's testified that he saw them enter

18    the building and knew they entered the building, so that's

19    appropriate.  It's overruled.

20    BY MS. HUGHES:

21    Q.  Correct?

22    A.  They're on the video going through the doors, yes,

23    ma'am.

24    Q.  And, Mr. Jackson, do you know that these doors are

25    called the East Rotunda doors?

1    A.  I'm not that familiar with the building, of the door

2    names, no, ma'am.

3    Q.  So you don't know that these doors lead directly to the

4    Rotunda of the United States Capitol, do you?

5    A.  No, I didn't, ma'am.

6        MS. HUGHES:  You can please keep playing,

7    Ms. Rohde.

8    BY MS. HUGHES:

9    Q.  Now, after they enter the United States Capitol, that

10   isn't the last time you see the members of your group,

11   correct?

12   A.  Correct.

13   Q.  You testified that when they exited, you rejoined with

14   these members, correct?

15   A.  Yes, ma'am.

16   Q.  And you testified that you were escorting or

17   accompanying officers after they exited the building?

18   A.  Yes, ma'am.

19        MS. HUGHES:  And if we could please bring up just

20   for the witness Government's Exhibit 9301.

21        And if we could please play -- and I think we will

22   need audio with this, Your Honor, for authenticity purposes.

23        If you could please play through with audio just

24   for the witness, Ms. Rohde.

25        (Government's Exhibit 9301 played.)

1            MS. HUGHES:  Pause there.

2

3      BY MS. HUGHES:

4      Q.  Is this the east side of the Capitol?

5      A.  It appears to be so.

6      Q.  And is this consistent with the line of officers exiting

7      the Capitol?

8      A.  I remember during that time I was standing at the bottom

9      of the stairs.  The stairs are very steep.  These stairs

10     don't look that steep.

11     Q.  Is that Mr. --

12     A.  But it is consistent.  There were about 20 officers that

13     came out of the Capitol.

14     Q.  Is that Mr. Roberto Minuta's voice?

15     A.  I couldn't tell.

16            MS. HUGHES:  The government seeks to admit and

17     publish Government's Exhibit 9301.

18            THE COURT:  Any objection?

19            MR. WOODWARD:  Objection, Your Honor.

20        (Whereupon, the following proceedings were held at

21     sidebar out of the presence of the jury:)

22            MR. WOODWARD:  We tried to bring this video in.

23     The government objection to our objection would be ruled we

24     can bring all the video.  In my absence -- I'm speaking over

25     my skis here, but my understanding is that we moved to admit

1    this and the government objected.

2              THE COURT:  I don't recall that specifically.

3              MS. HUGHES:  I don't either.  I don't know what

4    video they're referring to if it was not one that they could

5    lay a foundation with with the witness on the stand.

6              THE COURT:  I think the bottom line, he said this

7    is consistent with what he saw with these officers coming

8    down the stairs.  If there's an incomplete portion of the

9    video that needs to be played, then that's appropriate, but

10   I don't know what it is specifically you're referring to.

11             I understand the government is going to play at

12   least the entirety of this video, correct?

13             MS. HUGHES:  Correct.  And it's not a very long

14   clip.  And my apologies.  I don't recall what video they're

15   referring to.

16             MR. WOODWARD:  I'll find out as quick as I can.

17             THE COURT:  So this is 9301.  That will be

18   admitted.

19        (Government's Exhibit 9301 admitted.)

20        (Whereupon, the following proceedings were had in open

21   court:)

22             BY MS. HUGHES:  Back to the beginning and publish

23   please.

24        (Government Exhibit 9301 played.)

25   BY MS. HUGHES:

1    Q.  Now, the voice on this video said, "These are police

2    being escorted from our, expletive, building," correct?

3    A.  Can you repeat that?

4    Q.  The voice on this video said, "These are police being

5    escorted from our, expletive, building" -- "our fucking

6    building" is what he specifically said.

7              THE WITNESS:  I be free to speak?

8              THE COURT:  Just respond to her question, sir.

9              THE WITNESS:  At that moment of time when the

10   police were coming down the steps, as I said, I was located

11   by the two vehicles at the bottom of the stairs.  There was

12   a lot of people, a lot of conversations going on, good and

13   bad.

14             My position there was to secure the safety of

15   people all around me.  They did not have an open area, so I

16   asked people to move aside so we could let the police go

17   through peacefully.

18             I stated before that Brian took the lead to lead

19   them through the crowd.  I stood there and looked at every

20   one of them coming down and told them I had their back.  I

21   didn't care what people were saying at that time.  My focus

22   was on their security.

23   BY MS. HUGHES:

24   Q.  Sir --

25   A.  And when the last one went through --

1    Q.  Sir -- sir --

2    A.  -- I followed them out.

3    Q.  Sir, is the voice you heard on that video consistent

4    with Roberto Minuta --

5    A.  I cannot testify --

6              THE COURT REPORTER:  One at a time, please.

7    BY MS. HUGHES:

8    Q.  Is the voice you heard on that video consistent with

9    Robert Minuta's voice, the voice we heard on the golf cart

10   going to the Capitol?

11   A.  I cannot testify to that, ma'am, because, as I said, my

12   focus was on their safety.  I blocked out all other

13   conversations at that moment, and that's what happens to me

14   in a crowd.  My ears -- I block out conversations.  I'm

15   focused on -- my only purpose was to their safety.

16             MS. HUGHES:  If we could please bring up just for

17   the witness Government's Exhibit 4757.

18   BY MS. HUGHES:

19   Q.  Is this you on the steps, these same steps we've been

20   talking about?

21   A.  Yes, ma'am.

22             MS. HUGHES:  If we could publish to the jury and

23   admit Government's Exhibit 4757.

24             THE COURT:  4757 will be admitted.

25        (Government's Exhibit 4757 admitted.)

```
 1    BY MS. HUGHES:

 2    Q.  Sir, isn't this after Mark Grods, Roberto Minuta, Brian

 3    Ulrich, Joshua James, Jonathan Walden had exited the

 4    Capitol?  Isn't this after they got into the Capitol?

 5    A.  You're saying that this picture is taken at the

 6    approximate time that they exited?

 7    Q.  No, just after.  It's just after they've exited the

 8    building; that's correct, right?

 9    A.  I cannot testify to that because when they were exiting,

10    I was helping the police move.

11    Q.  Where are you in this photo, sir?  You're in the center,

12    correct?

13    A.  In the center.

14    Q.  And Brian Ulrich is on your right?

15    A.  He's on my left.

16    Q.  Brian Ulrich?

17    A.  Yes.  That's my left.

18    Q.  Fair enough.  And this is Mr. Walden on your right, my

19    left?

20    A.  Yes, ma'am.

21    Q.  And this is Roberto Minuta?

22    A.  Yes, ma'am.

23    Q.  And at this point, you -- you mentioned that you had

24    radios, correct?

25    A.  Yes, ma'am.
```

1    Q.  And you are not with Joshua James in this photo,

2    correct?

3    A.  No, ma'am.

4    Q.  But you were able to rejoin with Mr. James --

5    A.  Yes, ma'am.

6    Q.  -- who told you to meet him at a separate location,

7    correct?

8    A.  That's what they told me, because I had no

9    communications at all.

10            MS. HUGHES:  If we could please bring up

11   Government's Exhibit 1081.1A.

12            And this has already been admitted into evidence,

13   so if we could please publish.

14   BY MS. HUGHES:

15   Q.  Now after you exit, even though you, yourself, did not

16   go in, you joined with other members of the Oath Keepers

17   around Stewart Rhodes not far from where those steps were,

18   correct?

19            MS. HUGHES:  If we could -- we can keep playing,

20   Ms. Rohde, and pause when you see Mr. Jackson on the video.

21            You can pause there.

22   BY MS. HUGHES:

23   Q.  You and members of your contingent go and meet up with

24   other Oath Keepers, correct?

25   A.  Yes, ma'am.

1    Q.  And at the center of this gathering is Mr. Rhodes,

2    correct?

3    A.  If you say so, yes, ma'am.

4    Q.  And once again, you didn't pick this location as a

5    meeting point, correct?

6    A.  No, ma'am.

7    Q.  You were following the instructions of Josh James,

8    correct?

9    A.  I was -- whoever -- one of the team members was telling

10   us that, yes, ma'am.

11          MS. HUGHES:  And if you could please bring up

12   Government'S Exhibit 9303 just for the witness.

13   BY MS. HUGHES:

14   Q.  Now, sir, in addition to Signal groups, you also

15   exchanged Signal messages with Joshua James, correct?

16   A.  Yes, ma'am.

17   Q.  And is this consistent with messages you exchanged with

18   Joshua James?

19   A.  Yes, ma'am.

20          MS. HUGHES:  The government seeks to admit and

21   publish Government's Exhibit 9303.

22          THE COURT:  9303 will be admitted.

23       (Government's Exhibit 9303 admitted.)

24          MS. HUGHES:  Thank you.

25          If we can please publish.

```
 1    BY MS. HUGHES:

 2    Q.  So Rick J, that's you, sir?

 3    A.  Yes, ma'am.

 4    Q.  So the green bubble, that would be Joshua James -- or

 5    apologies -- that would be you.  The green bubble is you;

 6    the gray bubble is Joshua James, correct?

 7    A.  Yes, ma'am.

 8    Q.  So Joshua James on January 7th writes you, "Checking in

 9    with you, sir.  Did you make it back?"  Correct?

10    A.  Yes, ma'am.

11    Q.  And you wrote, "Just dropped off second package.  Headed

12    home now."

13             And Mr. James responds, "Awesome" exclamation

14    point, correct?

15    A.  Yes, ma'am.

16             MS. HUGHES:  If we please zoom in on the middle

17    section here, Ms. Rohde.

18    BY MS. HUGHES:

19    Q.  On Tuesday, January 12th, you changed your profile

20    setting on your Signal account; isn't that right?

21    A.  It appears that way, yes, ma'am.

22    Q.  You made it so your messages disappear after they've

23    been posted for one day?

24             MR. TARPLEY:  Objection, this is way beyond the

25    scope of the direct examination.  We didn't go into any of
```

1    this on our direct examination, and I object.

2            THE COURT:  It's overruled.

3    BY MS. HUGHES:

4    Q.  Is that correct?

5    A.  Yes, ma'am.

6            MS. HUGHES:  And we can bring it down, Ms. Rohde.

7    BY MS. HUGHES:

8    Q.  Now, Mr. Jackson, you may have been following Mr. James

9    that day, but you're aware that your conduct at the Capitol

10   exposes you to criminal exposure, doesn't it?

11   A.  I can only testify to myself.  No, ma'am.

12           MS. HUGHES:  No further questions.

13           THE COURT:  Redirect.

14           MR. TARPLEY:  Yes, sir.  Thank you.

15                      **REDIRECT EXAMINATION**

16   BY MR. TARPLEY:

17   Q.  Mr. Jackson, was it your plan to overthrow the

18   government with a golf cart?

19   A.  No, sir.

20   Q.  Have you ever laid eyes on Roberto Minuta before that

21   morning?

22   A.  Before January 5th, have I --

23   Q.  The morning of January 6th when you got in the golf

24   cart, had you laid eyes on Roberto before the 6th?

25   A.  He joined us on the 5th.

1    Q.  He joined you on the 5th, but he was not part of the

2    group that you came to Washington, D.C. with, was he?

3    A.  No, sir.

4    Q.  And you weren't in his golf cart, were you?

5    A.  I don't believe I was, no, sir.

6    Q.  So as a practical matter, you weren't able to hear what

7    they were saying in that first golf cart?

8    A.  No, sir.

9    Q.  Is it a crime to engage in raucous, loud behavior

10   directed at the police?

11   A.  I don't believe so.  Under the First Amendment you have

12   freedom of speech.

13              MS. HUGHES:  Objection.

14              THE COURT:  He's already answered, so --

15   BY MR. TARPLEY:

16   Q.  With regard to the groupings of people outside the

17   Capitol, when you walked out of the Capitol, did you see the

18   larger group of Oath Keepers at that moment?  When you

19   walked down the steps of the Capitol, did you see the larger

20   group of people at that moment?

21   A.  Well, remember, when I walked down the steps, I stood

22   there and didn't -- helped the police officers move around.

23   Once that was done, Brian and I went back to the same area

24   where the two vehicles were, and we pretty much regrouped

25   with the other folks.  At that time, I did not know there

1    was another contingent of Oath Keepers over there.

2    Q.  But you didn't walk over there until you all actually

3    visually saw them; is that correct?

4    A.  I tell you, half the day I was in a daze.  But when we

5    were back in the group, we were told we were going to walk

6    back towards that area.  For what reason, I don't know, but

7    as we got closer, I did see that there was a group of Oath

8    Keepers there.

9    Q.  There were some earlier questions to you about the

10   Signal chats.

11          Did you always read everything on the chats?

12   A.  No, sir.

13   Q.  Were you -- were you an often participant in the chats?

14   Did you post a lot of things on the chats?

15   A.  I tried not to post that much on chat, no, sir.

16   Q.  Well, what about the letters, what was being posted

17   regarding the January 6th rally and the letters written by

18   Mr. Rhodes?  Did you read all of those letters in detail?

19   A.  I don't believe I read any one of them, sir.

20   Q.  Have you ever been charged with a crime for being there

21   at the Capitol on January 6th?

22   A.  No, sir.

23          MR. TARPLEY:  That's all the questions I have,

24   Your Honor.

25          THE COURT:  Okay.  Sir, thank you for your time

```
 1    and testimony, Mr. Jackson.  You may step down.
 2                   All right, Counsel.
 3      (Whereupon, the following proceedings were held at sidebar
 4     outside of the presence of the jury:)
 5                   THE COURT:  All right.  We've got Mr. Siekerman
 6     now.
 7                   MR. WOODWARD:  Yes, if we can remind the jury
 8     we're going out of order.
 9        (Whereupon, the following proceedings were had in open
10     court:)
11                   THE COURT:  Ladies and gentlemen of the jury, if
12     you want to stretch, by all means.  The next witness is
13     coming in.  Because of witness scheduling matters we're
14     going to take a break in Mr. Rhodes's case-in-chief and move
15     to Mr. Meggs's case-in-chief with Mr. Meggs's witness who is
16     now about to be called.  Okay.
17                   MR. WOODWARD:  Are we ready, Your Honor?
18                   THE COURT:  Yes.
19                   MR. WOODWARD:  Your Honor, Kelly Meggs calls
20     Donald Siekerman to the stand.
21                   (Whereupon, Donald Siekerman, entered the
22     courtroom and the following proceedings were had:)
23                   THE CLERK:  Before you have a seat, can you please
24     raise your right hand?
25                   (Witness sworn.)
```

```
1              THE COURT:  Mr. Siekerman, welcome.  Have a seat,
2       sir.  Does that work?
3              THE WITNESS:  Yes, sir.
4              THE COURT:  Mr. Woodward.
5         DONALD SIEKERMAN, DEFENDANT MEGGS WITNESS,
6                     DIRECT EXAMINATION
7       BY MR. WOODWARD:
8       Q.  Good afternoon, Mr. Siekerman.  Thank you for joining us
9       in the afternoon, sir.  I would ask for you to start by
10      saying and spelling your full name for the court reporter.
11      A.  Donald Siekerman, S-i-e-k-e-r-m-a-n.
12      Q.  Thank you, sir.
13             And your wife is scheduled for surgery imminently,
14      hence the --
15      A.  Yes, sir.  She asked me to make sure I protected things
16      and so I don't bring anything home to her.
17      Q.  We completely understand.
18             Mr. Siekerman, I want to get right to the heart of
19      the matter.
20             Were you asked to take any leadership role with
21      respect to the events of January 6th?
22      A.  Yes, sir, I was.
23      Q.  What role was that?
24      A.  It was, as I understood it, a coordinator meeting to
25      organize the folks for the protective details that day.
```

1    Q.   Okay.  So you were asked to be the leader of the

2    operation or the events of January 6th?

3    A.   Yes.

4    Q.   All right.  Are you aware of any plan by the Oath

5    Keepers to go into the Capitol?

6    A.   No, sir.

7    Q.   Are you aware of any plan by the Oath Keepers to stop

8    the certification of the election on January 6th?

9    A.   No, sir.

10   Q.   All right.  Let's step back.

11        Sir, do you -- do you have any military

12   experience?

13   A.   Yes, I do.

14   Q.   Can you tell the ladies and gentlemen of the jury what

15   that experience is.

16   A.   Three years active duty Army.  I'm trying to remember

17   the exact amount of time.  It was three to four years at the

18   Air Guard, Pennsylvania Air Guard after that.

19   Q.   You say Air Guard?

20   A.   Yes, sir.

21   Q.   And when did you first join the Oath Keepers?

22   A.   I had initially joined in, I think it was, 2017.

23   Q.   You say initially?

24   A.   Yes, sir.  At that point I read about what they were

25   doing, responding to natural disasters and so forth.  I

1    thought as an old, you know, first responder and so forth,

2    it would be good to join an organization like that.  But at

3    that point, due to my work and other things going on, I

4    could never coordinate.  You know, it was always a

5    last-minute thing, and I just don't do that, so I never

6    really responded to any event after that.

7    Q.  All right.  Before we -- before we move on from that,

8    you mentioned as a former first responder.  Do you have

9    experience as a first responder?

10   A.  Well, sir, most of my life.  From, actually, about the

11   age of 14 on up, I was a volunteer firefighter, EMT; for

12   most of my life as a police officer.

13   Q.  Did you ever serve as a police officer?

14   A.  Yes, sir.

15   Q.  And in what capacity?

16   A.  Well, multi-capacities:  patrol officer, K-9.  After I

17   lost my K-9, it was -- my specialty besides patrol officer

18   was as an accident reconstructionist and DOT inspections.

19   Q.  Sir, on what force did you serve?

20   A.  Mechanics for police department in PA.

21   Q.  In Pennsylvania?

22   A.  Yes, sir.

23   Q.  And in the Army, do you remember where you were

24   assigned?

25   A.  Yes, sir.  The majority of my time I spent on Fort Sam

1    Houston.

2    Q.  And with which division, which company?  Forgive my

3    ignorance about the organization.

4    A.  Well, I was a medic.

5    Q.  Tell us, what does that mean?

6    A.  Well, my particular duties, I was an orthopedic --

7    originally, I was just an Army medic, but I had someone who

8    got me into orthopedics, and I became an orthopedic

9    specialist.

10   Q.  Orthopedics, like broken humerus?

11   A.  Yes, sir.

12           THE COURT:  Where were you when we needed you?

13           THE WITNESS:  I'm a little out of date on that.

14   I'm sorry.

15   BY MR. WOODWARD:

16   Q.  You mentioned that you initially joined the Oath

17   Keepers.

18           Did you later become more involved in the Oath

19   Keepers?

20   A.  The next time I had any contact at all I happened to

21   see -- I think -- you have to forgive me on the memory.

22   Q.  Well, let me ask you about that.

23           Do you have difficulty remembering things?

24   A.  Unfortunately, yes.

25   Q.  Why?

1   A.  Well, I had COVID during the time of January 6th,

2   actually prior to that.  And between that and the fact that

3   it basically destroyed what I have left of my thyroid -- I

4   had a serious case and it -- I didn't know it until I

5   started hearing the term "long COVID" and the "COVID fog"

6   that I realized --

7           Unfortunately, prior to that, I was thinking it

8   was an age thing as we all get, but the -- more and more I

9   came to realize that there was a real issue there.

10  Q.  Well, I think one thing we may all agree on is that

11  we're sorry to hear that, sir.

12  A.  Well, it's life.

13  Q.  And so you became reengaged with the Oath Keepers, I

14  believe you testified.

15  A.  Yes, sir.  That's correct.

16  Q.  Could you tell us if you recall when that was?

17  A.  It was a few days -- again, memory escapes me exactly

18  when it was.  Probably a few days prior to the MAGA March,

19  the first MAGA March in DC.

20  Q.  In Washington, D.C.?

21  A.  Yes, sir.

22  Q.  Did you come to Washington, D.C., for the MAGA March?

23  A.  Yes, I did.

24  Q.  What role did the Oath Keepers play in the MAGA March in

25  Washington, D.C.?

1    A.  On that day really all we did is come into town as a

2    group and at that point walked around town.  And it was my

3    understanding that we were just there to, you know, protect

4    everybody and make sure everything went down, that no

5    outside groups came in to harm anyone or cause any issues

6    and just basically there to support law enforcement that was

7    around us.

8    Q.  Fair to say you were providing voluntary security?

9    A.  Yes, sir.

10   Q.  Do you recall attending an Oath Keepers event in

11   Atlanta?

12   A.  Yes, sir.

13         THE COURT:  Mr. Woodward, I'm sorry to interrupt

14   you.  I didn't realize how long we've been going, so let's

15   take an afternoon break and give our court reporter a rest.

16   It's a little before 3:00, so why don't we resume a little

17   bit after 3:05.  We'll see you all shortly.

18       (Whereupon, the jury exited the courtroom and the

19   following proceedings were had:)

20         THE COURT:  Mr. Siekerman, you can step down.  I

21   would ask you not to discuss your testimony with anyone

22   during the break.

23       (Recess taken 2:49 p.m. until 3:07 p.m.)

24       (Whereupon, the following proceedings were had in open

25   court:)

```
 1                THE COURT:  Please bring Mr. Siekerman in.
 2           (Whereupon, the jury entered the courtroom at 3:08 p.m.
 3      and the following proceedings were had:)
 4                THE COURT:  Please be seated again.
 5                Mr. Woodward, when you're ready.
 6                MR. WOODWARD:  Thank you, Your Honor.
 7      BY MR. WOODWARD:
 8      Q.  Mr. Siekerman, when we broke, I had asked you about
 9      whether you participated in an event in Atlanta?
10      A.  Yes, sir.
11      Q.  Do you remember traveling to Atlanta to participate in
12      an event with the Oath Keepers?
13      A.  That's correct.
14      Q.  Can you tell the ladies and gentlemen of the jury about
15      that event?
16      A.  Yes, sir.  We went down -- I think it was called the --
17      Stop the Steal, I think, was the event.  And it was
18      basically the same type of thing.  We stood in front -- at
19      least I did -- stood in front of the speakers area all day
20      just to make sure nothing happened.  And I interacted a lot
21      with the law enforcement folks and the state police who were
22      there.
23      Q.  Would you tell us more about that interaction.
24      A.  It was just a sergeant and lieutenant from the Georgia
25      State Police that was talking -- it was my late war stories
```

1    about police work and so forth, but just talking to them

2    about things that were going on and what we were doing there

3    and so forth, which they seemed to understand.

4    Q.  Okay.  Do you recall the names of anyone specifically

5    whom you provided security for in Atlanta?

6              Let me ask you this:  Do you recall the name Ali

7    Alexander?

8    A.  Yes, that does sound familiar.

9    Q.  Do you recall that Ali Alexander was a speaker at this

10   event in Atlanta?

11   A.  Yes, I think he was.  Yes.

12   Q.  Do you have any recollection of escorting Mr. Alexander

13   from the stage after he was speaking?

14   A.  I think we did, around to the back side, yes.

15   Q.  And do you recall the manner in which you did that?

16             How were you physically oriented with respect to

17   Mr. Alexander?  Were you in a line?

18   A.  I mean, we were around him.

19   Q.  Okay.  And was there a time when had you to navigate

20   through a crowd of people?

21   A.  Yes, sir, there was.

22   Q.  And do you recall the process or the formation that you

23   took when you navigated through that line of people?

24   A.  Well, it's -- in protection details and so forth like

25   that, you use like a wedge-type thing.

1    Q.  If I could just ask you to lean a little bit closer to

2    the microphone so we can all hear you.

3    A.  Sure.  Like a wedge.

4    Q.  Okay.  And so if you could describe the placement of the

5    humans in this wedge.  We don't have a picture, so how would

6    this look, for the jury?

7    A.  Well, there would be a wedge of protection detail around

8    the person you're protecting who would be in the center of

9    that wedge.

10   Q.  And would you have hands on one another?

11   A.  There could be at times, especially in a heavy crowd, so

12   you don't lose contact because you're -- I'm sorry.

13   Sometimes I have to search for words.

14   Q.  Take your time.

15   A.  When you're in contact with the person ahead because

16   you're looking out for anything that may be coming, for any

17   dangers, so you have to keep contact and make sure nobody --

18   you don't lose anybody; you don't sort of wander off.

19   Q.  I'm sorry to speak over you.

20   A.  That's all right.

21   Q.  So you might place your hand on the back of the person

22   in front of you?

23   A.  Yes, sir.

24   Q.  Now, you testified about the Atlanta event.  You

25   testified about the MAGA March.

1          And then you also testified that at some point you

2     were asked to be a leader for the January 6th event?

3     A.  Yes, sir.

4     Q.  And were you responsible for any planning leading up to

5     the January 6th event?

6     A.  Well, we were -- the week before we were trying to

7     gather the names and who would be coming into the event.

8     You want to know who is going to be responding and how many

9     folks so you know how to prepare and make things up that --

10    you know, assign people to certain areas and things of that

11    nature.

12    Q.  Were you communicating with other members of the Oath

13    Keepers about that, about those preparations?

14    A.  Yes, sir.

15    Q.  Do you recall how you were communicating with other

16    members of the Oath Keepers?

17    A.  A lot of it was through --

18    Q.  Are you familiar with an app called Signal?

19    A.  That's it.  Yes, Signal.

20          MR. WOODWARD:  Can we show Mr. Siekerman what has

21    been marked as KM-63.  I've given up on the technology

22    myself.

23          And if we could just scroll through some of these.

24    BY MR. WOODWARD:

25    Q.  Mr. Siekerman, if you could give these a read as we

```
 1    scroll through some of these chats.
 2    A.  Sure.  Have a ruck with all my items, like medical
 3    items --
 4    Q.  I'm sorry.  Mr. Siekerman, if you could just read it to
 5    yourself.
 6    A.  Oh, I'm sorry.
 7    Q.  And then I'm going to ask you if you are familiar with
 8    what you're seeing.
 9    A.  Sure.
10              THE COURT:  Let me ask, any objection to KM-63?
11              MR. MANZO:  No, Your Honor.
12         (Defendant Meggs Exhibit KM-63 admitted.)
13    BY MR. WOODWARD:
14    Q.  So if we could start at 1.
15              MR. WOODWARD:  If we could publish to the jury.
16    BY MR. WOODWARD:
17    Q.  Do you see this message in front of you, Mr. Siekerman?
18    A.  Yes, sir.
19    Q.  Without reading it to the ladies and gentlemen of the
20    jury, could you explain what you're talking about here?
21    A.  Well, sir, at the other marches and really any big
22    events you go to, a lot of times all the porta-potties are
23    there, and you go in to use the porta-potties and the
24    necessaries are not there to finish your action.  So I
25    always advise folks to take their own along, whether they're
```

1    there or -- yeah, at other events also, and I always carry
2    some of those kits with me.
3    Q.  So you used the word "kit" in the message.  And you used
4    the word "kit" just now.
5              What is a kit?
6    A.  Well, it's just like a plastic bag with, you know, a
7    couple of hunks of toilet paper, maybe some wet wipes,
8    things of that nature.
9    Q.  And in your service as military did you also use the
10   word "kit"?
11   A.  Yes, sir, a lot.  I use it when we pack up our backpacks
12   for hiking and things of that nature.
13   Q.  So it's a ubiquitous term in your mind?
14   A.  In my mind, yes, sir.
15             MR. WOODWARD:  If we could move to -- let's keep
16   going.  And I'm sorry.  If we could go back.
17   BY MR. WOODWARD:
18   Q.  What is an IFAK?
19   A.  An IFAK kit is a small medical kit that contains things
20   like a tourniquet, a clot stopper and a pressure bandage to
21   take care of trauma.
22   Q.  Well, let me ask, why were you recommending bringing
23   those items to the event on January 6th?
24   A.  Well, you always want to have medical items along for a
25   big crowd like that.  Besides just if, you know, something

1    would happen, just everyday possible medical issues, people

2    falling, yourself, like your arm.

3    Q.  Yeah.

4    A.  Sorry to use that as an example.

5    Q.  Do you find this humorous, sir?

6    A.  Yeah.  I am sorry.

7           THE COURT:  I've never had a lawyer be a

8    demonstrative exhibit.

9           THE WITNESS:  But any bleeding-type issues, a

10   broken bottle, you know, anything of that nature, it would

11   be very important, because -- especially in a crowd like

12   that for medical help to get there could be some time.

13   BY MR. WOODWARD:

14   Q.  Okay.  Well, it doesn't sound like you're describing a

15   kit that might be used to, in furtherance of violence.

16   A.  No, sir.  If anything it's to take care of people after

17   that occurs.

18           MR. WOODWARD:  If we could advance again.

19   BY MR. WOODWARD:

20   Q.  Do you recall participating in any of the conference

21   calls leading up to the event on January 6th?

22   A.  Yes, sir.

23   Q.  And do you recognize this message here as an invitation

24   for one such call?

25   A.  I know we have them.  I know it went out.  I can't

1    directly recollect this one.

2    Q.  All right.  Do you recall whether an ad called

3    GoToMeeting was used?

4    A.  It probably was, yes.

5    Q.  And on those calls, do you recall any discussions about

6    going into the Capitol Building, stopping the certification

7    of the election?

8    A.  No, sir.  If I would have heard that, I would have

9    immediately -- that would have been it for me.  I would not

10   have participated.

11             MR. WOODWARD:  All right.  If we could advance.

12   BY MR. WOODWARD:

13   Q.  Now you, if you could tell the ladies and gentlemen of

14   the jury, what is an LEOSA?

15   A.  It's -- LEOSA is -- I'm trying to remember the number --

16   US 218, I think it is, where as long as a retired police

17   officer -- that fits their qualification of a retired police

18   officer meets certain qualifications depending on his state

19   he's living in, that they can carry a firearm, a concealed

20   firearm, in all of the states as long as they will adhere to

21   the restrictions within that state or locale.

22   Q.  And I should have asked.  Are you still a member of law

23   enforcement?  Are you still on the force?

24   A.  No, sir.  I retired over 20 years ago.

25   Q.  Are you a LEOSA?

1   A.  I was, sir.  I've given it up.

2   Q.  But your familiarity with the concept is personal?

3   A.  Yes, sir.

4   Q.  So you write here that you spoke with an LT?  What is an

5   LT?

6   A.  A lieutenant.

7   Q.  A lieutenant.  And a watch commander for the first

8   district.  Without telling us what the officer told you, did

9   you have an understanding as to what the rules were in

10  Washington, D.C., with respect to firearms?

11  A.  Well, sir, yes.  Between that and looking up online what

12  the -- what the regulations were, it was my understanding at

13  that point that there were no restrictions on those who

14  would carry under LEOSA for that day.

15  Q.  And so you reached out to law enforcement in advance of

16  January 6th?

17  A.  Yes, sir, of course.

18  Q.  And let them know that you were coming?

19  A.  Yes, sir.  Well, if I remember correctly, I told him

20  that we were coming down with a large group for the rally

21  and that there would be some retired police officers

22  possibly carrying under LEOSA.

23          MR. WOODWARD:  Okay.  If we could advance to the

24  next slide.

25

1    BY MR. WOODWARD:

2    Q.  And was it unusual for you to reach out to law

3    enforcement in advance of a mission like this?

4    A.  Well, this was the first time I've ever done anything

5    like this for Oath Keepers.  I know we were told in the past

6    when we got to an event what the restrictions were, what the

7    law was on use of force and things of that nature.

8              MR. WOODWARD:  All right.  If we could advance and

9    let's keep --

10   BY MR. WOODWARD:

11   Q.  And so eventually you did communicate specifically with

12   a member of the Metropolitan Police Department?

13   A.  That's correct, sir.

14   Q.  And, again, without telling us what that officer said,

15   you had come to an understanding about what was allowed?

16   A.  That's correct.  The e-mail I got basically stated that

17   you were not -- they would be posting that day that in that

18   area that you would not be allowed to carry at all, even

19   with permits under LEOSA and things of that nature.  And

20   under LEOSA you have to follow the local regulations.

21             MR. WOODWARD:  All right.  Let's keep moving then.

22   BY MR. WOODWARD:

23   Q.  Now, were you paid to provide your services on

24   January 6th?

25   A.  No, sir, not what I'm aware of.

```
 1    Q.  And is that a relevant fact in what you were doing?

 2    A.  No.

 3               MR. WOODWARD:  Okay.  Let's keep moving.

 4    BY MR. WOODWARD:

 5    Q.  Do you recognize these messages?

 6    A.  Yes, sir, I do.

 7               MR. WOODWARD:  All right.  Let's keep moving.

 8               And we can continue.

 9    BY MR. WOODWARD:

10    Q.  You recognize the name here on this message, Jessica

11    Watkins?

12    A.  Yes, sir.

13    Q.  And did you know -- what did you know about Jessica

14    Watkins in December, January of 2020, 2021?

15    A.  I first met her at the first MAGA rally.

16               MR. WOODWARD:  All right.  If we could publish for

17    the witness and the jury what's already been admitted as

18    Watkins 1.

19    BY MR. WOODWARD:

20    Q.  Do you know whether Ms. Watkins was added to any of the

21    leadership chats in advance of January 6th?

22    A.  I can't -- in my mind I can't be sure of that, sir.

23    Q.  Well, let's show -- all right.

24               Do you recall sending this message?

25    A.  I don't recall it, but I probably did.
```

1    Q.  All right.  Do you know which Ohio folks you were

2    referring to?

3    A.  I'm pretty sure that was Jessica.

4              MR. WOODWARD:  Okay.  If we could then skip ahead

5    to --

6    BY MR. WOODWARD:

7    Q.  Do you know why you would have added Ms. Watkins too?

8    A.  Well, it is my understanding was that she was an

9    experienced Army medic and EMT.

10             MR. WOODWARD:  Okay.  If we could go back to

11   KM-63.

12   BY MR. WOODWARD:

13   Q.  Now, ultimately, sir, actually, in addition to speaking

14   about the kits, what other planning do you recall being done

15   for the events on January 6th?

16   A.  Well, as part of organizing, I appointed two people to

17   sub -- like, sub-organize under me, delegated authority for

18   the close-in protection and -- meaning the dignitary

19   protection, and if we had enough people that come in that

20   they would -- sorry.

21   Q.  Take your time.

22   A.  -- that they would go out and patrol.  Looking back

23   at -- I think there was supposed to be two venues, and we

24   would use them to travel between the venues to make sure

25   everybody was okay.

1    Q.  Would it be fair to use the word "escort"?

2    A.  Yes, that would be a good word to use.

3    Q.  So you had two groups:  one handling the designees,

4    protectees, and a second group escorting people to and from

5    different places?

6    A.  Yes, sir.

7    Q.  And do you recall any of the specific planning that went

8    into the activities of those groups on the day?

9    A.  I mean, we were trying to organize, see how many people

10   were coming, but, you know, most people had a general idea

11   of who may show up, but you never know until everybody gets

12   there.

13   Q.  Okay.  But if you'll take a look at the message before

14   you're there, it was your understanding that security was

15   the mission of the day?

16   A.  Right, sir, that being first.

17         MR. WOODWARD:  If we could advance.

18   BY MR. WOODWARD:

19   Q.  But, as you say, as of January 1st, you're still trying

20   to find out who the point of contacts will be, who the

21   protectees will be?

22   A.  Yes, sir.

23         MR. WOODWARD:  If we could advance.

24   BY MR. WOODWARD:

25   Q.  And here you're asking about maps?

```
 1    A.  Yes, sir.

 2    Q.  Do you recall whether a map was exchanged?

 3            That's all right.  Let's keep moving.

 4    A.  Yeah.

 5    Q.  Do you recall the name Stephen Brown?

 6    A.  No, sir, I don't.

 7    Q.  Do you see here what Mr. Brown has posted in the chat?

 8    A.  Yes, sir, I do.

 9    Q.  Fair to describe that as schedule of the day's events?

10    A.  Yes, sir.

11    Q.  Fair to say Mr. Brown was providing you with specific

12    information about the day in question?

13    A.  Yes, sir.

14            MR. WOODWARD:  All right.  Let's keep moving.

15            Keep going.

16    BY MR. WOODWARD:

17    Q.  Do you see these maps?

18    A.  Yes, sir, I do.

19    Q.  And do you have a sense of why those would have been

20    sent to the chats?

21    A.  Just that -- the parking restrictions, you know, how far

22    people can get in, where they would have to park outside of.

23    And the particular one I'm looking at here now is what we

24    described earlier, the restrictions for firearms and so

25    forth as, you know, First Amendment activity.
```

1   Q.  All right.  And so those were useful for purposes of the

2   security operation?

3   A.  Yes, sir.

4           MR. WOODWARD:  All right.  If we can keep moving.

5           Let's keep -- let's get through this.

6   BY MR. WOODWARD:

7   Q.  All right.  Again, reference to one of many calls; is

8   that fair to say?

9   A.  Yes, sir.

10          MR. WOODWARD:  Let's keep going.

11          If we could keep going.

12  BY MR. WOODWARD:

13  Q.  Okay.  Here, if you could, if this refreshes your

14  recollection as to where the various events you referenced

15  were occurring that day.

16  A.  Okay.  Yes.

17  Q.  All right.  And so there were multiple event sites that

18  you recall?

19  A.  As far as -- yeah, but within a couple-of-block area

20  supposedly.

21  Q.  And this next message you reference "Whip"?

22  A.  Yes, sir.

23  Q.  And who is Whip?

24  A.  Whip was second in command after Stewart.

25  Q.  What was his role on January 6th?

1    A.  I asked Whip to have the personal security detail.

2    Q.  So he was leading the group of folks that were handling

3    the protectees?

4    A.  That's correct.

5    Q.  If you could just explain this message for us.  Again,

6    not asking you to read it, but help us understand the

7    context in which you would have sent this message on

8    January 2nd.

9    A.  Okay.  Can we go forward one?

10   Q.  Yes.

11   A.  Okay.  Context being that, you know, here we are.  We're

12   all first responders, ex-military, you know, police

13   officers, whatever, and we're going out and doing our thing

14   protecting people again.  You know, my wife had to put up

15   with me being a police officer for 20-some years, and it's

16   tough on the families and that we should, you know, even

17   though we're not expecting trouble, as we never do, that it

18   happens and that we should thank them for allowing us to do

19   what we do.

20   Q.  Well, sure.  In hindsight, given the events of

21   January 6th, some might suggest that sending this message

22   was a precursor to your anticipation of what was going to

23   happen on the 6th of January?

24   A.  No, sir, that was not intended to be something of that

25   nature.

1    Q.  Because you weren't aware of any plans to go in the

2    Capitol Building?

3    A.  No, sir.

4    Q.  You weren't aware of any plans to stop the certification

5    of the election?

6    A.  No, sir.

7                MR. WOODWARD:  If we could advance.

8    BY MR. WOODWARD:

9    Q.  Do you know whether it was difficult to communicate at

10   rallies in Washington, D.C., including on the 6th?

11   A.  On the 6th, I have no idea.  Prior rallies, yes, it was

12   extremely difficult.

13   Q.  Could you explain exactly why it was difficult.

14   A.  Well, I know enough to make myself dangerous with

15   technology, but with the radio propagation and line of sight

16   and things like that, it's almost impossible in DC, if

17   you're anywhere apart, to be able to communicate.

18                And with phone calls, it was -- you know, using a

19   cell phone, it was almost impossible.  I would try to send a

20   text to my wife or something of that nature, and it would

21   sit there and spin and spin and spin.  It just didn't go out

22   sometimes for an hour or more or even longer.

23   Q.  Could you place calls?

24   A.  No.  I tried several times and -- to home and it just

25   wouldn't go through.  There was, I guess, so many people

1    that it overwhelmed the system.

2    Q.  What about WiFi networks?

3    A.  Not that I'm aware of.  I was never connected to any as

4    far as I know.

5    Q.  And so was your recommendation to use an alternative

6    communication source at the events on January 6th?

7    A.  Well, again, through being a first responder, to me

8    communications is essential.  Without communications, things

9    break down.  And I suggested that we attempt to find

10   somebody, like a ham radio operator, that could advise us

11   and maybe even set up a -- because we were thinking things

12   would be spread out -- I was thinking things would be spread

13   out like they were before and that they could set up a relay

14   point and so -- and establish like a communications where

15   they could control it, rather than everybody being on the

16   radio at one time.

17   Q.  Are you familiar with the concept of "PACE"?

18   A.  PACE?

19   Q.  PACE, P-A-C-E, primary alternate contingency emergency?

20   A.  I'm not sure in what context --

21   Q.  Perfectly acceptable answer.

22   A.  Okay.

23   Q.  It's fair to say, with the Court's indulgence -- trying

24   to move this along -- but there were a number of

25   communications about planning, whether it be with respect to

1   how to communicate, maps?  You don't have any reason to

2   disagree with me?

3   A.  No, sir.

4   Q.  You exchanged a number of those messages leading up to

5   the --

6   A.  Yes, sir.

7   Q.  -- event.

8            MR. WOODWARD:  So if we could scroll through

9   these -- not that quickly, but just go to the end here.

10           Parking.

11           All right.  Let's pause.

12  BY MR. WOODWARD:

13  Q.  Again, was this a message you sent about there being

14  multiple venues on the 6th?  Is one and a half miles a lot?

15  A.  Yes, sir, it is.

16  Q.  Okay.  Maybe not for us DC guys.

17           MR. WOODWARD:  Let's keep going.

18  BY MR. WOODWARD:

19  Q.  Why were you concerned about BLM, Antifa?

20  A.  Well, sir, at the time we were -- and forgive me.  I

21  forget who exactly it was.  There was somebody within Oath

22  Keepers who was getting information and sending out

23  information on different groups that would be attending and

24  individuals from Antifa, BLM, and other left-wing groups who

25  would be attending and could possibly cause issues that day.

1    Q.  All right.  So you were concerned for planning purposes?

2    A.  Yes, sir.

3              MR. WOODWARD:  If we could continue scrolling

4    through until --

5    BY MR. WOODWARD:

6    Q.  Now as we scroll through these, ultimately you did not

7    attend the events on January 6th, did you?

8    A.  No, I did not.

9    Q.  Why not?

10   A.  Well, I'm not sure exactly when it really started, but

11   Sunday I started feeling ill.

12   Q.  The Sunday before January 6th?

13   A.  Yes, sir.  My wife said something to me Sunday night

14   about it.  I said, typical manner I guess, that I'm fine,

15   but I wasn't feeling all that well.  But Monday morning I

16   woke up, and when I did, I turned to her and said, "Get me

17   to the ER," which I don't do.  I was sick.

18   Q.  Did you later come to receive a prognosis?

19   A.  Well, they gave me a test that day.  I forget which one

20   it was.  You know, they swabbed something and sent it out.

21   It came back negative, but my doctor said it's most -- Yeah,

22   it was about a 50-50 chance whether the test, either

23   positive or negative, were correct.

24   Q.  Positive or negative for what?

25   A.  For COVID.

1    Q.  And so did you later come to be advised that you had

2    contracted COVID?

3    A.  That's what my doctor advised me, due to all the

4    symptoms and I -- I think it was on Monday evening or it

5    might have been Tuesday until I got the medications.  They

6    put me on a bunch of meds, breathing treatments.

7    Q.  So is it fair to say the only reason you didn't come to

8    Washington with Stewart Rhodes on January 6th was because

9    you had COVID?

10   A.  Yes, sir.

11   Q.  You live where, approximately?

12   A.  In south central Pennsylvania.

13   Q.  How many hours away is that?

14   A.  It's about two, depending on Washington traffic.  Two to

15   two and a half hours.

16   Q.  Now, at some point -- well, were you -- were you aware

17   of -- new sentence.

18          On January 6th, do you recall knowing what was

19   going on?

20   A.  No, sir, I don't.  I was -- it was everything I could do

21   to walk from the bed 15 feet to the bathroom.

22   Q.  And at some point did you come to learn about the events

23   of January 6th?

24   A.  Yes, I did.

25   Q.  And do you have an opinion about what happened on

1    January 6th?

2              MR. MANZO:  Objection, Your Honor.

3              THE COURT:  He can answer.  It's fine.

4              THE WITNESS:  I was very angry.

5    BY MR. WOODWARD:

6    Q.  Why?

7    A.  Number one, it went against everything that I personally

8    stand for.  The injuries to police officers -- I'm sorry.

9    Q.  Take your time.

10   A.  The injuries to police officers, what grief it caused

11   them and their families, and I know we lost officers

12   afterwards, and I've had some personal experience with that.

13   It -- it angered me.  I just, I -- I mean, I understand

14   because of training, crowd psychology.

15             And it's -- I -- you know, it's hard to say what

16   anybody does in the moment.  For me to sit here and say

17   absolutely 1000 percent I would not have participated, you

18   know, I can't do that.  But I think that if I would have

19   been there, there's about a 99.999 percent chance that as

20   soon as I -- if I would have been in a position to see it --

21   because, in my estimation, as soon as that started, we

22   should have been -- you know, if I was there, we would have

23   been directing people away from the scene, not towards it.

24   Q.  You were the operations leader for the Oath Keepers for

25   the event on January 6th?

```
1    A.  Yes, sir.

2    Q.  You had that role until approximately the Sunday before?

3    A.  Yes, sir.

4    Q.  And you had no knowledge of any plan to do anything like

5    what happened that day?

6    A.  No, sir.  Like I say, if I would have learned of that,

7    if I would have heard of it, if I would have suspected it, I

8    would not have participated beyond that point.

9              MR. WOODWARD:  Thank you, Mr. Siekerman.

10             THE WITNESS:  Sure.

11             MR. WOODWARD:  No further questions.

12             THE COURT:  I assume no examination from defense

13   counsel or requested cross-examination?

14             MR. GEYSER:  No questions, Your Honor.

15             MR. BRIGHT:  No, Your Honor.

16             THE COURT:  Okay.  Mr. Manzo.

17             MR. MANZO:  Thank you, sir.

18                         CROSS EXAMINATION

19   BY MR. MANZO:

20   Q.  Good afternoon, Mr. Siekerman.

21   A.  Good afternoon.

22   Q.  We actually spoke on the phone this morning?

23   A.  Yes, sir.

24   Q.  My name is Lou Manzo.  I think we met once before at the

25   U.S. Attorney's Office, passing in the hallway.
```

```
 1    A.  We may have.
 2    Q.  Thank you for your time being here today.
 3             You were a law enforcement officer for many years,
 4    correct?
 5    A.  That's correct, sir.
 6    Q.  Over 20?
 7    A.  Yes, sir.
 8    Q.  And was this in Mechanicsburg?
 9    A.  Mechanicsburg.  And then prior to that I was in a little
10    town up in the mountains in south central PA.
11    Q.  And Mechanicsburg is about 8,000 people, right?
12    A.  Yeah, give or take.  It's probably a little bit bigger
13    now, but, yes.
14    Q.  And the little towns, smaller than the 8,000-person
15    town?
16    A.  Well, you mean in the area?
17    Q.  Yeah.
18    A.  It's -- at the time I was there with, you know, it was
19    all surrounding townships and growing townships and so
20    forth, yes.
21    Q.  And what did you say on direct examination were your
22    duties when you said DOT?
23    A.  DOT is Department of Transportation enforcement, truck
24    inspections.  It's now under the Federal Motor Carrier
25    Safety Administration.
```

1   Q.  And so that's what you were doing at the end of your

2   career as a police officer?

3   A.  Yeah, that was part of my duties.  I'm in a small

4   department.  You're a jack-of-all-trades, so to speak, but

5   my specialties at that time were accident reconstruction and

6   DOT enforcement.

7   Q.  How many officers are on the Mechanicsburg police force,

8   approximately?

9   A.  At that time, we varied.  I think it was probably around

10  12 to 13.

11  Q.  And you retired in around 2001?

12  A.  That's correct.

13  Q.  And you met Stewart Rhodes at the Million MAGA March?

14  A.  That's correct.

15  Q.  Did it strike you in any way that he's got the Oath

16  Keepers organization, tens of thousands of followers, and

17  he's appointed you, who retired in 2001 from Mechanicsburg,

18  to be in charge of January 6th?

19  A.  Yes, sir, it struck me a little odd, I guess.

20  Q.  Why did it strike you as odd?

21  A.  Because he had -- I'm sorry.  His name just went

22  straight out of my head again, his second in command.  I'm

23  sorry.

24  Q.  But he put you in charge --

25  A.  Right.

7828

1    Q.  -- of the January 6th operation, but he was ultimately

2    in charge of everything; is that fair to say?

3    A.  Yes, sir.

4    Q.  And as a retired police officer -- you spoke about this

5    briefly on direct examination, your special gun rights under

6    the Law Enforcement Officer Safety Act, LEOSA, correct?

7    A.  Yes, sir.

8    Q.  Can you just describe for the jury what LEOSA is?

9    A.  Yes, sir.  LEOSA, I can't remember -- it hasn't been in

10   effect that many years I don't think.  It just allows

11   retired and active duty police officers who meet the certain

12   requirements and fall into the federal definition of what a

13   police officer was.  There is some that fall into that, some

14   that don't.

15          And depending on the state -- and I'm not familiar

16   with other states.  In Pennsylvania, you must qualify every

17   year and take training every year to be able to do that,

18   qualify with any of the firearms that you'll be carrying.

19   Q.  So even though you retired in 2001, in 2019 or 2020, you

20   would have special gun rights that other citizens who were

21   not retired officers wouldn't have?

22   A.  That's correct.

23   Q.  So if you came into Washington, D.C., you could carry

24   your gun in situations where other people, other retirees,

25   could not?

```
1    A.  That has some nuances to it.  If someone in DC has a
2    carry permit, we would basically -- you have to follow, for
3    all intents and purposes, the local regulations for the
4    people that have permits in that area.  You still have to
5    follow those regulations.
6    Q.  But you -- as a central Pennsylvania resident, you could
7    come into DC without having to get licensed in DC?
8    A.  Got it.
9    Q.  Let's go back to right before January 6th.
10            You came up with a pretty bad case of COVID?
11   A.  That's correct, sir.
12   Q.  And you still have some lingering effects today that
13   affect your memory?
14   A.  Yes, sir.
15   Q.  And you've met since January 6th multiple times with the
16   FBI or the U. S. Attorney's Office?
17   A.  That's correct.
18   Q.  And specifically with Assistant United States Attorney
19   Ahmed Baset?
20            MR. WOODWARD:  Object, Your Honor.  Outside the
21   scope of direct examination.
22            THE COURT:  Go ahead.
23   BY MR. MANZO:
24   Q.  You met with the U.S. Attorney's Office, U.S. Attorney
25   Ahmed Baset?
```

```
1    A.  Yes, sir.

2    Q.  Did he treat you fairly in your interactions?

3    A.  Yes, sir, very much so.

4    Q.  And, essentially, you haven't been really able to

5    provide much information due to your COVID fog?

6    A.  Unfortunately, yes, sir.

7    Q.  And you sent an e-mail -- and I'm going to pull up 9096.

8            MR. MANZO:  Ms. Rohde, thank you.

9    BY MR. MANZO:

10   Q.  And you sent an e-mail to Mr. Baset, essentially

11   explaining this after a meeting; is that fair?  Do you see

12   your e-mail here in 9096?

13           MR. MANZO:  And, Ms. Rohde if you could just zoom

14   in on the --

15           THE WITNESS:  Oh, yes, sir.  Thank you.

16           MR. MANZO:  And, Your Honor, at this time I seek

17   to move into evidence Exhibit 9096.

18           MR. WOODWARD:  We would object it is needless,

19   cumulative and it is hearsay.

20           THE COURT:  Overruled.  It's not.

21           Sir, go ahead.

22   BY MR. MANZO:

23   Q.  Sir, do you recognize this is the e-mail you sent to

24   Assistant U. S. Attorney Ahmed Baset back on February 4th of

25   2022?
```

1    A.  Yes, sir.

2    Q.  And can you just read the first paragraph here of the

3    body that you sent:

4    A.  "Mr. Baset, I know you and the agents were somewhat

5    skeptical -- I would be -- as an investigator, of my brain

6    fog and memory issues during our meeting.  I just wanted to

7    let you know I just had a doctor's appointment and found out

8    that not only could the COVID possibly have caused those

9    issues, but so could another major medical issue I am

10   currently having."

11   Q.  So, essentially, you're telling Mr. Baset -- or AUSA

12   Baset that you just can't remember anything?

13   A.  It comes and goes, sir.  It's -- I think COVID fog is --

14   when I heard that description, it's probably the most apt

15   description of anything I've heard.  It's like driving in a

16   fog.  And sometimes it lifts a little bit.  Sometimes it

17   comes down, you know, that you can hardly see anything.

18          And when you go for a thought, it may be there and

19   you go to reach it, and that fog just -- just closes in over

20   it.

21   Q.  Understood.  But you were able to remember a few

22   messages on direct examination, a Signal message that you

23   exchanged?

24   A.  Yes, sir.  Sometimes when I see things, it jogs a

25   memory.

```
 1                    MR. MANZO:  Perfect.  Can we pull up 9091, please.
 2      BY MR. MANZO:
 3      Q.  And, sir, do you remember exchanging a direct message
 4      with Stewart Rhodes around about December 17th, 2020?
 5      A.  Yes, sir.  I think we had talked about this before.
 6      Q.  And you recognize this instant message?
 7      A.  Yes, sir.
 8                    MR. MANZO:  Your Honor, I seek to move into
 9      evidence 9091.
10                    THE COURT:  I think it's already in, or some
11      version of it, so 9091 is moved.
12          (Government's Exhibit 9091 admitted.)
13      BY MR. MANZO:
14      Q.  Sir, can you read this message to the jury here?
15      A.  Sure.
16                    "Stewart, just wanted to let you know that the
17      letter you and Kellye drew up was outstanding.  I fully
18      agree with your statements 100 percent.  Great job, brother.
19      Is that something you want to get out?  Can I send it to
20      other people or put it on Parler?  Please let me know if I
21      can help with anything.  Take care, stay safe and watch your
22      six."
23      Q.  And so you're referring to the open letter that Stewart
24      Rhodes had written to President Trump; is that fair to say?
25      A.  That's -- yes, sir.
```

1          MR. MANZO:  And if could just pull up what's

2    already been admitted into evidence as Government's

3    Exhibit 1005.

4          And can we go to page -- well, stop right here.

5    BY MR. MANZO:

6    Q.  Do you recognize this as the open letter to President

7    Trump?  I don't know if you saw it in this format or in some

8    different format.

9    A.  I don't recognize it.

10         MR. MANZO:  Well, let's go down to page 4 here

11   where it says "Conclusion."  And it's very small print, but,

12   Ms. Rohde, if you could enlarge that section.

13   BY MR. MANZO:

14   Q.  And, sir, do you see -- let me back up for one second.

15         MR. MANZO:  Sorry.  Can you zoom in on the

16   signature block on the bottom of the page?

17   BY MR. MANZO:

18   Q.  Sir, do you recognize the "For the Republic, Stewart

19   Rhodes, Yale Law '04, Kellye SoRelle, Texas attorney"?

20   A.  Yes, sir, I recognize that.

21   Q.  Okay.

22         MR. MANZO:  Okay.  Now can we go to the conclusion

23   part here, just that one paragraph.

24   BY MR. MANZO:

25   Q.  And do you recognize this as the open letter that

1    Stewart Rhodes sent to President Trump?

2    A.  Yes, sir, I think it was.

3    Q.  Can you just read this paragraph here beginning with

4    "Conclusion"?

5    A.  Sure.

6            "Conclusion.  We are in for a fight, no matter

7    what.  Let's get it done with you as commander in chief.

8    There is no way out but through.  We will not submit to a

9    CHICOM puppet regime.  You must stand tall and use your

10   constitutional powers to fight this war against enemies,

11   foreign and domestic, while are you still president and

12   commander in chief.  If you fail to do so, we, the people,

13   will have a bloody revolution/civil war to throw off an

14   illegitimate deep state Chinese puppet regime."

15   Q.  Do you remember Mr. Rhodes talking about a bloody

16   revolution and civil war?

17   A.  I remember reading this.  I don't remember particulars

18   on it, sir.  I'm sorry.

19   Q.  Okay.  Let's go back to 9091.

20   A.  Okay.

21   Q.  And it's fair to say that you agree 100 percent with the

22   statements that Stewart --

23   A.  I wrote that down there, yes, sir.

24   Q.  Do you still agree with the bloody civil war and the

25   bloody revolution?

1    A.  No, sir.  My context of that, and still is, that, you

2    know, right now in the country we are at such odds with each

3    other that -- and I think we're closer now to something

4    awful, whether you want to call it a civil war or whatever,

5    if we don't scale back some of the rhetoric.

6    Q.  Let me stop you right there.

7    A.  Sure.

8    Q.  Stewart Rhodes is saying, We're going to have to fight a

9    civil war, and you're saying, I'm in, correct?

10   A.  It appears that way, yes.

11   Q.  So let me just draw your attention to 9091 where it

12   says, "Can I send it to other people or put it on Parler?"

13          You were pretty active on Parler at this period,

14   weren't you?

15   A.  At that time, yes, sir.

16   Q.  I look at your Parler profile and I think we talked

17   about it this morning, right?

18   A.  Yes.

19   Q.  In your Parler profile you're retired LEO, 25 years,

20   three cop/K-9, five years active duty Army and eight years

21   Air Guard, volunteer firefighter/EMT, patriot/patron, NRA,

22   member of Oath Keepers, aka Shadow Walker in some circles.

23          Also do you remember that as being kind of your

24   summary on here?

25   A.  Yes, sir.

```
 1    Q.  And your screen name was LEO2211, and that was -- LEO is

 2    a reference to law enforcement officer, right?

 3    A.  Yes, sir.

 4             MR. MANZO:  Can we pull up 9097.

 5    BY MR. MANZO:

 6    Q.  And, sir, do you recognize your screen name here as

 7    Leo2211?

 8    A.  Yes, sir.

 9    Q.  And these messages posted on Parler?

10    A.  Yes, sir.

11             MR. MANZO:  Your Honor, at this time I seek to

12    move into evidence 9097.

13             MR. WOODWARD:  Is there more than just the --

14             MR. MANZO:  Yes, it's a series that has been

15    disclosed, but we can flip through them.

16             Can you flip through them, please.

17             MR. WOODWARD:  Your Honor, we object.  We don't

18    know to whom these statements are being made, and they're

19    hearsay.

20             MR. MANZO:  State of mind, Your Honor.

21             THE COURT:  Objection is overruled.  Subject to my

22    clerk's review, they're not being admitted for the truth of

23    the matter asserted, so --

24             MR. MANZO:  Can we go back to the first page?

25             THE COURT:  It goes to the impeachment of his
```

1   testimony.

2    (Whereupon, the following proceedings were held at sidebar

3    outside the presence of the jury:)

4          THE COURT:  Who would have said that had he been

5    there?  Impeach that testimony.

6          MR. WOODWARD:  I understand, Your Honor.  Thank

7    you for taking time to explain that.

8      (Whereupon, the following proceedings were had in open

9      court:)

10          THE COURT:  Do you need to take a short break?

11          MR. MANZO:  Permission to publish 9097, please.

12          THE COURT:  9097 is moved.

13      (Government's Exhibit 9097 admitted.)

14   BY MR. MANZO:

15   Q.  Sir, we're looking here at 9097.  And in the top

16   left-hand corner, LEO2211, that's your screen name on Parler

17   back in the November/December period of 2020?

18   A.  Yes, sir.

19   Q.  So I'm looking at this message here on November 6th,

20   2020.  Can you read it to the jury?

21   A.  Yes, sir.  "There is a storm coming.  Patriots prepare,

22   get mentally ready, have absolute resolve."

23   Q.  So what was the storm, sir?

24   A.  Well, sir, I think that, as I just stated, even then the

25   way things are going that there could ultimately be a

```
1    confrontation within the country.

2    Q.  And this was right after the election, correct?

3    A.  I'm trying to think back what the 6th was.

4    Q.  First Tuesday in November.

5    A.  Okay.  Yes, sir.

6    Q.  Today.

7    A.  Okay.

8             MR. MANZO:  Let's go the next message, please.

9    BY MR. MANZO:

10   Q.  What do you say here on 11-9?

11   A.  Do you want me to read it, sir?

12   Q.  Yes, please.

13   A.  "Well, no one wants it, but millions of American

14   patriots have the training, the experience and the tools to

15   go to war.  It will be ugly, but once it starts, there will

16   be a cleansing of the freedom tree."

17   Q.  So when you're talking about American patriots, you're

18   talking about people like yourself, correct?

19   A.  Yes, sir.

20   Q.  And people who have training with guns --

21   A.  Yes, sir.

22   Q.  -- and movements?

23   A.  Yes, sir.

24   Q.  Military training?

25   A.  Yes, sir.
```

```
1    Q.  And then once it starts, you're going to be in to kill
2    people.  That's what "cleansing the freedom train" means,
3    correct?
4             MR. WOODWARD:  Objection, Your Honor.
5             THE COURT:  Overruled.
6             THE WITNESS:  Yes, sir.  For the most part, yes.
7    BY MR. MANZO:
8    Q.  So walk us through how you're going to kill people.
9    A.  Well, that is not something I want to do, and I think,
10   if I remember correctly -- it's not on here, but there are
11   places in there -- I'm pretty sure that I posted things that
12   I hope it never comes.  I pray every day that it doesn't
13   come.
14   Q.  What would make it come?
15   A.  It could come from any angle, sir.
16   Q.  You're pretty upset at this point about President Trump
17   not being elected, correct?
18   A.  In some context, yes.
19   Q.  And you were ready to take action, cleansing the freedom
20   tree, correct?
21   A.  Well, I don't know if that was directly related to that
22   because we really weren't sure at that point.
23   Q.  All right.  And then "tools to go to war" -- I just
24   circled it -- those mean guns, correct?
25   A.  Yes, sir.  And knowledge and things of that nature.
```

1    Q.  And as a patriot, you have that knowledge?

2    A.  Yes, sir.

3    Q.  And you have the guns?

4    A.  Yes, sir.

5         MR. MANZO:  Can we go to the next slide.

6    BY MR. MANZO:

7    Q.  Sir, this is on November 8th, and this is now five days

8    after the election.  What are you writing on November 8th?

9    A.  "Attempted coup for now, but possible civil war is not

10   out of the question at this point.  I think the possibility

11   is about 80 percent."

12   Q.  So here you're on November 8th.  It is five days after

13   the election, and you're talking about how civil war is at

14   80 percent, correct?

15   A.  Correct.

16   Q.  And so is the civil war killing Democrats or other

17   branches of the federal government?  Walk us through that.

18   A.  Civil war is not necessary -- I mean, unfortunately,

19   when civil war comes, a civil war between people is usually

20   the ugliest war you can have.  I mean, that's historical.

21   Q.  So the patriots would be on one side, correct?

22   A.  That's correct.

23   Q.  And then the force that oppose the patriots would be on

24   the other side, correct?

25   A.  Correct.

```
 1    Q.  And those forces would be anyone, such as elements in
 2    the federal government, the deep state?
 3    A.  Anyone one -- I mean, pretty much at that point people
 4    would probably have to decide which side they would be on.
 5    Q.  And so the patriots would fight military elements that
 6    supported the not patriots?
 7    A.  That's a possibility.
 8    Q.  And maybe some military would break off and be on your
 9    side?
10    A.  That's a possibility.
11    Q.  And then where would you take up arms in this situation?
12    So you as a patriot, would you go out and kill people?
13    A.  That's a very tough question, sir.
14    Q.  But it's possible you would go kill people?
15    A.  No.  I think in that context, it would be people that
16    came -- I'm a little old for things like that.
17    Q.  But don't sell yourself short.  On January 6th you were
18    in charge of the ground operations.
19    A.  Right.
20    Q.  You were supervising dozens of people so you could order
21    those people to go kill, correct?
22          MR. WOODWARD:  Misstates facts in evidence.  He
23    was not in charge of anything on January 6th.
24    BY MR. MANZO:
25    Q.  Until you came down with COVID, you could have ordered
```

 1    people to kill, correct?

 2    A.  That never would have happened.

 3    Q.  Okay.  But you're talking about civil war and

 4    80 percent.

 5    A.  Yes, sir.  Right now I think the possibility is the way

 6    things have gone even since that time, and it's not just

 7    left or it's across the board.  People are to the point I

 8    think the possibility of -- of something happening is even

 9    higher than that right now.

10    Q.  So if an opportunity arose, someone might go for it?

11    A.  It could be --

12              MR. CRISP:  Objection to the question.

13              THE COURT:  Let's just move on.

14              MR. MANZO:  Let's go to the next slide here.

15    BY MR. MANZO:

16    Q.  All right.  Sir, can you read this?  On November 9th,

17    this is six days after the election.  What do you say here?

18    A.  "Not one step back.  Do not blink.  If the time comes,

19    no hesitation.  Total resolve.  Most of all, never, ever

20    surrender."

21    Q.  So if there's an opportunity for civil war, you're here

22    saying, You got to take a chance; you got to go for it,

23    right?

24    A.  If that would break out, if something like that would

25    break out.

7843

1    Q.  So if there's an opportunity to advance a cause, it was

2    it would be time to go for it, right?

3    A.  No, not necessarily.  No.

4    Q.  Well, walk us through.  Why would it not be necessarily

5    a time?  You say, "Do not blink.  If the time comes, no

6    hesitation.  Never, ever surrender."

7    A.  If that time would ever come.  You make every attempt

8    not to have that time come.

9    Q.  But if it is, it's kill or be killed?

10   A.  Unfortunately, in some circumstances, yes.

11   Q.  And so this is six days after the election, you're

12   saying; is that correct?  November 9th?  Election is on

13   November 3rd, 2020?

14   A.  Yes, sir.

15             MR. MANZO:  All right.  Let's go to the next

16   slide.

17   BY MR. MANZO:

18   Q.  Okay.  So can you read what you're saying here later on

19   November 26, 2020?  What do you say here?

20   A.  "If Biden gets away with this, there will be war."

21   Q.  So what do you mean by "if Biden gets away with it"?

22   A.  If the election is not certified correct and all of the

23   issues are resolved, that people are going to be very, very

24   angry.

25   Q.  And the election certification is on January 6th,

```
 1   correct?

 2   A.  That's correct.

 3   Q.  And so if the election is certified, there's going to be

 4   war, right?

 5   A.  Not necessarily at that point.

 6   Q.  But soon thereafter, like a couple hours, couple days?

 7   A.  I have no idea.

 8   Q.  But this is your statement --

 9   A.  A lot of it is rhetoric, sir, at that point.

10            THE COURT:  Counsel.

11     (Whereupon, the following proceedings were held at sidebar

12   outside the presence of the jury:)

13            THE COURT:  So the jury has a good sense of what

14   this all is and what this witness and what you have, and I

15   would urge you to get there and let's move on.  Okay?

16            MR. MANZO:  Understood.

17     (Whereupon, the following proceedings were had in open

18   court:)

19            MS. MANZO:  Okay.  Ms. Rohde, can you go to the

20   next slide.

21   BY MR. MANZO:

22   Q.  All right.  Now this is on now December 22, 2020.

23            Can you read this slide to the jury, please?

24   A.  "Ali, this may be bigger than both prior DC days

25   combined.  I see on multiple sites and chats people
```

1    organizing groups for travel and being there.  Multiple

2    patriot groups are getting highly organized for their trip

3    and participation.  People are totally fed up with

4    Washington and 99 percent of those in it.  While things

5    could change and you never know until they actually show up,

6    this has the possibility to overwhelm DC."

7    Q.  And so this is December 22nd.  This is as you're

8    beginning to organize for January 6th?

9    A.  Right.

10   Q.  So when you recognize that this has the possibility to

11   overwhelm DC, did you call the U.S. Capitol Police and tell

12   them?

13   A.  To?

14   Q.  Warn them?

15   A.  Well, sir, I would have thought they would have known.

16   Q.  Well, sir, you cried when you talked about officers

17   getting injured.

18            THE COURT:  Mr. Manzo, let's move on.

19   BY MR. MANZO:

20   Q.  But fair to say you didn't contact the police about what

21   you are seeing online?

22   A.  No, sir, I didn't.

23            MR. MANZO:  Can we go to the next slide, please?

24   BY MR. MANZO:

25   Q.  Sir, can you read this on December 24th?

1    A.  "Fellow patriots, are we going to let all of those past

2    sacrifices of our forefathers, our own friends, our sons and

3    daughters slip between our fingers?  Or are you going to put

4    forth some real effort to maintain our freedoms?  It may

5    cost you something -- effort, time, money, or maybe

6    everything you have, including your life -- or are you just

7    going to sit there and bitch about it?"

8    Q.  So what did you mean by this statement here?

9    A.  Well, you need to go out -- you know, we were going, as

10   we said, to overwhelm DC.  By that I mean -- like the first

11   MAGA March, it was huge.  It basically, from my

12   understanding, shut down DC, and with people flowing in, the

13   trains were basically overwhelmed.  And at that point,

14   really, it was hard to move.

15   Q.  But it was a peaceful event; there wasn't any

16   disturbances?

17   A.  Absolutely.

18   Q.  But here you're talking about maybe even giving

19   everything you have, including your life.

20           What did you mean by that?

21   A.  Well, we had, as we stated before, the possibility of

22   some of the left-wing groups that were very, very radical.

23   Q.  Like Black Lives Matter?

24   A.  Yes, sir.

25   Q.  Well, you said that on direct.

```
 1                   What is Black Lives Matter?

 2     A.  It is a left-wing group, along with Antifa.

 3     Q.  What does Black Lives Matter believe in?

 4     A.  It is a group of folks who are together to promote

 5     equality and -- you know, I don't know their ultimate

 6     stance.  You know, I don't know their platform, per se.

 7     Q.  But you as a police officer, why would you be worried

 8     about a group promoting equality?

 9     A.  Well, they have rioted in some instances around the

10     country, but that wasn't the major --

11     Q.  What was the main danger?

12     A.  Antifa and some of the offshoots from Antifa.

13     Q.  What is Antifa?

14     A.  Pardon?

15     Q.  What is Antifa?

16     A.  They're a radical left-wing group that is -- has rioted

17     in many places around the country.

18     Q.  So who's in charge of Antifa?

19     A.  That -- I don't know if there is anyone in charge.

20     Q.  Where is their headquarters in Washington, D.C.?

21     A.  Well, I think at the time -- I forget what they call it.

22     What -- wasn't -- wasn't it Antifa Square or something?

23               THE COURT:  Let's move on.

24               MR. MANZO:  Can we go to the next slide, please?

25
```

1    BY MR. MANZO:

2    Q.  Sir, this is the last slide we have.

3            On 12-30-2020 -- can you read this slide to the

4    jury, please?

5    A.  "Patriots and communists, take a long, hard look at that

6    map.  We know in reality, due to election fraud, many of

7    those blue areas are red, and, if not, some are barely blue.

8    Now think long and hard what would happen if patriots said

9    blockade, no goods or services provided to those areas.  If

10   nothing else but the trucks stopped moving to those areas, a

11   minimum of 72 hours and totally bare grocery store shelves.

12   So if you really mean to push us to the point of rebellion,

13   how do you think that will end?"

14           MR. MANZO:  So, Ms. Rohde, can you zoom in on the

15   top paragraph on this slide.

16   BY MR. MANZO:

17   Q.  So what do you mean here by the, "Patriots and

18   communists, take a long, hard look at the map.  We know in

19   reality, due to election fraud, many of those blue areas are

20   red, and, if not, some are barely blue"?  What did you mean?

21   A.  Well, if -- I'm trying to picture the map.

22           THE COURT:  Mr. Manzo, I think it speaks for

23   itself.

24           MR. MANZO:  Let's go to the bottom then.

25

```
 1    BY MR. MANZO:

 2    Q.  When you say "blockade," what are you talking about

 3    here?

 4    A.  Well, if people just stopped a movement of goods and so

 5    forth.

 6    Q.  So the people in Washington, D.C., wouldn't have food?

 7    A.  That's a possibility.

 8    Q.  And that's one of the possibilities you envisioned?

 9    A.  Well, what I'm saying is if things ever eventually

10    happen, that's a possibility.

11    Q.  Just to starve out the city?

12              THE COURT:  Mr. Manzo.

13              MR. MANZO:  We'll go to the next slide.

14    BY MR. MANZO:

15    Q.  Sir, what are you saying on 1231?

16              Sir, can you please read the slide on 1231?

17    A.  "There are tens of millions of well-trained, equipped

18    and fully ready patriots standing beside and in back of you,

19    General, and they're ready for your orders to assault their

20    positions."

21              MR. MANZO:  I'm just going to move on for the sake

22    of time here.

23              Go to the next slide.

24    BY MR. MANZO:

25    Q.  And what do you mean -- or what do you write here on
```

1    1-1-21?

2    A.   That a Concord Green movement is inevitable.

3    Q.   What is Concord Green?

4    A.   It's what everybody knows as the --

5    Q.   Is it the American Revolution, the start of the American

6    Revolution?

7    A.   The start, yes, sir.

8    Q.   Up in Massachusetts?

9    A.   Yes, sir.

10   Q.   And you're writing this on 1-1?

11   A.   Yes, sir.

12   Q.   You heard Stewart Rhodes talk a lot about the American

13   Revolution; is that fair to say?

14   A.   A lot?  I wouldn't say a lot, no.

15            MR. MANZO:  All right.  Let's go back to

16   Government Exhibit 1005.

17            And can you go to the next page?

18            And can you just zoom in on the picture and the --

19   right down to the author here.

20   BY MR. MANZO:

21   Q.   So do you recognize this as "Open letter to President

22   Trump.  You must use Insurrection Act to Stop the Steal and

23   defeat the coup."  December 14 by Stewart Rhodes.

24            Do you recognize who is depicted in the painting

25   in the top?

```
 1    A.  Yes, sir.

 2    Q.  Who is that?

 3    A.  That is George Washington.

 4    Q.  From the American Revolution?

 5    A.  Yes, sir.

 6    Q.  All right.  Let's now talk about some of the Signal

 7    chats that you talked about in direct examination here.

 8            In preparation for January 6th, you contacted the

 9    Metropolitan Police Department, right?

10    A.  Yes, sir.

11    Q.  And you contacted the First District, and the First

12    District is kind of Capitol Hill, Eastern Market, downtown

13    DC, area around the Capitol, fair to say?

14    A.  Yes, sir.

15            MR. MANZO:  Can we pull up 9093?

16    BY MR. MANZO:

17    Q.  And, sir, do you recognize this as a message from you to

18    Signal chat called "January 5th/6DC OP Intel team"?

19    A.  Yes, sir.

20            MR. MANZO:  At this time I would like to move this

21    exhibit into evidence, 9093.

22            MR. WOODWARD:  Is it just the one page?

23            MR. MANZO:  Yes.

24            MR. WOODWARD:  No objection.

25            THE COURT:  9093 is received.
```

```
 1              (Government Exhibit 9093 admitted.)
 2                   MR. TARPLEY:  Objection, Your Honor.  The date is
 3      wrong.
 4                   MR. WOODWARD:  He has no standing to object.
 5                   THE COURT:  Let's keep moving, folks.  Let's go.
 6      BY MR. MANZO:
 7      Q.  Ignoring the date for the time being, do you remember
 8      writing this message to the January 5-6 DC OP Intel team?
 9                   THE COURT:  Mr. Manzo.
10      BY MR. MANZO:
11      Q.  Just read the message.
12      A.  "Just to let everyone know, one thing I am going to
13      check on with the District 1 DCPD commander -- I have an
14      e-mail sent, but she is out until Monday -- can she put me
15      in touch with any their Intel folks who we might be able to
16      contact, and depending on the reception I get, possibly
17      share Intel or call if we see issues developing.  Of course,
18      I will feel them out first.  Not going to do so if I get
19      that feeling."
20      Q.  What did you mean by "that feeling?"
21      A.  That they really didn't want to share.
22      Q.  And did you tell the DC police that you thought that DC
23      might get overwhelmed?
24      A.  Well, I'm not sure about that time, if we knew or not.
25      When was that?
```

1    Q.  Did you tell them about Stewart Rhodes' letter about a

2    bloody revolution or civil war?

3    A.  No, sir, I did not.

4    Q.  Why not?

5    A.  I have no idea.

6    Q.  Did you tell them anything about a Quick Reaction Force

7    organizing?

8    A.  No, sir.

9    Q.  Who is Josh James to you?

10   A.  Josh James?

11           MR. MANZO:  Let's pull up Government Exhibit 92.

12   A.  Okay.

13   BY MR. MANZO:

14   Q.  Do you remember exchanging messages with an individual

15   named Josh James?

16           MR. MANZO:  And we can go to the second slide

17   here.

18   A.  Yes, sir, I remember.

19           MR. MANZO:  Your Honor, I would seek to move in

20   9091.

21           THE COURT:  9092?

22           Any objection?

23           MR. WOODWARD:  Is it just these two messages?

24           MR. MANZO:  Yes.

25           MR. WOODWARD:  No objection.

```
 1                THE COURT:  9092 is admitted.

 2         (Government Exhibit 9092 admitted.)

 3    BY MR. MANZO:

 4    Q.  This is actually 1121 here.

 5                What does Josh James say to you here?

 6    A.  "Do we have a farm location for weapons?"

 7    Q.  What does that mean to you?

 8    A.  At the first one, at the MAGA March, they had -- the

 9    location that we met at was a farm in Virginia.

10                MR. MANZO:  And then can we go to the second slide

11    here.

12    BY MR. MANZO:

13    Q.  How did you respond?

14    A.  "Not that I am aware of yet.  If nothing else, my hotel

15    in Virginia has secured underground parking about

16    15-20 minutes outside DC, less if you really don't care

17    about speed limits.  Would be great if we had someone with

18    an enclosed-type truck vehicle and had a quick response unit

19    just outside the city."

20    Q.  So what was your understanding of a quick response unit?

21    A.  That was -- in past instances, it was one or two folks

22    who, if I remember correctly, really didn't have the

23    physical ability to be with us and that some of the guys had

24    placed some weapons in there, and it would be in the context

25    of a real emergency, you know, I guess to put it blankly,
```

1    stuff-hit-the-fan-type moment, that they would respond with

2    that.

3    Q.  But you're aware that DC has strict gun laws, right?

4    A.  Yes, sir.

5    Q.  And so you would just be ignoring those gun laws in that

6    situation; is that fair to say?

7    A.  Yes, with limitations.

8    Q.  Well, you would make the decision about when to violate

9    the gun laws, correct?

10   A.  Me?

11   Q.  Well, the quick response team, you said --

12           THE COURT:  Mr. Manzo, would you move on, please.

13   BY MR. MANZO:

14   Q.  All right.  Let's go now to --

15           THE COURT:  Let's just go off the record.

16    (Whereupon, the following proceedings were held at sidebar

17   outside the presence of the jury:)

18           THE COURT:  How much longer do you think your

19   cross will be?

20           MR. MANZO:  Maybe another 45 minutes.

21           THE COURT:  Really?

22           MR. MANZO:  He's the ground lead.  The defense is

23   holding him out as the authority on lawfulness here, and I

24   have to impeach him and then I've got to go through all of

25   his messages.  So he is a major witness.

 1          MR. WOODWARD:  But the government didn't call him.

 2   He drove three hours because Mr. McWhirter is not here.  He

 3   will have to drive three hours home tonight and three hours

 4   in the morning.

 5          THE COURT:  We can put him up in a hotel, but --

 6          MR. WOODWARD:  I don't think he has a change in

 7   underwear.

 8          MR. MANZO:  I can try and get through in 45

 9   minutes here.

10          THE COURT:  We won't have time for redirect.

11   That's the issue.  You'll have to forgive me here.  Is there

12   any way -- he's got six ways until Sunday, and it's quite

13   clear to the jury about his limitations from his memory and

14   what his assignments were on the evening of January 6th.

15          MR. MANZO:  Okay.  Thank you.

16      (Whereupon, the following proceedings were had in open

17   court:)

18          MR. MANZO:  Can we pull up 9094?

19   BY MR. MANZO:

20   Q.  And, sir, you were on the DC OP 10-6 chain that you

21   talked about in your direct examination, correct?

22   A.  Yes.

23   Q.  And do you recognize this message -- and we'll come

24   through a couple more here.

25          MR. MANZO:  Is there any objection admitting this

 1    exhibit?

 2            MR. WOODWARD:  Your Honor, we object.  This is --

 3    we understand the government's -- he's -- well, I understand

 4    the government's desire to impeach the witness.  This is

 5    beyond the scope of direct and --

 6            THE COURT:  It is not.

 7            MR. WOODWARD:  They have -- they have selectively

 8    chosen messages, many of which they've already admitted, and

 9    he didn't lay the foundation for why this message is

10    responsive to anything else we've seen.

11            MR. MANZO:  This is the exact same chain defense

12    put up.

13            THE COURT:  I know.  I know.  It's overruled.

14    BY MR. MANZO:

15    Q.  Okay, sir.  We're going to try to do this quickly here

16    so we can get you on the road.

17    A.  Okay.

18    Q.  Sir, do you recognize this message as what you talked

19    about in your direct examination?

20    A.  Yes, sir.

21    Q.  "Everyone tonight or tomorrow, let's take some time to

22    thank our loved ones for putting up with us and our

23    inability not to stop from running to the sounds of battle."

24            The "sounds of battle," now is that Civil War or

25    something different?

1    A.  No, sir.  That's a generalized, you know, we're going

2    off and protecting folks like we did as first responders.

3    You know, even most of the military folks never heard the

4    sound of battle, myself included, and --

5    Q.  Right.

6    A.  -- it was just that generalized we're going to do our

7    duty and that was it.

8                MR. MANZO:  Let's go forward now to slide 11.

9    BY MR. MANZO:

10   Q.  Now on January 6th, you were pretty down with COVID; is

11   that fair to say?

12   A.  Yes, sir.

13   Q.  I'm going to read this to the jury.  This is your

14   message on January 6th about 7:40 p.m.?

15   A.  Yes, sir.

16   Q.  All right.  So you say, "To my brothers and sisters, my

17   heart is heavy that I cannot be there with you.  You showed

18   bravery and the warrior spirit.  I am still down, but

19   improving, thanks to Stewart's recommendation on the doc to

20   call."  And then you go on to talk about hydroxychloroquine,

21   associated meds.

22                Can you go to the next page?

23                "I am starting to already show improvement.

24   Thanks, Stewart.  If not for you, this 68-year old with Type

25   2 diabetes may not have been around.  Stay safe all.  Time

1    to put my head back down."

2              Did you write this on January 6th?

3    A.  I probably did, sir.  I don't remember much of that time

4    frame, but I probably did.

5              MR. MANZO:  We're over at slide 11 right now.  Can

6    we go back to slide 3.

7    BY MR. MANZO:

8    Q.  And so you testified about you knew somebody by the name

9    of Jessica Watkins; is that fair to say?

10   A.  I'm sorry?

11   Q.  That you know someone by the name of Jessica Watkins?

12   A.  Yes.

13   Q.  Do you remember seeing this message at 5:50 p.m. on

14   January 6th where she writes, "We were in there.  Flash

15   bangs tear-gassed us.  We are taking our senior citizen

16   members back to the hotel now."

17   A.  No, I don't remember seeing that.

18   Q.  Did you ever turn over all this evidence to law

19   enforcement at any point?

20   A.  Um --

21   Q.  You said on direct you cried when you said you heard

22   about law enforcement officers getting hurt.

23              Did you ever turn over the evidence in your

24   possession to law enforcement?

25              MR. WOODWARD:  Objection.

```
 1              THE COURT:  It's overruled.

 2              THE WITNESS:  No, sir.

 3    BY MR. MANZO:

 4    Q.  Why not?

 5    A.  Well, I was -- as stated there, I was down and out for

 6    quite some time.

 7    Q.  But here is somebody saying --

 8              THE COURT:  Mr. Manzo, let's not continue to be

 9    arguing.  It's late in the afternoon.

10    BY MR. MANZO:

11    Q.  Okay.  We'll go to the next slide.

12              Do you know who OK Gator 1 is?  Did you ever

13    meeting Kelly Meggs?

14    A.  Pardon?

15    Q.  Did you ever meet Kelly Meggs?

16    A.  I probably did at some time.  I remember the nickname,

17    but I probably did.

18              MR. MANZO:  Okay.  We'll go to the next slide.

19              "Congress being escorted into the tunnels toward

20    Capitol now" at 7:26.

21              Go to the next slide, and Stewart Rhodes says,

22    "People who weren't there should shut their damn mouths and

23    listen to those of us who were there."

24              Do you remember reading this?

25              You can go to the next slide here.
```

7861

```
 1              Ed Vallejo says "Here, here" at 7:28 p.m.

 2     BY MR. MANZO:

 3     Q.  Do you remember this?

 4     A.  No, sir.

 5              MR. MANZO:  Go to the next slide.

 6     BY MR. MANZO:

 7     Q.  Somebody named Walden said, "We held the line."

 8              Do you remember this?

 9     A.  No, sir.

10              MR. MANZO:  Can you go to the next slide.

11     BY MR. MANZO:

12     Q.  Ed Vallejo at 7:32 says, "We'll be back at 6 a.m. to do

13     it again"?

14     A.  No, sir.

15              MR. MANZO:  Go to the next slide.

16     BY MR. MANZO:

17     Q.  OK Gator says, "We aren't quitting.  We are reloading"?

18     A.  No, sir.

19              MR. MANZO:  Next slide.

20     BY MR. MANZO:

21     Q.  And then you say here just moments later, "To my

22     brothers and sisters, my heart is heavy that I cannot not be

23     with you.  You showed bravery and the warrior spirit."

24              Sir, at any point was there any commentary about

25     personal security details here on the evening of
```

1    January 6th?

2    A.  In what context?

3    Q.  Sir, when you're looking at the Signal chain on the

4    evening of January 6th and you say, "You showed bravery and

5    the warrior spirit," was anyone saying that, We did our job.

6    We did a personal security detail?

7    A.  You know, sir, I'm not sure at this point what my mind

8    was.  I -- I -- I know I probably sent this out.  I was

9    pretty much down and out that day.  Like I say, it took me

10   10 minutes to walk 15 paces to the bathroom and back, and

11   with the meds and so forth, I'm not sure how much I saw or

12   recognized before I wrote that.  I'm sorry.  I -- I just

13   don't.

14            MR. MANZO:  No further questions.  Thank you.

15            THE COURT:  Any redirect examination?

16            MR. WOODWARD:  We will be finished within

17   19 minutes.

18                    **REDIRECT EXAMINATION**

19   BY MR. WOODWARD:

20   Q.  Mr. Siekerman?

21   A.  Yes, sir.

22   Q.  Mr. Manzo, had you read a number of your Parler

23   messages.  What is Parler?

24   A.  Parler was a -- yeah, basically a social media-type

25   thing.  First time I've ever been a part of something like

1      that.

2      Q.   And you were a member or a user of Parler?

3      A.   For a short amount of time, yes.

4      Q.   Do you agree -- as we sit here today, do you agree with

5      the statements you posted on Parler before January 6th?

6      A.   Would I do a lot of them again?  No.  I think I got

7      caught up in that social media -- I'm sorry to say it -- BS.

8      I never participated in that.  I think a lot of it was on my

9      part, you know, just rhetoric coming back at other people

10     and so forth, caught up in the moment.

11     Q.   You used the word "rhetoric" in your examination.

12     A.   Pardon?

13     Q.   In response to a question of Mr. Manzo's, you used the

14     word "rhetoric"?

15     A.   Yes, sir.

16     Q.   Would you agree your statements were rhetorical?

17     A.   Yes, sir.

18     Q.   Would you agree that at that time -- and would you agree

19     that at that time there was vitriol in our nation?

20     A.   Still is, sir.

21     Q.   Have you heard -- and there's some irony today is

22     election day?

23     A.   Yes, sir.

24     Q.   And you agree there's vitriol today?

25     A.   In some ways I think it's worse today than it was then.

7864

```
 1              MR. WOODWARD:  Now, if we could show just the
 2    witness -- or really just the government a few slides.  If
 3    we could just go through these.  As the Court is aware, I'm
 4    not all that tech savvy.
 5    BY MR. WOODWARD:
 6    Q.  But, Mr. Siekerman, are you familiar with in a chat you
 7    can click on a message or tap a message and you can respond
 8    to that message?
 9    A.  I think so, yes.
10    Q.  And you can do that in Signal?
11    A.  Yeah.  I think you could, yes.
12              MR. WOODWARD:  Okay.  And so -- if we can move to
13    admit this presentation as KM-64.  Subject to that
14    correction, I don't think there's an objection to KM-64,
15    Your Honor, we would ask for it to be admitted.
16              MR. MANZO:  No objection.
17              THE COURT:  KM-64 is admitted.
18         (Defendant Meggs Exhibit KM-64 admitted.)
19              MR. WOODWARD:  And published.
20              And if we could start with the slide.
21    BY MR. WOODWARD:
22    Q.  Mr. Manzo showed you this message.
23              MR. WOODWARD:  Now, Ms. Wintermyer, if we could go
24    to the first message.
25
```

1    BY MR. WOODWARD:

2    Q.  And, Mr. Siekerman, the question would be you have no

3    reason to disagree that these are all responses to this

4    message.  I'm not going to ask you to read these.  The jury

5    can read them.  If you would relatively slowly scroll

6    through these.

7              MR. WOODWARD:  All right.  If we could turn to

8    KM-63, slide 28.

9    BY MR. WOODWARD:

10   Q.  Do you recall this message on your direct examination?

11   A.  Yes, sir.

12   Q.  Mr. Siekerman, when you volunteered to participate in

13   these ops with the Oath Keepers, did you believe it possible

14   that you or your colleagues could be injured?

15   A.  Yes.

16   Q.  Could you say more about that for the ladies and

17   gentlemen of the jury?

18   A.  Well, there were instances during some of these, you

19   know, and probably one of the most prominent incidents was

20   Atlanta where thank goodness for the Georgia State Police

21   and their guys from their correction system.  The rioters,

22   Antifa, had a post with a very large group in close

23   proximity, but they were blocked by them.  But a large

24   number of them were armed.

25   Q.  And so there was a risk, even though the events had been

1    peaceful?

2    A.  The events themselves were peaceful, but even here in

3    D.C., the first one, there were a lot of people injured on

4    the, you know -- on the outlying areas of later after the

5    event itself and things of that nature.

6              MR. WOODWARD:  No further questions, Your Honor.

7              THE COURT:  Okay.  Thank you, Mr. Woodward.

8              Okay.  Mr. Siekerman, thank you for your

9    testimony, sir.  You may step down.  Good luck.  And wish

10   your wife well in having her surgery.  Thank you.

11             All right.  Ladies and gentlemen, we have come to

12   the end of the day.  Thank you very much for your time and

13   patience.  I promise you we are moving along.  We'll see

14   everybody back tomorrow again at 9:30.  We'll get started

15   tomorrow again at 9:30.  I look forward to seeing you again.

16   Thank you all very much.

17             THE COURTROOM DEPUTY:  All rise.

18        (Whereupon, the jury exited the courtroom at 4:49 p.m.

19   and the following proceedings were had:)

20             THE COURT:  Have a seat, everybody.

21             Okay.  So with respect to Mr. McWhirter, we will

22   have forwarded a letter -- or we received a letter through

23   Mr. Bright indicating that Mr. McWhirter's doctor is not

24   recommending that he travel, so --

25             MR. BRIGHT:  I've forwarded that e-mail to the

1    entire group, Your Honor.

2                THE COURT:  So what are you all proposing to do?

3                MR. BRIGHT:  Deposition.

4                MR. NESTLER:  In the interests of expediency, as I

5    indicated earlier, the Government would be amenable to

6    remote testimony from Mr. McWhirter if we could have that

7    arranged.

8                MR. BRIGHT:  May we have the opportunity, Your

9    Honor, now that we definitively know that he's got doctor's

10   recommendations not to travel for whatever the foreseeable

11   future, to have a discussion tonight and approach the Court

12   and the government regarding accepting that possibility

13   tomorrow morning?

14               THE COURT:  Before you do that, I guess there's

15   two questions:

16               One is, is there any further impairment that not

17   only would prevent travel but prevent him from being in a

18   condition to testify?  That's one.

19               Two, Federal Civil Rules -- I can't remember which

20   rule it is, but there is a provision there about remote

21   testimony, and it's permitted in civil cases.  I don't know

22   to what extent to which it applies criminally.  Typically,

23   the concern is with respect to the defendant's right to

24   confront.  This is a remote situation.  And if you all can

25   come up with some rules, I'll take a look, if you can get me

7868

1    comfortable with the idea that we can do this in a criminal

2    case.

3              MR. NESTLER:  We can provide some case law, also

4    some other cases in this courthouse where it has been done

5    in a criminal case.  I do believe that both parties -- all

6    three of us have to be in agreement.  If any of those

7    members, the Court or other parties is not in agreement,

8    then I think it's a nonstarter.  But I think logistically it

9    would be helpful if we can forward some questions to

10   Mr. Kramer and talk about technological issues.

11             THE COURT:  I guess the question is how would that

12   work?  I suppose you could put exhibits up in front of him

13   via Zoom, but --

14             MR. NESTLER:  Basically, wheel a screen as if he's

15   here, but we can talk to Mr. Kramer.

16             THE COURT:  Talk to him.

17             MR. NESTLER:  We'll send the Court some

18   information, and we'll discuss tonight and see what we can

19   come up with.  We understand the Defendant's desire, and

20   we'll do what we can to help facilitate.

21             MR. BRIGHT:  So we certainly have an interest in

22   making this happen.  I mean, clearly.

23             THE COURT:  So figure that out.

24             And then there's the related issue that we talked

25   about under seal.

```
 1              MR. NESTLER:  Court's brief indulgence?

 2         (Whereupon, conversation between counsel off the

 3    record.)

 4         (Whereupon, the proceedings returned to open court:)

 5              MR. NESTLER:  It sounds like the defense has told

 6    us that they did not want to get into that issue.  Then we

 7    heard this morning that maybe they did.  Mr. Bright said now

 8    they don't, but maybe Mr. Woodward does.  So we're waiting

 9    to hear what the defense wants to do.

10              MR. BRIGHT:  Your Honor, I had indeed indicated a

11    possible interest in that.  Mr. Nestler is aware that I gave

12    him, along with co-counsel -- in the hallway we had a

13    discussion about it.  My co-counsel convinced me that -- of

14    a way that we want to go, and I'm okay not doing that, so --

15    but I can't speak on behalf of other counsel, Your Honor.

16              THE COURT:  So talk to each other, figure out what

17    you would like to do, contact Mr. McWhirter -- I don't know

18    if he's got counsel or not.  If this is something to know

19    about timing and if you send us something this evening with

20    whatever information you have, that would be helpful.  Okay?

21              MR. NESTLER:  Understood, Your Honor.  Thank you.

22              THE COURT:  The second issue before we adjourn is

23    that Mr. Bright has given me handwritten notes of interviews

24    that he conducted both with Mr. McWhirter and Mr. Green, who

25    I gather is being called tomorrow.  The notes with
```

1    Mr. McWhirter I think are six pages long.

2            MR. BRIGHT:  That's correct, sir.

3            THE COURT:  But notes with Mr. Green are three

4    pages long.  I've read them all to see whether these are

5    statements of the witness, and they were not.

6            I would just read to everybody *U.S. v. Donato*, 99

7    F.3d 426 from the D.C. Circuit, 1999.  The Court there

8    writes, "In *Palermo v. United States*, the Supreme Court

9    explained that the Jencks Act covered statements that could

10   fairly be used by the defense to impeach a government

11   witness."  This is, obviously, the opposite situation, so

12   not helpful.

13           "In order that this goal be achieved, these

14   statements had to be limited to those that could properly be

15   called the witness' own words.  Notes from an interview with

16   a witness that were not the whole interview but, rather, a

17   "substantial selection" of the interview were not covered.

18   Here, the Agent testified that he included in his account of

19   his interview with the witness everything that he (the

20   agent) considered pertinent.  The agent engaged in

21   substantial selection, recording not the entire interview

22   but only those portions he found pertinent.  Under *Palermo*,

23   the agent's notes and the 302 report from his pre-trial

24   interview with the witness are not covered by the Jencks

25   Act."

```
 1              The same logic, it's quite clear that Mr. Bright's
 2     notes reflect a substantial selection of the statements that
 3     were made to him by the witnesses in regards to the
 4     interview with Mr. McWhirter, which was two hours long --
 5              MR. BRIGHT:  That's correct, sir.
 6              THE COURT:  You know, it produced six pages of
 7     notes.  How long was the interview?
 8              MR. BRIGHT:  With Mr. --
 9              THE COURT:  Green.
10              MR. BRIGHT:  Green?  An hour, an hour and
11     20 minutes, possibly, sir.  I apologize.  I don't remember
12     exactly.
13              THE COURT:  I mean, even if it's 60, it's short.
14     It's only three pages of notes.  These don't purport to
15     contain direct limitations from the witnesses.  I assume the
16     witnesses have not had an opportunity to review these notes
17     before?
18              MR. BRIGHT:  No, sir.  He's not in town right now.
19              THE COURT:  And those also contain oral argument
20     with Mr. Bright with respect to what was said.  I'll ask
21     Mr. Bright to just make copies of these and have them marked
22     just for the record.
23              MR. BRIGHT:  Do you want me to make copies of
24     those for the Court, Your Honor?
25              THE COURT:  Yes, sir.
```

```
1              MR. BRIGHT:  I will do so.
2              THE COURT:  They don't have to be disclosed as
3    Jencks.
4              MR. BRIGHT:  Thank you, sir.
5              THE COURT:  Anything else before we adjourn?
6              MR. NESTLER:  Just for scheduling, we're aware of
7    two witness the defense wants to call tomorrow, but no
8    others.
9              THE COURT:  Okay.  And they are Mr. Green and who
10   else?
11             MR. WOODWARD:  Your Honor, Mr. Green and then,
12   going out of order again to accommodate things, we're going
13   to be anticipating calling Stephen Brown, who is -- he was
14   responsible for organizing the event on January 6th.  He
15   runs the production company.  He obtained the permits.
16             THE COURT:  I thought you meant the other --
17             MR. WOODWARD:  Not Jeremy Brown.
18             THE COURT:  I'm not quite sure how that would have
19   been pulled off.
20             MR. WOODWARD:  Thursday is still a toss-up, if
21   Mr. McWhirter can testify as soon as Thursday and close out.
22             THE COURT:  Are we going to need more than two
23   witnesses tomorrow?
24             MR. WOODWARD:  I don't think so with respect to
25   Mr. Green and Mr. Brown, no.
```

 1          MR. NESTLER:  It's possible.  I don't know.

 2          MR. WOODWARD:  We may have -- we are intending to

 3     recall Mike Adams who testified in the government's

 4     case-in-chief.  He won't be very long, but I think he's

 5     either getting on a plane tonight or tomorrow morning to be

 6     available on Thursday.  He can be available tomorrow

 7     afternoon.  We are diligently trying to put people on planes

 8     who weren't expecting to travel until Sunday evening, now

 9     get them here this week.  So we're going the best we can.

10          THE COURT:  I appreciate that.

11          So how long do you think your direct of Mr. Green

12     is going to be?

13          MR. BRIGHT:  I think that my direct --

14          THE COURT:  You only have three pages of notes.

15          MR. BRIGHT:  Fair enough, Your Honor.  But I

16     didn't take any notes on my prior one, so, realistically,

17     hour and a half perhaps.  I mean, he's got a lot of

18     information and we'll cover a lot of ground, and I imagine

19     there's a great amount of interest in both the government as

20     well as other defense attorneys possibly being able to ask

21     the questions.  But I will do my best, as I've always

22     promised, to not worry about the time and expedite it.

23          THE COURT:  I'm not asking you or suggest you

24     should take less time.  I'm just trying to figure out how

25     your witnesses you should have available.  I would like to

1    have at least a third person available because I don't -- it

2    doesn't sound to me like we will occupy a full day with only

3    two witnesses.  So -- okay.

4              Anything else we should discuss?

5              I guess the last thing, since it's Tuesday, I

6    would like to give the jury a sense by Thursday of where

7    things stand.  I'm sure they're anxious to know.  So I'll

8    ask defense counsel and government counsel to the extent

9    that you thought about a rebuttal case what it's going to

10   look like and how many more days we're anticipating because

11   I think we owe them a sense of timing here.  Okay?

12             All right.  Anything else, Counsel?

13             MR. WOODWARD:  We'll have a third.

14             THE COURT:  Great, great.  All right.  Anything

15   else before we adjourn for the evening?

16             MR. LINDER:  Should we anticipate -- is the jury

17   coming back at 9:30?

18             THE COURT:  Yes.

19             MR. LINDER:  Should we anticipate coming back at

20   9:00 to maybe discuss these issues?

21             THE COURT:  Do we have anything tomorrow?

22             THE CLERK:  Yes, we have a bond hearing.

23             MR. LINDER:  Maybe 9:15.

24             THE COURT:  9:00 is fine.  I've got a bond

25   hearing, so 9:00.  I think I'll be done with my 8:30 by

1       9:00, so we should be ready to go.  Okay?

2               All right.  Thanks, everybody.  Have a nice

3       evening.

4          (Proceedings concluded.)

5

6                       *      *      *      *      *

7

8                            **CERTIFICATE**

9

10              I, MARIA V. WEINBECK, RMR, FCRR, certify that the

11      foregoing is a true and accurate transcript of my

12      stenographic notes, and is a full, true, and complete

13      transcript from the afternoon session proceedings produced

14      to the best of my ability.

15

16                  Certified by:  *s/ Maria V. Weinbeck*
                              Maria V. Weinbeck, RMR-FCRR
17

18

19

20

21

22

23

24

25